# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

|                                              |     |                         |
|----------------------------------------------|-----|-------------------------|
| **SARAHJANE BLUM; RYAN SHAPIRO;**            | )   |                         |
| **LANA LEHR; LAUREN GAZZOLA;**               | )   |                         |
| **and IVER ROBERT JOHNSON III,**             | )   |                         |
|                                              | )   |                         |
| **Plaintiffs,**                             | )   |                         |
|                                              | )   |                         |
| **v.**                                      | )   | **Civil Action No.:_____** |
|                                              | )   |                         |
| **ERIC HOLDER, in his official capacity as** | )   |                         |
| **Attorney General of the United States**    | )   |                         |
| **of America,**                             | )   |                         |
|                                              | )   |                         |
| **Defendant.**                              | )   |                         |

_____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.  This action is brought by five individuals committed to changing public opinion and corporate policies regarding animal mistreatment and cruelty.  They challenge the Animal Enterprise Terrorism Act ("AETA"),18 U.S.C. § 43 (2006), under the First and Fifth Amendments to the United States Constitution, for unconstitutionally restricting their ability to speak on these matters of public concern.

2.  The AETA classifies certain protected speech and activity as a "terrorist" crime.  It punishes individuals who alone, or with others, criticize or demonstrate against what the statute vaguely identifies as an "animal enterprise," if that otherwise permissible speech damages the property or profitability of the animal enterprise or even a person or entity connected with it.

3.  Specifically, the AETA creates the terrorist offense of traveling in interstate or foreign commerce, or using the mail or any other facility of interstate commerce, "for the

purpose of damaging or interfering with the operations of an animal enterprise," when in connection with such purpose, an individual (A) intentionally damages or causes the loss of any real or personal property used by an animal enterprise, or by a person or entity with a connection to an animal enterprise; (B) intentionally places a person in reasonable fear of death or serious bodily injury through a course of conduct involving threats, vandalism, property damage, criminal trespass, harassment or intimidation; or (C)  conspires to do so.

4.    The AETA fails to define key terms, but its plain language criminalizes core political advocacy and speech that are protected by the First Amendment.   For example, it punishes otherwise lawful and innocuous speech or advocacy that causes a business that uses or sells animal products to lose profit, even where that lost profit comes from a decrease in sales in reaction to public advocacy.   Thus, AETA effectively criminalizes the very purpose of the First Amendment – changing people's minds.   It would also criminalize individuals who plan a peaceful protest, if an entity undertakes the routine business decision hire a security guard.

5.    The law is also uncommonly broad, insofar as it defines an "animal enterprise" to include almost any business that buys or sells animal products.   As such, it insulates a large number of businesses from the types of criticism that are deeply rooted in our constitutional tradition.   For example, labor picketers, who seek to affect the bottom line of an employer engaged in unfair labor practices (that happens to sell animal products) are subject to prosecution under the act if their peaceful, lawful picket "causes the loss of any…personal property," including profits.

6.    While all kinds of activists and protestors may be chilled from undertaking constitutionally protected activity as a result of this overbroad statute, the specific target of the AETA is clear: animal rights activists whose demonstrations have caused large

businesses to lose profits.  Previous prosecutions under the AETA and its precursor statute, the Animal Enterprise Protection Act (the AEPA), along with the AETA's legislative history, support this interpretation.

7.   By targeting lawful speech and advocacy, the AETA has cast a chill over the animal rights community, leading many advocates to censor themselves and refrain from protected speech.

8.   Plaintiffs Sarahjane Blum, Ryan Shapiro, Lana Lehr, Lauren Gazzola and J Johnson, are animal rights activists with long histories of lawful protest and non-violent civil disobedience.  Each has chosen to refrain from engaging in First-Amendment-protected conduct because they fear prosecution under the AETA.

9.   Plaintiffs currently want to engage in lawful animal rights activism, like attending public protests, or investigating and publicizing conditions and mistreatment of animals on factory farms – all of which are protected activity under the First Amendment – in order to educate fellow citizens about the harms and abuses associated with large-scale factory farming and to urge businesses to discontinue inhumane farming practices.  But, they are chilled from this lawful and socially useful advocacy based on their reasonable fear that such activities will subject them to prosecution and imprisonment as terrorists under the AETA.

10. The AETA is unconstitutional for several independent reasons: (1) it is overbroad because it sweeps within its ambit core First-Amendment-protected speech; (2) it is vague because many of its terms leave citizens uninformed as to whether they will run afoul of the law's prohibitions; and (3) it discriminates on the basis of the content and viewpoint of particular speech and expressive conduct.  Plaintiffs seek a declaration that the AETA is

unlawful and an injunction striking down the AETA on its face, and as applied to them, as a violation of the First and Fifth Amendments to the United States Constitution.

## JURIDICTION AND VENUE

11.  This action arises under the United States Constitution and the Animal Enterprise Terrorism Act.  The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

12. The Court may grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

13. Venue lies in the District of Massachusetts, in which Plaintiff Ryan Shapiro resides, and some relevant events have occurred, pursuant to 28 U.S.C. § 1391(e)(1).

## PARTIES

**<u>Plaintiffs</u>**

14. Plaintiff SARAHJANE BLUM has been an animal rights activist for 23 years.  Prior to the passage of the Animal Enterprise Terrorism Act, she played a prominent role in several successful animal rights campaigns, including co-founding GourmetCruelty.com in 2003, a coalition dedicated to exposing cruelty in the foie gras industry.  With GourmetCruelty.com, Ms. Blum and others engaged in investigation of conditions at the Hudson Valley Foie Gras farm, and created a short documentary film regarding their findings.  Her work, and that of the coalition, led to the 2004 passage in California of a law banning foie gras farming within the State.  Ms. Blum, a small business owner, currently lives in Minneapolis, Minnesota.  She remains active in the animal rights movement, but is chilled from continuing, publicizing, or discussing her prior work out of fear of prosecution as an animal enterprise terrorist.

15. Plaintiff RYAN SHAPIRO has also been an animal rights activist for roughly two decades.  Over this time, Mr. Shapiro combined protests, civil disobedience, and public education to draw attention to issues like animal experimentation, the fur industry, cetacean captivity and slaughter and factory farming.  In the late 1990s, as an undergraduate student at Tisch School of the Arts at New York University, Mr. Shapiro co-founded and coordinated the work of the New York City Animal Defense League and Students for Education and Animal Liberation.  After earning a film degree in 1998, Mr. Shapiro engaged in activism full-time, eventually co-founding GourmetCruelty.com with Ms. Blum.  Mr. Shapiro focused closely on efficacy – analyzing various tactics to determine what works to shape public opinion and achieve results, and what does not.  Prior to the passage of the Animal Enterprise Terrorism Act, Mr. Shapiro came to believe that the investigation and dissemination of information about conditions and treatment of animals on factory farms was the single most effective way to sway public opinion.  The AETA has chilled Mr. Shapiro's ability to do this work.  Mr. Shapiro now lives in Cambridge, Massachusetts, where he is working toward a Ph.D. tracing the marginalization of animal protectionists from the late 19th century to the present.  Although he is still a devoted animal rights activist, the AETA has chilled Mr. Shapiro's ability to investigate and document animal cruelty in a manner that he believes most effective.

16. Plaintiff LANA LEHR is a dedicated animal rights activist, and the co-founder and Managing Director of RabbitWise, an all-volunteer, 501(c)(3) public charity devoted to preventing the irresponsible acquisition and care of companion rabbits, improving retention rates of rabbits already living in homes, educating people who live with or treat rabbits to give them the best possible care, and advocating for the broader welfare of rabbits in general.

Ms. Lehr resides in Bethesda, Maryland.  She has no criminal record and is unwilling to risk arrest, as it might jeopardize her career as a licensed psychotherapist.  In the mid-2000s, prior to passage of the AETA, Ms. Lehr used to supplement her RabbitWise advocacy with organizing and attending lawful, public anti-fur protests.  Given the broad language of the AETA, Ms. Lehr now fears that attendance at otherwise lawful anti-fur protests that succeed in affecting the profits of fur vendors might violate the AETA.  For this reason, she has ceased attending any public protests.  Ms. Lehr wants to continue to protest to supplement her rabbit advocacy, but the possibility of prosecution under the AETA chills her ability to do so.

17. Plaintiff LAUREN GAZZOLA is a long-time animal rights activist who was prosecuted in 2006 under the Animal Enterprise Protection Act, the precursor to the AETA. The prosecution arose from Ms. Gazzola's involvement with Stop Huntington Animal Cruelty (SHAC), a grassroots coalition of activists devoted to ending animal abuse at Huntington Life Sciences, a research corporation that performs tests on animals.  Based primarily on her involvement in a website that advocated for and reported on legal and illegal protests against Huntington Life Sciences, Ms. Gazzola was found guilty and sentenced to 52 months incarceration.  She is now on probation and staying in Brooklyn, New York.  She is a Connecticut resident, but has received permission from her probation officer to travel to New York City for a temporary job.  Ms. Gazzola would like to lawfully continue her animal rights campaign work, but is chilled from engaging in First-Amendment-protected advocacy, particularly that directed at a specific business or industry, out of fear of prosecution under the AETA.

18. Plaintiff IVER ROBERT JOHNSON III, has been engaged in animal rights activism since high school.  After graduating from high school in Chicago in 2001, Mr. Johnson devoted much of the next decade to organizing the lawful and peaceful activities of the Chicago-area SHAC campaign.  Mr. Johnson's activism primarily involved organizing lawful, First-Amendment-protected protests at the homes and offices of individuals employed by businesses that associated with Huntington Life Sciences and educating the public on animal abuse carried out in Huntington's labs.  Mr. Johnson is currently enrolled at the New School in New York City and resides in Brooklyn, New York.  Mr. Johnson would like to engage in lawful animal rights protest and advocacy, but has been unable to find functioning activist groups to work with, as many in the community have been chilled or silenced by the passage of the AETA.

**Defendant**

19. Defendant ERIC HOLDER is sued in his official capacity as the Attorney General of the United States.  He is responsible for prosecuting violations of the AETA.

STATUTORY FRAMEWORK

20. Signed into law on November 27, 2006, the AETA amended the Animal Enterprise Protection Act, Pub. L. No. 102-346, 106 Stat. 928 (codified at 18 U.S.C. § 43 (1992)).

**The Animal Enterprise Protection Act of 1992**

21. Passed in 1992, the AEPA outlawed travel or use of interstate commerce "for the purpose of causing physical disruption to the functioning of an animal enterprise," and "intentionally caus[ing] physical disruption to the functioning of an animal enterprise by intentionally stealing, damaging, or causing the loss of, any property (including animals or

7

records) used by the animal enterprise, and thereby caus[ing] economic damage exceeding

$10,000 to that enterprise, or conspir[ing] to do so." 18 U.S.C. § 43(a) (1992).

22. The offense created by 18 U.S.C. § 43(a), called "Animal Enterprise Terrorism," was

punishable by a fine, or up to a year of imprisonment.  An aggravated offense under the

statute, defined as a violation of the act that causes serious bodily injury or death, was

punishable by fines, and up to a ten-year or life sentence, respectively. *Id.* at § 43(b) (1992).

23.  Under the AEPA, an "animal enterprise" was defined as "(A) a commercial or

academic enterprise that uses animals for food or fiber production, agriculture, research, or

testing; (B) a zoo, aquarium, circus, rodeo, or lawful competitive animal event; or (C) any

fair or similar event intended to advance agricultural arts and sciences."  *Id.* at § 43

(d)(1)(1992).

24. "Physical disruption" had no positive definition in the statute, but rather the AEPA

excluded from the term "lawful disruption that results from the lawful public, governmental,

or animal enterprise employee reaction to the disclosure of information about an animal

enterprise." *Id.* at § 43(d)(2)(1992).

25. "Economic damage" was defined as "the replacement costs of lost or damaged

property or records, the costs of repeating an interrupted or invalidated experiment, or the

loss of profits."  *Id.* at § 43(d)(3)(1992).

26. The AEPA also required the Attorney General and Secretary of Agriculture to

conduct a joint study on "the extent and effects of domestic and international terrorism on

enterprises using animals," no less than a year after enactment.

27. According to the resulting study, the AEPA was passed in response to concern about

the "expanding use of violence" *and* "disruptive expressions of extremism on behalf of

animal rights." *Report to Congress on the Extent and Effects of Domestic and International Terrorism on Animal Enterprises* (hereafter "Congressional Study") at 1, Dept. of Justice (1993). Under this rubric, the study summarizes the one attempted act of violence attributed to an animal rights activist within the United States since 1977, along with numerous acts of property damage. *Id.* at 8-25. Also noted, though not summarized, were the existence of many demonstrations, sit-ins, and other protests. *Id.* at 15.

28. The Congressional Study explores changing philosophies within the animal welfare and animal rights movements, touching on mainstream law-abiding organizations' tacit support for, if not involvement in, underground acts of animal liberation and economic sabotage. *Id.* at 7. Included among the damages to animal enterprises the AEPA is meant to address are increased security costs, as well as the collateral effect of a change in public opinion leading to gradual and permanent loss of animal enterprise clientele. *Id.* at 22.

29. The AEPA was amended in 2002 to allow for prosecution of any physical disruption causing less than $10,000 in economic damage and to raise the permissible terms of imprisonment to up to three years imprisonment for economic damage exceeding $10,000 and up to 20 years imprisonment for serious bodily injury. Pub.L. 107-188, 116 Stat 681, 18 U.S.C. § 43(b)(2002).

**The Animal Enterprise Terrorism Act of 2006**

30. In 2006, the AEPA was substantially amended and renamed the "Animal Enterprise Terrorism Act."

31. The legislative history makes clear that, like the AEPA, the AETA was passed in direct response to the activities of animal rights activists. *See e.g.,* Introduction of the Animal Enterprise Terrorism Act of 2005, Speech of Hon. Tomas E. Petri of Wisconsin, 151

Cong. Rec, E2276-02 (2005) (discussing threats posed by "animal rights extremists");
Statements on Introduced Bills and Joint Resolutions, 152 Cong. Rec. S9254-01 (2006)
(discussing actions by "extremist activists, acting in the name of animal rights"); Animal
Enterprise Terrorism Act, 152 Cong. Rec. H8590-01 (2006) (describing "extremist elements
among the animal rights groups").

32. In amending the AEPA, Congress abandoned the language requiring that a violator
have both the purpose and effect of "caus[ing] a *physical disruption*" to an animal enterprise.
Instead, the AETA disallows travel or use of interstate commerce "for the purpose of
*damaging* or *interfering* with the operations of an animal enterprise" when, in connection
with that purpose, an individual acts in one of three ways, described below.  18 U.S.C. §
43(a)(1) (emphasis added).

33. Neither "damaging" nor "interfering with" is defined in the statute.

34. Without definition, these terms are so vague as to fail to provide the notice due
process demands so that citizens may shape their behavior in compliance with legal norms.
Moreover, the undefined terms are so broad as to criminalize a substantial amount of First-
Amendment-protected activity, like protesting, picketing, dissemination of information and
other advocacy intended to affect a business that uses or sells animals.

35. In connection with this broad purpose, the first prong of the AETA allows for
prosecution of one who "intentionally damages or causes the loss of any real or personal
property (including animals or records) used by an animal enterprise." 18 U.S.C. §
43(a)(2)(A).   Neither "damages," nor "causes the loss" is defined in the AETA.  *Id.* at §
43(d).  The phrase "economic damage" *is* defined latter in the statute, but that phrase appears
only in the penalty section.  Thus "economic damage," as it relates to penalties, must be

interpreted as a subset of the broader terms, "damage" and "loss," that are elements of the offense of animal enterprise terrorism.  For this reason, the definition of "economic damage" does nothing to limit the broad and problematic applicability of (a)(2)(A).

36. Black's Law Dictionary defines personal property as "[a]ny movable or intangible thing that is subject to ownership and not classified as real property."  Black's Law Dictionary 988 (7th ed., abr. 2000).  Consistent with this definition, "causing the loss of property" as outlawed in the AEPA was interpreted by the United States in the SHAC 7 case to include lost profits.[1]  Thus common use, and comparison with the definition of "economic damages" in the penalties section, indicate that the AETA prohibition against damaging or causing the loss of real or personal property includes actions that cause loss of profit and increased security costs.

37. Without definition, these terms are unconstitutionally vague and so broad as to criminalize a huge amount of protected First Amendment activity.

38. A labor picket that leads would-be customers to avoid shopping at a store that sells meat products, for example, could easily "cause[] the loss of personal property," i.e., business profits, and is undertaken for just this "purpose."  So too could a lawful investigation that causes diners to cease ordering foie gras, or an anti-fur protest that causes a fur store to hire extra security guards.

39. Congressmen Steve Israel raised just such concerns in the House of Representatives. *See* 152 Cong. Rec. E2100-01 (2006) ("This bill criminalizes conduct that 'intentionally

---

[1] *Fullmer v. United States,* 584 F.3d 132, 159 (3d Cir. 2009); *see also Gully v. Southwestern Bell Tel. Co.,* 774 F.2d 1287, 1295 n.20 (5th Cir. 1985) (damages to property includes lost profits and business goodwill); *Radiation Sterilizers v. United States*, 867 F. Supp. 1465, 1471-72 (E.D. Wash. 1994) (property damage includes damage to intangible property, including lost profits and business goodwill).

damages or causes the loss of any real or personal property,' however, the bill fails to define what 'real or personal property' means. As a result, legitimate advocacy - such as a boycott, protest, or mail campaign - that causes an animal enterprise to merely lose profits could be criminalized.")

40. The second prong of the AETA creates the new offense of "intentionally plac[ing] a person in reasonable fear of the death of, or serious bodily injury to that person, a member of the immediate family … of that person, or a spouse or intimate partner of that person by a course of conduct involving threats, acts of vandalism, property damage, criminal trespass, harassment, or intimidation." *Id.* at § 43(a)(2)(B).   "[C]ourse of conduct" is defined by the statute as a "pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose." *Id.* at § 43(d)(2).

41. The phrase "course of conduct," as defined, is so vague as to fail to provide adequate notice or guide law enforcement discretion.  Most problematically, there is no set time frame specified; it is not clear if an actionable course of conduct could include disparate acts across years, or even decades.  The requirement of "continuity of purpose" adds to this uncertainty, as an animal rights activist's larger political purpose would presumably tie together otherwise attenuated acts of protest.  Conversely, it is not clear if attendance at one protest, involving, for example, multiple chants, or multiple actors, could comprise a "course of conduct."

42. Finally, the third prong of the statute prohibits conspiring or attempting "to do so." *Id.* at § 43(a)(2)(C).  Strangely, on its face this subsection cannot be read to penalize a conspiracy or attempt to commit the conduct outlined in subsection (a)(2)(A) or (a)(2)(B), but rather seems to criminalize, with nothing more, a conspiracy or attempt to travel or use

interstate commerce for the purpose of damaging or interfering with the operations of an animal enterprise.

43. The AETA's penalty section also includes substantial changes from the AEPA. Under 18 U.S.C § 43(b), a violation, attempt, or conspiracy to violate the Animal Enterprise Terrorism Act shall be punished by:

(1) a fine and/or imprisonment not more than one year, if the offense does not instill in another reasonable fear of serious bodily injury and (A) the offense results in no economic damage or bodily injury; or (B) the offence results in economic damage that does not exceed $10,000;

(2) a fine and/or imprisonment not more than 5 years, if no bodily injury occurs and (A) the offense results in economic damage exceeding $10,000 but not exceeding $100,000; or (B) the offense instills in another the reasonable fear of serious bodily injury or death;

(3) a fine and/or imprisonment not more than 10 years, if (A) the offense results in economic damage exceeding $100,000 or (B) the offense results in substantial bodily injury to another individual;

(4) a fine and/or imprisonment for not more than 20 years, if (A) the offense results in serious bodily injury to another individual; or (B) the offense results in economic damage exceeding $1,000,000; and

(5) a fine and/or imprisonment for life or any term of years if the offense results in death of another individual.

44. Section (c) of the statute allows for a restitution order under 18 U.S.C. §§ 3663 or 3663A, to include the reasonable cost of repeating interrupted or invalidated experiments,

loss of food production or farm income, and *any other* economic damage, including "losses or costs caused by economic disruption, resulting from the offense." *Id.* at § 43(c).

45. Section (d) of the AETA defines various terms in the statute.

46. The term "animal enterprise" is defined (similarly to the AEPA) as "(A) a commercial or academic enterprise that uses or sells animals or animal products for profit, food or fiber production, agriculture, education, research, or testing; (B) a zoo, aquarium, animal shelter, pet store, breeder, furrier, circus, or rodeo, or other lawful competitive animal event; or (C) any fair or similar event intended to advance agricultural arts and sciences." *Id.* at § 43(d)(1).

47. This definition is so broad as to include as "animal enterprises" all public and private universities and schools with cafeterias, sports arenas with meat vendors, and grocery and retail stores that sell meat or leather.  Moreover, the AETA also applies to damage to "any real or personal property of a person or entity having a connection to, relationship with, or transactions with an animal enterprise."  *Id.* at § 43(a)(2)(A).  When § 43(d)(1) is combined with § 43(a)(2)(A), there likely is not a business, corporation, organization, or unincorporated association in the country that is not covered by this definition.  And, as many connections between animal enterprises and non-animal enterprises may be confidential or difficult to discern, individuals may find themselves in violation of the statute without fair notice of the statute's applicability.

48. The term "economic damage" is defined by section 43(d)(3)(A) to mean "the replacement costs of lost or damaged property or records, the costs of repeating an interrupted or invalidated experiment, the loss of profits, or increased costs, including losses and increased costs resulting from threats, acts or vandalism, property damage, trespass,

harassment, or intimidation taken against a person or entity on account of that person's or entity's connection to, relationship with, or transactions with the animal enterprise." Under (d)(3)(B), the definition excludes any "lawful economic disruption (including a lawful boycott) that results from lawful public, governmental, or business reaction to the disclosure of information about an animal enterprise."

49. This definition fails to protect First Amendment activity leading to lawful economic loss. Even though it excludes lawful disruptions that result from disclosure of information, it would include, for example, increased security costs related to animal rights protests. It also includes *unlawful* third party reaction that may be caused by a protestor or advocate's lawful disclosure of information or other advocacy efforts.

50. Finally, section (e) of the AETA sets forth the rules of construction, stating that "nothing in this section shall be construed (1) to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the Constitution; (2) to create new remedies for interference with activities protected by the free speech or free exercise clauses of the First Amendment to the Constitution, regardless of the point of view expressed, or to limit any existing legal remedies for such interference; or (3) to provide exclusive criminal penalties or civil remedies with respect to the conduct prohibited by this action, or to preempt State or local laws that may provide such penalties or remedies." *Id.* at § 43(e).

51. The question of what activity is or is not "protected from legal prohibition by the First Amendment" is hardly obvious to the legal profession, much less the public, but rather is frequently the subject of protracted legal debate and litigation. As such, this savings clause does nothing to assuage the chill felt by legitimate and law-abiding animal rights activists

who worry their successful campaigns may cause an animal enterprise to lose profit or hire additional security, and thus expose them to terrorism charges.

52. Indeed, the savings clause is effectively meaningless because no federal statute could "prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the Constitution." Plaintiffs should not be forced to test the breadth of the savings clause and the First Amendment by risking substantial prison terms in the event that their expressive conduct is deemed a violation of the AETA.

## HISTORY OF AEPA AND AETA PROSECUTIONS

53. There have been only a handful of AEPA and AETA prosecutions since the AEPA was first passed in 1992.  Some of these prosecutions demonstrate the breadth of the law and likelihood of a First Amendment chill.  Others, though not focused on speech or expressive conduct, demonstrate the disproportionality of punishing otherwise minor state crimes, including trespass, criminal mischief, and burglary, as acts of terrorism.

### The SHAC 7

54. On May 26, 2004 seven activists and the not-for-profit corporation Stop Huntington Animal Cruelty USA ("SHAC"), were indicted in New Jersey District Court for conspiracy to use a facility in interstate and foreign commerce for the purpose of causing physical disruption to the functioning of Huntington Life Sciences, an animal enterprise, and for intentionally damaging and causing the loss of property used by Huntington in an amount exceeding $10,000.

55. The SHAC movement arose in the United States after undercover investigators released video of egregious animal abuse inside Huntington labs, including beagle puppies

being punched repeatedly in the face.  The resulting divestment campaign sought to apply economic pressure on Huntington by convincing corporations and individuals who did business with Huntington to sever ties with the corporation.  In the course of the SHAC campaign, animal rights activists undertook myriad legal and illegal actions, ranging from peaceful public protests to personal threats and property destruction.

56. The "SHAC 7"—Darius Fullmer, Andrew Stepanian, Kevin Kjonaas, Joshua Harper, Plaintiff Lauren Gazzola, and Jacob Conroy—were convicted in March of 2006 and sentenced to between one and six years in prison.  None of the SHAC 7 were shown (or even alleged) to have personally engaged in property destruction.  Rather, the convictions rested on the defendants' advocacy and involvement in running a website which reported on both lawful and unlawful actions in the campaign against Huntington Life Sciences.

57. On appeal, the Third Circuit Court of Appeals explained that, while much of the political speech on the SHAC website was otherwise protected by the First Amendment, "in context, the speeches, protests, and web postings, were all tools to further their effort [to pressure businesses and individuals to divest in Huntington]" and thus violated the Animal Enterprise Protection Act.  *United States v. Fullmer,* 584 F.3d 132, 156 (3d Cir. 2009).

58. In assessing the damage to property caused by the SHAC 7's advocacy, the United States included profit loss caused when third parties flooded Huntington Life Sciences with email after SHAC posted a link to an electronic civil disobedience campaign organized overseas.  They were also charged for the cost of HLS's purchase of sophisticated computer firewall technology.

**The AETA 4**

59. The first indictments under the AETA were issued in February of 2009 against four young animal rights activists: Joseph Buddenberg, Maryam Khajavi, Nathan Pope, and Adriana Stumpo.  Known as the "AETA 4," the activists were each charged with one count of conspiracy under 18 U.S.C. § 371, and one count of animal enterprise terrorism under 18 U.S.C. § 43.

60. According to the criminal complaint, the AETA 4 took part in a series of demonstrations at the homes of several University of California at Berkeley professors who engaged in experimentation on animals.  The 4 allegedly trespassed onto the professors' lawns and chanted slogans including "1, 2, 3, 4, open up the cage door; 5, 6, 7, 8, smash the locks and liberate; 9, 10, 11, 12, vivisectors go to hell," "you're a murderer," and "what goes around comes around, burn UC Berkeley vivisection to the ground."  These protests allegedly placed the professors in fear for their health and physical safety.  The complaint also alleged that three of the four defendants either created or distributed a flyer listing the professors' home addresses, identifying them as bio-medical researchers, and stating "animal abusers everywhere beware we know where you live we know where you work we will never back down until you end your abuse."

61. After a year of pre-trial motions and discovery, the indictments were dismissed by United States District Judge Ronald M. Whyte.  *See United States v. Buddenberg,* No. CR-09-00263, 2010 U.S. Dist. LEXIS 78201 (N.D. Ca. July 12, 2010).  The Court found that the indictments, which parroted the language of the criminal statute, did not provide adequate facts identifying what each defendant was alleged to have done to violate the law.  The

Court emphasized both the "breadth of … the statue" and its potential for implicating First Amendment interests.  *Id.* at \*24-27.

62. Though the indictments were dismissed without prejudice, the AETA 4 have not been re-indicted.

**William Viehl and Alex Hall**

63. In March 2009, William Viehl and Alex Hall were indicted in Utah on two counts of violating the AETA.  The two faced six years in prison for releasing hundreds of mink at the McMullin mink farm, and for spray painting slogans including "No More Mink, No More Murder" and "ALF: We are Watching."

64. They pleaded guilty to "Animal Enterprise Terrorism," and were sentenced to 21 and 24 months in prison, respectively.

**Scott Demuth**

65. In November of 2009 Scott Demuth was charged with one count of violating 18 U.S.C. § 43(a) and (b)(2).  The indictment came immediately after Mr. Demuth was jailed for refusing to testify before a grand jury regarding a break-in at a University of Iowa lab.

66. A second superseding indictment filed in April of 2010 charged Demuth with disruption and property damage at a University of Iowa lab, and at a ferret farm in Minnesota.  Demuth ultimately pleaded guilty to one count of misdemeanor Conspiracy to commit Animal Enterprise Terrorism, related only to the release of animals and some vandalism at the ferret farm, and was sentenced to six months in prison.

## IMPACT OF THE AETA ON PLAINTIFFS

**Sarahjane Blum**

67. Ms. Blum is a published author, successful small business owner, and a dedicated animal rights activist.  Since 2005, she has resided in Minneapolis, Minnesota, with her husband.

68. Ms. Blum's devotion to animal rights issues began early.  She became a vegetarian at age 11, and a vegan upon graduation from high school. After attending one year of college, Ms. Blum left school so that she could dedicate herself full-time to animal rights advocacy.

69. Ms. Blum's early animal rights work brought her to New York City, where she worked with the New York City Animal Defense League on an anti-fur campaign.  The campaign primarily centered upon lawful public demonstrations and non-violent civil disobedience at stores that sold fur.

70. During this time Ms. Blum also led trainings on non-violence and animal rights advocacy, and attended grassroots conferences and animal rights gatherings across the country.

71. In 2000, after two years of living in New York, Ms. Blum moved to Hawaii to continue her animal rights work.  There, Ms. Blum and plaintiff Ryan Shapiro organized a successful campaign in Maui County to educate the public on the effects of captivity on dolphins and other cetaceans.  After gathering ten thousand signatures and lobbying the city council, the two were successful in pushing a legislative ban that halted construction of a captive dolphin facility at a local mall.

72. During this time period, Ms. Blum and Mr. Shapiro also became involved in an anti-whaling campaign, traveling to Washington State to engage in non-violent disruption of the Makah Indian whaling hunts.

73. Ms. Blum continued to supplement her advocacy work with a significant amount of public speaking at conferences and animal rights gatherings.

74. In 2001, Ms. Blum returned to New York City to complete her undergraduate degree. From there, she moved to Washington, D.C. to enroll in a doctoral program in history while continuing her political advocacy and speech on behalf of animals.

75. In 2003, Ms. Blum co-founded GourmetCruelty.com, a grassroots coalition dedicated to exposing the cruelty of the foie gras industry.  Considered a delicacy by some, foie gras—French for fatty liver—is the grossly enlarged liver of a duck or goose.  Birds raised for foie gras are force-fed enormous quantities of food through a long metal pipe three times a day. This process of deliberate and painful overfeeding continues for up to a month, by which time the birds' livers have swelled up to twelve times their healthy size.  The pre-slaughter mortality rate for foie gras production is around 10 - 12 times the average rate on other duck factory farms.

76. At the time GourmetCruelty.com was founded, only two known companies produced all of the domestically raised foie gras in the United States: New York State's Hudson Valley Foie Gras and California's Sonoma Foie Gras.

77. Over the course of many months, Ms. Blum worked with GourmetCruelty.com to conduct a nationwide investigation into the domestic foie gras industry, uncovering filthy, crowded conditions and significant animal abuse and neglect. GourmetCruelty.com discovered and documented corpses of ducks who had literally burst open through

overfeeding. Investigators also found many birds who had choked to death on their own vomit. Necropsies performed by veterinarians on dead ducks taken from Hudson Valley Foie Gras determined that some of the birds had died of aspiration pneumonia—a painful and often fatal condition caused when, during the process of force-feeding, food is pushed into the lungs of the birds.

78. Ms. Blum visited the Hudson Valley farm many times over the course of the year to document these conditions.  Some of these visits occurred during the day, while the farm was open.  Ms. Blum saw no "No Trespassing" signs during these visits, and the birds Ms. Blum observed were not held behind locked doors.  Other visits occurred at night.

79. As a culmination of the undercover investigation, Ms. Blum, Plaintiff Shapiro, and other organizers openly rescued and rehabilitated a number of ducks from the farm.  They released a short documentary film, *Delicacy of Despair*, *Behind the Closed Doors of the Foie Gras Industry*, documenting and acknowledging their illegal rescue of the ducks, and educating the public regarding the cruelty they had uncovered in the investigation.

80. The documentary and open rescue generated significant media attention, including an extended investigation by a local ABC news affiliate, articles in the Los Angeles Times, the New York Times, Time magazine, and Metroland, and a television special on Animal Planet. The film was also instrumental in the passage, later that year, of a California State law banning all foie gras production within the State, slated to take effect in 2012.

81. Ms. Blum openly acknowledged her role in the undercover investigation and is featured on the film rescuing ducks.  She was arrested in connection with this action in 2004, after a screening and discussion of the film at Syracuse University.  She pleaded guilty to misdemeanor trespass and was sentenced to fifty hours of community service.

82. Shortly thereafter the animal rights community was stunned by the arrests and indictment of the SHAC 7. *See supra,* ¶¶ 54-58. Ms. Blum is good friends with many of the SHAC defendants; she worked closely with Plaintiff Lauren Gazzola and Andrew Stepanian in New York City when organizing with the New York City Animal Defense League, and she lived with Jacob Conroy and Joshua Harper in Washington State while working on the campaign against Makah whale hunting. Ms. Blum was devastated by the arrest and prosecution of her friends as terrorists, and shocked by their resulting prison sentences.

83. When the AEPA was amended in 2006 to become the Animal Enterprise Terrorism Act, Ms. Blum's fear and dismay were heightened all the more. While she had knowingly and openly violated the law many times through acts of non-violent civil disobedience, she was unwilling to face the possibility of prosecution and sentencing as a terrorist. She was stunned that the ethical, important work that she had devoted her life to had been turned overnight into terrorism.

84. Over the next several years, Ms. Blum curtailed her animal rights activism significantly. Her withdrawal from the movement was partially in response to her depression over her friends' convictions and her own fear of prosecution as a terrorist, but was also personal in nature. Her mother became seriously ill, and Ms. Blum returned to New York to become her mother's primary caregiver. With the significant responsibility posed by caring for a very ill family member, she could not risk any activism that might result in her arrest.

85. After a few years away from the animal rights movement, Ms. Blum decided to return to the issue, as it is the political work she feels most strongly about. However, her current involvement is severely limited by her unwillingness to engage in any activity, even

that which should be protected by the First Amendment, that risks prosecution under the AETA.

86. Recently, Ms. Blum was approached by members of a grassroots animal rights group, the Minneapolis Animal Rights Collective, for advice on organizing a local anti-foie gras campaign, Forego Foie Gras.  Since the California ban, Minnesota has emerged as a notable source of domestic foie gras.  Ms. Blum has significant expertise on this issue, and wants to advise and work with the collective to raise public awareness of foie gras, toward the goal of banning its production in Minnesota.

87. However, Ms. Blum is chilled in this work by fear of terrorism charges under the AETA.  Based on her experience with GourmetCruelty.com and with the production of *Delicacy of Despair*, Ms. Blum believes that the investigation, documentation, and distribution of information about treatment and conditions of ducks and geese on foie gras farms is the most effective means to raise public awareness against foie gras.  Ms. Blum wants to investigate the treatment of animals at the Au Bon Canard farm in Minnesota.  She wants to do this lawfully, by seeking permission to enter the farm for the purpose of documenting conditions, by entering the farm during the day, while it is open to tours, or by documenting conditions on the farm visible from public property.  Upon reviewing conditions at the farm, Ms. Blum would like to publicize the results of her investigation through local and national events and on the internet.   She would also like to organize a letter-writing or protest campaign explaining how foie gras is made, so as to pressure local restaurants to stop serving the product.

88. Ms. Blum would like to speak publicly about investigation and documentation of farm conditions as an important tactic, and in connection with this advocacy, she would like

to screen *Delicacy of Despair* for activist groups and the general public.  When asked about the tactics of undercover investigation and open rescue, she would like to answer with her honest assessment: that though these techniques can be unlawful in certain circumstances, they are extremely effective and useful tools in the fight against animal abuse.

89. The advocacy Ms. Blum would like to undertake is protected by the First Amendment, and as core political speech it is deserving of the utmost protection. Yet, it is also criminalized by the AETA as an act of terrorism, punishable by significant prison time and fines.

90. Ms. Blum is unwilling to break the law, and thus is chilled in her advocacy.

91. In the summer of 2010, Ms. Blum was invited to Seattle to speak at an Animal Rights conference.  She wanted to screen *Delicacy of Despair* but did not, because she was worried that, if the film and her remarks succeeded in educating people about the reality of foie gras (as it did in 2004), people might cease to purchase it, and urge others to do the same, thus "caus[ing] the loss of … personal property" to the few United States farms that produce foie gras, for the purpose of damaging their operations.  *See* 18 USC § 43(a)(2)(A).

92. At the Seattle event, many in the audience asked Ms. Blum for advice about what they could do to advance animal rights.  She wanted to tell them to spread the truth—to report to the public what happens on foie gras farms—but she worried that even this advice might subject her, or others, to prosecution.  Her fear about saying the wrong thing left her tongue-tied and unable to speak as effectively as she has in the past.

93. In fall of 2011, Ms. Blum was invited to write a letter to the editor responding to an Atlantic article about foie gras.  Ms. Blum wrote the letter, focusing on her investigation on foie gras farms and the abuse she saw there.  Though she wanted to, she did not disclose in

her letter that her investigation had focused specifically on Hudson Valley Foie Gras, the farm mentioned in the original article, as she was afraid that any resultant harm to the profits of that farm could be prosecuted under the AETA.

94. Indeed, Ms. Blum is frequently invited to speak and advocate across the country, and continues to feel chilled from showing *Delicacy of Despair*, or discussing undercover investigation or open rescue. She feels ineffective as an advocate and organizer. Though she would like to show the film to larger audiences across the country she has only been willing to screen the documentary at very small local gatherings of trusted friends.

95. It is clear to Ms. Blum that Forego Foie Gras needs to document current conditions at Au Bon Canard Farm. As a seasoned investigator, Ms. Blum is best situated to gain this information. But because of her fear of AETA prosecution, Ms. Blum has not entered the Au Bon Canard Farm when it is open for business, nor has she attempted to tour the farm without disclosing her identity. Rather, in the summer of 2011, she sent a letter to the owner of Au Bon Canard Farm requesting a tour of the premises. Ms. Blum explained in the letter that she had been involved in a prior investigation at Hudson Valley Foie Gras, and wanted to verify for herself Au Bon Canard's claims that its animals were cared for differently than at other foie gras farms. After months of not receiving a response to her letter, Ms. Blum called the owner of Au Bon Canard directly, requesting a tour. The owner responded that he would consider it, in the Spring. Due to the risk of AETA prosecution, Ms. Blum fears attempting to lawfully visit Au Bon Canard without explicit prior permission.

96. Ms. Blum would like to uncover and expose conditions on the farm, and would like to educate the public in Minneapolis about the treatment of birds on *all* foie gras farms, but

fears that talking and writing about Au Bon Canard and the foie gras industry in general in the wrong way would subject her to prosecution.

97. Ms. Blum's fears about prosecution under the AETA are reasonable, and based on the plain language of the law. Under 18 U.S.C. § 43(a)(2)(A), crossing state lines or using the internet to purposefully cause a foie gras farm to lose profit is a terrorist offense. Even if this profit loss does not qualify as "economic damage" under (d)(3)(B) because it is based on lawful public response to the disclosure of information, the offense is still punishable by fines and a year in prison as a convicted terrorist. And if her advocacy caused the owner of Au Bon Canard to spend money on increased security, or inspired others to act illegally against the farm, causing greater economic damage, the penalties could increase.

98. Indeed, the FBI has explicitly endorsed prosecution of undercover investigation and open rescue as animal enterprise terrorism. An FBI memo uncovered through a Freedom of Information Act request by Plaintiff Ryan Shapiro in the course of his academic research describes illegal entry onto a farm, videotaping the condition of animals there, and taking animals, all as violations of the Animal Enterprise Terrorism Act. A true and correct copy of this memo, redacted to avoid disclosure of identifying information, is attached hereto as Exhibit A.

**Ryan Shapiro**

99. Ryan Shapiro is a Ph.D. candidate at the Massachusetts Institute of Technology (MIT), a vegan and a committed educator on animal rights issues. Since 2006, he has resided in Cambridge, Massachusetts.

100.        Mr. Shapiro became a vegetarian in middle school, at the age of 13. He was instrumental in persuading his brother to become a vegetarian as well, and both later became

vegans.  Mr. Shapiro's early activism focused on vegetarian outreach and anti-factory farming issues through his high school's Animal Rights Club.

101.     Mr. Shapiro attended Tisch School of the Arts at New York University from 1994 through 1998 and graduated with a BFA in film.  There, he established himself as a leader in the grassroots animal rights movement.  He began coordinating an anti-fur campaign in 1995, and a few years later he co-founded the New York City Animal Defense League (NYC ADL).  He was also the co-founder of an NYU organization called Students for Education and Animal Liberation, or SEAL.  The group remains active to this day, though under a different name.  Mr. Shapiro coordinated both these groups through 1999.

102.     With NYC ADL and SEAL, Mr. Shapiro helped organize numerous acts of non-violent civil disobedience and lawful protest at fur stores, circuses, labs, and universities. He also engaged in vegan outreach, led civil disobedience trainings, and spoke at grassroots animal rights conferences across the country.  Mr. Shapiro was arrested many times in the course of this work.

103.     In 1999, Mr. Shapiro left New York with Plaintiff Sarahjane Blum and worked with her on campaigns to ban the display of captive cetaceans in Maui County and disrupt the Makah whale hunts in Washington State. *See supra,* ¶¶ 71-72.

104.     He moved to Washington, D.C., in 2001, and the following year he began work on a Master's degree in American History at American University.  During this time period, Mr. Shapiro's activism centered on investigation and public education, specifically related to foie gras production.  As discussed *supra*, Mr. Shapiro, Ms. Blum, and a core group of activists led a bi-coastal movement to ban foie gras.

105.    Mr. Shapiro was arrested in 2004 for his rescue of abused ducks.  Like Ms. Blum, Mr. Shapiro pleaded guilty to misdemeanor trespass, and was sentenced to perform community service.

106.    Mr. Shapiro's work with GourmetCruelty.com represented a turning point in his advocacy, as he became convinced that issues of factory farming demanded the focused attention of animal rights activists, for the simple reason that so many millions of animals each year lived and died on corporate farms.  Though practiced at peaceful civil disobedience and lawful public protest, Mr. Shapiro came to believe that these tactics were ultimately less effective than exposing what actually happens on factory farms.  With his degree in film and experience coordinating the anti-foie gras campaign, Mr. Shapiro felt well-placed to undertake this work.

107.    But even as Mr. Shapiro became convinced of the value of investigation and documentation of animal cruelty as part of public education and outreach efforts, events were unfolding that put those tools effectively out of his reach.  Like the rest of the animal rights community, Mr. Shapiro was stunned and saddened by the SHAC 7 indictments and convictions under the precursor to the AETA.  *See supra,* ¶¶ 54-58.  Mr. Shapiro had worked and lived with Jacob Conroy and Joshua Harper on the Makah anti-whaling campaign, had coordinated New York City Animal Defense League protests and civil disobedience with Plaintiff Lauren Gazzola and Andrew Stepanian, had co-founded SEAL with Darius Fullmer, and was close friends with these and other targeted activists.

108.    Faced with the imprisonment of his friends, and with the passage of the Animal Enterprise Terrorism Act, Mr. Shapiro began to worry that the price for peaceful protest and civil disobedience was one he could not afford to pay.  He felt shaken by the fact

that, if the investigation and open rescue for which he and Ms. Blum were arrested had taken place just a few years later, he would likely have been prosecuted as a terrorist.

109.     Exhibit A underscores the reasonableness of this fear.  In that communication, the FBI named Mr. Shapiro as an individual who "direct[s] activities which disrupt the normal business and cause economic loss to local establishments."

110.     Feeling that aboveground direct action work and undercover investigation were no longer viable, Mr. Shapiro decided to focus on academics.  He eventually moved to Cambridge and enrolled in a Ph.D. program at MIT's Program in History, Anthropology, & Science, Technology and Society.  He threw himself into his dissertation, focusing on national security conflicts over animal protection from the late 19th Century to the present, with a particular emphasis on the marginalization of animal protectionists as threats to national security.  His dissertation topic was the natural result of the pain and distress Mr. Shapiro felt as he watched his closest friends go to jail as terrorists for working to end animal abuse.

111.     Given the AETA's broad reach, Mr. Shapiro feels constrained from doing the kind of animal rights work he believes is necessary to bring about change.  His work with Plaintiff Sarahjane Blum to document the underlying cruelty of the foie gras industry impressed upon him the value of using investigation and documentary footage to complement public protests in support of animal rights issues.   As a film-school graduate, he is especially suited to this kind of work.  He wants to re-engage in the work of lawfully documenting evidence of animal rights abuse, but he does not, out of fear of prosecution under the AETA.   Instead, he restricts himself to engaging in other animal rights activism,

including leafleting, public speaking and campaign work, that he worries is less effective, but does not risk prosecution as a terrorist.

112.     With his fear of prosecution under the AETA limiting him from engaging in the work he believes is most effective, Mr. Shapiro struggles with feeling frustrated and unfulfilled.  Mr. Shapiro is painfully aware that he cannot do the kind of work he did in the past, and the narrow spectrum of activism he can engage in is less effective and does not take advantage of some of his strengths, specifically his background in film.

113.     Mr. Shapiro fears that, under the AETA, lawful protest, peaceful civil disobedience, documentation of animal cruelty and the dissemination of his findings could now be criminalized and result in fines and substantial prison sentences.  He also worries about the effects of being labeled a terrorist in general, and about the potential effects on his academic career in particular.

114.     Mr. Shapiro's concerns derive from the plain language of 18 U.S.C. § 43. Under the law, taking documentary footage of farms, slaughterhouses, or research facilities and disseminating the resulting film through the mail could count as "interfering with the operations of an animal enterprise" under 18 U.S.C. § 43(a)(1).  Traveling cross-country to show any films that result from such investigations could constitute "causing the loss of any real or personal property" if they motivate viewers to engage in open rescue of abused animals or just to cease purchasing meat products.  18 U.S.C. § 43(a)(2)(A).  And organizing protests outside a department store that sells fur coats could be construed as causing property loss, punishable by prison time and the imposition of crippling fines. 18 U.S.C. § 43(b).  The threat of prosecution under these provisions poses a powerful obstacle to Mr. Shapiro's ability to engage in political speech protected by the First Amendment.

115.     As a direct result of the Animal Enterprise Terrorism Act, Mr. Shapiro is chilled from participating in the kind of lawful protest and investigation of animal cruelty that gives energy to the animal rights movement and substance to his principles.

**Lana Lehr**

116.     Lana Lehr is a long-time civil rights activist who began to focus on animal rights issues approximately 15 years ago.  Ms. Lehr resides in Bethesda, Maryland, is a licensed psychotherapist, and has been in private practice since 1988.

117.     Ms. Lehr is intensely involved in care and advocacy on behalf of rabbits, and in that capacity, she is the founder and Managing Director of RabbitWise, an all-volunteer, 501(c)(3) public charity devoted to preventing the irresponsible acquisition and care of companion rabbits, improving retention rates of rabbits already living in homes, educating people who live with or treat rabbits to give them the best possible care, and advocating for the broader welfare of rabbits in general.

118.     Ms. Lehr became interested in rabbit issues, and animal rights more broadly, after adopting Muggins, a rescued rabbit raised for meat in a battery cage.  Ms. Lehr could not find any advice from the local veterinary community about how to socialize and heal her traumatized rabbit, and thus decided to implement a plan one would use to rehabilitate a traumatized child.  When this approach proved successful, Ms. Lehr was struck by the similarities in cognition between humans and other mammals, and became interested in learning more about animal rights issues.

119.     Ms. Lehr attended her first animal rights convention in 2002 and decided on the spot to become a vegetarian.  She spent the next several years slowly cutting all meat out of her diet, and has been vegan since 2004.

120.      When Ms. Lehr adopted Muggins, she became active with the Friends of Rabbits, a non-profit organization that rescues rabbits from shelters and educates the public on rabbit care and behavior, to supplement the dearth in veterinary assistance in her area focused on rabbits.  However, Ms. Lehr was frustrated with the rabbit rescues sole focus on care and limited advocacy around the core issues – like experimentation and use of rabbits for fur; rabbits as meat; and the irresponsible purchase or give-away of rabbits as pets – that lead to a never-ending need for basic education.  For this reason, Ms. Lehr joined with a few other rabbit enthusiasts to form RabbitWise, an organization devoted to rabbit care and education, but also advocacy around rabbit issues.

121.      Through RabbitWise, Ms. Lehr engages in significant public outreach and advocacy around rabbit issues.  For example, in 2005, Ms. Lehr learned that the Renaissance Harbor Court Hotel in Baltimore was planning a "rabbit raffle" for Easter.  Ms. Lehr and other activists discovered that the hotel did not have the necessary permit to raffle live animals, and convinced the hotel to cancel the event.  Soon after, Ms. Lehr found out that the Willard Hotel was planning a "bunny brunch" for Easter, at which rabbits would be used as "décor."  Ms. Lehr called the hotel and explained why this was a bad idea.  While the event did go forward as planned, Ms. Lehr and RabbitWise succeeded in convincing the hotel to allow rabbit advocates to attend the brunch with informational material about rabbit care.  After the event, the Willard informed Ms. Lehr that they would not feature animals at future events.  Following these successes, Ms. Lehr organized a letter-writing campaign targeting American hotel chains explaining the serious repercussions of irresponsible rabbit giveaways.  Her lobbying in Montgomery County assisted in creating and passing a municipal code that forbade giving away live animal prizes on county property.

122.     RabbitWise's website provides substantial information about rabbit care and behavior, guidelines for people considering rabbits as companion animals, and links and directories to other relevant rabbit resources.  Between 2004 and 2006, RabbitWise also published a tri-annual newsletter, with information about rabbit care, health, advocacy and protest opportunities, and rabbit-related fiction and poetry.  Since 2006, this same information has been distributed primarily through Facebook and other social networking sites.

123.     In 2004, Ms. Lehr also launched www.bundergroundrailroad.org, a state-by-state index of rabbit organizations to limit the footwork needed by rabbit rescuers when endangered rabbits need to get to safety.

124.     As part of her rabbit advocacy, Ms. Lehr has focused some of her energy on an anti-fur campaign.  In the winter of 2004 Ms. Lehr began organizing monthly fur protests in front of Hecht Company (a store that sells fur).  She occasionally brought rabbits out with her to the protests, as they would entertain the crowds and facilitate meaningful interaction and education of passersby.  Over the next few years, Ms. Lehr also attended, and helped organize, protests at Neiman Marcus and at the Chinese Embassy to direct public attention to fur, and other animal welfare issues. These protests were completely lawful, with all necessary permits.

125.     Indeed, Ms. Lehr has never engaged in civil disobedience nor has she ever been arrested.  She has no interest in breaking the law and takes pains to ensure all events and campaigns she is involved in are aboveground and lawful.

126.     When Ms. Lehr learned of the passage of the AETA, she did some organizing work urging repeal of the law.  She noticed that when she attended fur protests after the law

passed she felt hesitant, and was wary of speaking up.  She also limited the range of activities she was willing to engage in.  For example, at one point shortly after the passage of the AETA, Ms. Lehr considered bringing a few rabbits with her to restaurants that serve rabbit meat, but she decided not to do so, out of fear that these acts might violate the AETA.

127.    Ms. Lehr eventually stopped going to protests altogether out of fear of prosecution under the AETA.

128.    Ms. Lehr wants to continue attending fur protests.  She believes in the importance of demonstrating and educating the public through lawful, peaceful protests.  However, protests in front of fur stores, aimed at reducing those stores' profits through discouraging customers from purchasing fur, could be found to violate the property damage and loss prong of the AETA.  *See supra,* ¶¶ 35-39.  Ms. Lehr cannot risk the possibility of facing charges under the AETA, as she fears losing her professional license if she is arrested, and thus losing her livelihood.  Ms. Lehr must renew her license annually, and each time, she is asked if she has been arrested.

129.    Ms. Lehr's fear is heightened by the extra scrutiny she has already experienced from law enforcement as an animal rights activist.  Despite her perfectly clean criminal record, in or around 2009, Ms. Lehr's nephew applied for security clearance in connection to a job with the Department of Homeland Security and was questioned about Ms. Lehr's animal rights work.

130.    Because of her reasonable fear, Ms. Lehr has not attended an anti-fur or other animal rights protest since 2009.

131.     She has also limited her advocacy in other ways.  For example, Ms. Lehr used to protest and pass out literature at carnivals, fairs, and other events attended by rabbit breeders, but this activity also feels too risky to her and she no longer engages in it.

132.     It is only fear of an AETA charge, and the resulting disastrous harm to her career, that holds her back.

133.     Instead of engaging in lawful protest, Ms. Lehr limits her rabbit advocacy to letter writing campaigns, petitions, attending conferences, and similarly safe tactics.  Ms. Lehr would like to supplement this type of advocacy with lawful public protests, but she continues to be chilled from doing so.

**Lauren Gazzola**

134.     Lauren Gazzola is a vegan and a long-time animal rights activist, and was a defendant in the SHAC 7 case.  As a result of that prosecution, Ms. Gazzola served a significant prison term, and is currently on probation.  She is a Connecticut resident, but has recently received permission from her probation officer to travel to New York City for a temporary job.  She is currently staying in Brooklyn and working in the communications department of a non-profit legal organization.

135.     Ms. Gazzola became interested in animal rights issues in high school.  She moved to New York City in fall of 1997 to attend New York University and there became an active member in SEAL and NYC ADL, with Plaintiff Ryan Shapiro.

136.     Through those organizations, Ms. Gazzola took part in numerous campaigns and protests, primarily focusing on fur and vivisection.  While many protests she attended were completely lawful, she also engaged in non-violent acts of civil disobedience and was arrested on several occasions.

137.     During her last year in college, Ms. Gazzola began a paid internship with In Defense of Animals, a national animal rights organization founded in 1983 and dedicated to protecting the rights, welfare, and habitats of animals.  After graduating early from NYU, in December of 2000, Ms. Gazzola took a fulltime job at IDA.

138.     Ms. Gazzola was laid off from IDA in August of 2001, and decided to dedicate herself fulltime to work on the SHAC campaign, described in paragraph 55, above. From 2001 to 2004 Ms. Gazzola organized protests, drafted educational material and press releases, gave press interviews, conducted Internet research on Huntingdon and affiliated companies, and strategized with other organizers around the direction of the SHAC campaign.

139.     Ms. Gazzola was arrested in 2004, and in 2006 she was found guilty of conspiring to violate the Animal Enterprise Protection Act, conspiring to commit interstate stalking, interstate stalking, and conspiring to use a telecommunications device to abuse, threaten, and harass.  She was sentenced to 52 months incarceration.

140.     As explained above, *see supra* ¶¶ 54-56*,* the SHAC 7 prosecution arose out of the US Stop Huntington Animal Cruelty campaign.  *See United States v. Fullmer*, 584 F.3d 132 (3d Cir. 2009).  SHAC's primary organizing tool was its website, which published information about upcoming protests and included postings, some from anonymous sources, regarding lawful and unlawful protests that had already taken place.  The Third Circuit found that much of the SHAC website posts were protected by the First Amendment, with the exception of those that coordinated electronic civil disobedience, amounting to incitement of illegal activity, and those that disseminated the home addresses of individuals employed by Huntington Life Sciences and affiliated companies.

141.     Ms. Gazzola's prosecution was primarily based upon her leadership role in the SHAC movement.  She was not found to have personally incited any illegal actions, nor to have engaged in property destruction or civil disobedience.  However, along with the work described above, she was also found to have participated in a home demonstration during which some of the slogans she chanted were interpreted by the court, *in the context of her involvement in the SHAC website and other protests,* as true threats.  The same statements, devoid of this larger context, were found to be protected by the First Amendment by a Massachusetts state court. *See Commonwealth v. Gazzola*, 17 Mass. L. Rep. 308, 2004 Mass. Super. LEXIS 28, *15-16 (Sup. Ct. 2004).

142.     Since her release from prison in 2010, Ms. Gazzola would once again like to organize animal rights campaigns, but she would like to do so only within the bounds of what is lawful and protected by the First Amendment.  She understands that theoretical advocacy of illegal action, along with expressions of support for those who violate the law, is protected by the First Amendment.  She also understands that it is lawful to protest in front of an individual's home, consistent with municipal and state ordinances limiting such activity, as long as one does not make threatening statements.

143.     However, Ms. Gazzola is chilled from again engaging in a campaign that includes *both* of these tactics, each constitutional on its own, out of fear that, in combination, they will be found to violate section (a)(2)(A) or (a)(2)(B) of the Animal Enterprise Terrorism Act, especially if the campaign targets a specific business.

144.     Given her past prosecution under the AEPA, Ms. Gazzola's fears are particularly legitimate.  Indeed, Ms. Gazzola has reason to believe that the FBI continues to investigate her animal rights activities, despite completion of her criminal case: when

Plaintiff Ryan Shapiro requested Ms. Gazzola's FBI files, the FBI declined to produce responsive documents located at the FBI Newark office, stating the records, compiled for law enforcement purposes, were exempt from release as they "could reasonably be expected to interfere with enforcement proceedings." A true and correct copy of this letter is attached hereto as Exhibit B.

145.     Ms. Gazzola's reasonable fear of prosecution under the AETA chills her right to engage in staunch and provocative political advocacy that does not amount to incitement or a true threat.

146.     To give a specific example, in 2011 Ms. Gazzola was invited to Chicago to speak to an Animal Law class about the criminal case against her.  She wrote about that experience in a statement that was later published on the Internet:

> *A few weeks ago I gave a talk about the SHAC 7 case to a law school class. Before I got up to speak, the professor showed undercover footage from inside of HLS. It was the first time I'd seen it since getting out of prison and I broke down. When it ended, the Executive Director of the National Antivivisection Society got up to introduce me. "It's hard to know where to start," she began.*

> *I was next up and still slightly shaky from having seen the footage. I had planned to begin by thanking the professor for inviting me, thanking NAVS for sponsoring the event, and thanking the students for attending. Instead I told the class, "I know exactly where to start.*

> *I spent three-and-a-half years of my life trying to put HLS out of business and three-and-a-half years in prison for it. Every single day was worth it and I'd do it again." Today, I'd simply like to repeat this: I'd do it again. It was all worth it.*

147.     When recounting this moment to be published online, Ms. Gazzola wanted to end her statement slightly differently, by saying: "I spent three-and-a-half years of my life trying to put HLS out of business and three-and-a-half years in prison for it. Every single day was worth it and I'd do it again. Today, I'd simply like to repeat this: It was all worth it.  I'd

do it again.  So go do it."  Ms. Gazzola censored herself because she was worried that this statement could be taken, in conjunction with acts by other animal rights activists, as evidence of a conspiracy to violate the AETA.

148.     Ms. Gazzola's reasonable fear of AETA prosecution and the chill it has cast on her right to engage in political advocacy is significantly exacerbated by the "course of conduct language" found in 18 USC § 43(a)(2)(B).  She fears that any one speaking engagement, public statement, or protest chant might be combined with other, equally lawful conduct, and serve as the basis of an AETA prosecution.  For this reason, she fears engaging in animal rights advocacy even when it seems obvious that such advocacy is protected by the First Amendment.

**Iver Robert Johnson III, aka "J" Johnson**

149.     J Johnson is a long-time animal rights advocate, and is currently a freshman at Eugene Lang College The New School for Liberal Arts.  He resides in Brooklyn, New York.

150.     Mr. Johnson grew up in Chicago and first became involved in animal rights issues in middle school.   Through his middle and high school years, Mr. Johnson was involved in a wide range of activism, including organizing and attending weekly, lawful, anti-fur protests at Neiman Marcus and engaging in some acts of peaceful civil disobedience in connection with that campaign. The protests consistently attracted between 10 to 25 activists a week, with more attending after larger mobilization efforts.

151.     During this period of time, Mr. Johnson also attended myriad animal rights protests organized by others, usually focused on circuses, rodeos, fur farms and other events and industries relevant to animal advocates.

152.    Around 2001, Mr. Johnson graduated from high school, and began working part time as a delivery driver for a vegan restaurant.  His graduation coincided with the emergence of the SHAC campaign in the United States (*see supra* ¶ 55), and he devoted the balance and bulk of his time to work on that campaign in the Chicago area, partially under the auspices of the Chicago chapter of the Animal Defense League.

153.    Mr. Johnson became a leader in the SHAC Chicago movement, and in that capacity organized work on many fronts.  One of SHAC's central tactics was to pressure businesses that contracted or otherwise associated with HLS to end their relationship with that group by disseminating information about HLS's animal abuse, and protesting at the offices of targeted businesses as well as their employees' homes.  These protests occurred at least once a week, and consistently attracted between 10 – 20 protestors.

154.    Mr. Johnson was key in organizing many of these protests, sometimes as many as two or three a week.  He also helped to organize regional SHAC demonstrations several times a year.  These demonstrations drew between 100 - 200 people.

155.    While members of the Chicago SHAC campaign did engage in some civil disobedience, Mr. Johnson's primary work involved organizing lawful and peaceful pickets, during which he and other organizers took care to comply with complex local ordinances restricting protest in residential neighborhoods.

156.    Mr. Johnson also engaged in significant public education and outreach.  He showed undercover footage of animal abuse at Huntington Life Sciences at public events, created and distributed fliers and posters, and co-organized a speaking tour at college campuses across the Midwest, trying to get local groups to support the SHAC campaign.

157.     Over his years of animal rights work, Mr. Johnson has been arrested many times for disorderly conduct and other non-violent protest-related offenses.  Although Mr. Johnson has never been convicted of a crime of violence or property destruction, he has nevertheless been subjected to significant scrutiny from law enforcement.  In 2002, Mr. Johnson learned that he appeared on a law enforcement watch list: on information and belief, the Violent Gang and Terrorist Organization File (VGTOF).  Upon running his license, any law enforcement officer would be informed that Mr. Johnson is a "member of a terrorist organization," an "animal rights extremist," and should be "approach[ed] with caution."   He learned that many other activists also involved in the SHAC campaign at that time, who also lacked a significant criminal background, were subject to similar scrutiny by law enforcement.  Mr. Johnson does not know if he is still listed on the VGTOF.

158.     After the SHAC arrests and convictions (*see supra ¶¶* 54-58), and the passage of the AETA, Mr. Johnson began to face serious obstacles in organizing animal rights protests in Chicago.  For example, in 2007, HLS tried to get re-listed on the stock exchange and Mr. Johnson organized a lawful Chicago demonstration at the local NYSE Arca office building.  When he arrived at the site of the planned protest, he was met by over 40 police officers in riot gear, and *not a single other protestor*.  After about six months of organizing protests at which only 4 or 5 people showed up, at maximum, Mr. Johnson gave up on the campaign.  Similarly, when a group of out-of-state activists arrived in Chicago as part of the "Close HLS" campaign, only five local activists (including Mr. Johnson) showed up for the protest.  When he reached out to other animal rights activists to try to reinvigorate their campaigns, many told him that they were too afraid of being charged as terrorists to protest,

or that protest on the streets, even lawful protest, would play into the public's fear of animal rights activists as dangerous criminals.

159.     Though he tried repeatedly to continue the work he had done with Chicago ADL and the Chicago SHAC campaign, he was unable to convince others to work with him and engage in the lawful, First Amendment protected activity they had embraced in the past. Instead, he engaged in non-protest public education work, like showing screenings of animal rights related films, and became heavily involved in support work for imprisoned animal rights activists.

160.     Mr. Johnson moved to New York City in the summer of 2011 to begin undergraduate studies at the New School.  Though he knew he would have to devote significant time to his studies, he planned to immerse himself in the animal rights community in the city, and looked forward to organizing new, lawful campaigns, using the many lessons he learned from his leadership role in Chicago ADL and the Chicago SHAC campaign.

161.     To his disappointment, Mr. Johnson has not found a community to connect with.  His attempts to learn about local animal rights campaigns have been largely fruitless. While he has found individual protests to attend, he has found no sustained and carefully planned campaigns, as the bulk of animal rights activists in the area are chilled from engaging in protest-related activism out of fear of SHAC-like terrorist charges. Having delayed his education, and spent over a decade primarily devoted to animal rights advocacy, Mr. Johnson is depressed and dismayed by the way the AEPA and AETA have blocked not just sabotage or civil disobedience, but also peaceful, lawful protest and advocacy across a movement.

## IRREPARABLE INJURY

162.     All of the Plaintiffs are suffering ongoing irreparable injury to their First

Amendment rights, because the threat of prosecution under the AETA has deterred them

from engaging in political speech and advocacy that are protected by the First Amendment.

163.     Plaintiffs have no adequate remedy at law.

## FIRST CAUSE OF ACTION

### (First Amendment: Overbreadth)

164.     Plaintiffs incorporate by reference each and every allegation contained in the

preceding paragraphs as if set forth fully herein.

165.     The Animal Enterprise Terrorism Act violates the First Amendment to the

United States Constitution on its face, and as applied to Plaintiffs, because sections (a)(1),

(a)(2)(A), (a)(2)(C), and (d) are substantially overbroad, causing Plaintiffs and others to

avoid First Amendment protected activity in order to avoid criminal prosecution as terrorists.

This overbreadth infects the entire statute, and is not amendable to a limiting instruction or

severance.

## SECOND CAUSE OF ACTION

### (First & Fifth Amendment: Void for Vagueness)

166.     Plaintiffs incorporate by reference each and every allegation contained in the

preceding paragraphs as if set forth fully herein.

167.     The Animal Enterprise Terrorism Act violates the First and Fifth Amendments

to the United States Constitution on its face, and as applied to Plaintiffs, because key

provisions of the statute, including the terms and phrases "damaging or interfering,"

"damages or causes the loss," "course of conduct," "pattern of conduct," and "economic

damage," are so vague as to fail to provide adequate notice to individuals of what conduct is prohibited, giving government officials unfettered discretion in enforcement, and causing Plaintiffs and others to avoid First Amendment protected activity in order to avoid prosecution as terrorists.

## THIRD CAUSE OF ACTION

### (First Amendment: Content & Viewpoint Based Discrimination)

168.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

169.    The Animal Enterprise Terrorism Act violates the First Amendment to the United States Constitution because it targets animal rights activists and discriminates based on content and viewpoint, singling out speech that negatively affects animal enterprises based on the subject matter and communicative impact of that speech.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs seek an order and judgment:

1.  Declaring the Animal Enterprise Terrorism Act unconstitutional on its face, and as applied to Plaintiffs, because it violates the First and Fifth Amendments to the United States Constitution;

2.  Striking down the law in its entirety;

3.  Permanently enjoining Defendant from criminally prosecuting plaintiffs or others for violations of the Animal Enterprise Terrorism Act;

4.  Awarding Plaintiffs their costs and attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2414 *et seq*; and

5.  Granting such other and further relief as the Court may deem just and proper.

Dated: December 15, 2011

RESPECTFULLY SUBMITTED,

/s/Howard Friedman                                    Rachel Meeropol
Howard Friedman, BBO #180080                          Alexis Agathocleous
**Law Offices of Howard Friedman, P.C.**              **Center for Constitutional Rights**
90 Canal Street, 5th Floor                            666 Broadway, 7th Fl.
Boston, MA 02114-2022                                 New York, NY 10012.
617-742-4100                                          (212) 614-6432
hfriedman@civil-rights-law.com                        rachelm@ccrjustice.org


/s/ David Milton                                      Alexander A. Reinert
David Milton, BBO #668908                             **c/o Benjamin N. Cardozo**
**Law Offices of Howard Friedman, P.C.**              **School of Law**
90 Canal Street, 5th Floor                            55 Fifth Avenue, Room 938
Boston, MA 02114-2022                                 New York, NY 10003
617-742-4100                                          (212) 790-0403
dmilton@civil-rights-law.com                          areinert@yu.edu

*Attorneys for Plaintiffs*