**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

SARAHJANE BLUM; RYAN SHAPIRO; LANA
LEHR; LAUREN GAZZOLA; and IVER ROBERT
JOHNSON III,

     Plaintiffs,

          v.

ERIC HOLDER, in his official capacity as Attorney
General of the United States,

     Defendant.

---

**Civil Action No. 1:11-cv-12229**

**Leave to File Granted on April 6, 2012**

BRIEF OF *AMICI CURIAE* NATIONAL ASSOCIATION FOR BIOMEDICAL
RESEARCH, ASSOCIATION OF AMERICAN MEDICAL COLLEGES,
ASSOCIATION OF AMERICAN UNIVERSITIES, ASSOCIATION OF AMERICAN
VETERINARY MEDICAL COLLEGES, ASSOCIATION OF PUBLIC AND
LAND-GRANT UNIVERSITIES, FEDERATION OF AMERICAN SOCIETIES FOR
EXPERIMENTAL BIOLOGY, MASSACHUSETTS BIOTECHNOLOGY COUNCIL,
MASSACHUSETTS SOCIETY FOR MEDICAL RESEARCH,
THE GENERAL HOSPITAL CORPORATION D/B/A MASSACHUSETTS GENERAL
HOSPITAL, THE BRIGHAM & WOMEN'S HOSPITAL, INC.,
AND THE MCLEAN HOSPITAL CORPORATION
IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

ACTIVEUS 92968098v12

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................2

ARGUMENT ........................................................................................................................8

I.      The AETA is Not Overbroad.........................................................................8

II.     The AETA Is Not Unconstitutionally Vague..............................................14

III.    The AETA Is Content-Neutral And Viewpoint-Neutral.............................18

CONCLUSION.....................................................................................................................20

ACTIVEUS 92968098v12

# TABLE OF AUTHORITIES

## CASES

*American Life League, Inc. v. Reno*, 47 F.3d 642 (4th Cir. 1995)................................................19

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*,
    403 U.S. 388 (1971)...............................................................................................13

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ........................................................8, 11

*Burson v. Freeman*, 504 U.S. 191 (1992) ....................................................................10

*Cameron v. Johnson*, 390 U.S. 611 (1968).................................................................15

*Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) ..................................................12

*Cheffer v. Reno*, 55 F.3d 1517 (11th Cir. 1995) .........................................................19

*Coates v. Cincinnati*, 402 U.S. 611 (1971) ..................................................................17

*Fantasy Book Shop v. City of Boston*, 652 F.2d 1115 (1st Cir. 1981) .........................17

*Frisby v. Schultz*, 487 U.S. 474 (1988).......................................................................10

*Grayned v. City of Rockford*, 408 U.S. 104 (1982) .....................................................10

*Hill v. Colorado*, 530 U.S. 703 (2000) ............................................................12, 14, 17

*Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010) ...................................17

*McCullen v. Coakley*, 571 F.3d 167 (1st Cir. 2009) ............................................ *passim*

*McGuire v. Reilly*, 260 F.3d 36 (1st Cir. 2001) ...........................................................19

*Members of City Council of Los Angeles v. Taxpayers for Vincent*,
    466 U.S. 789 (1984)..............................................................................................13

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)...........................................9

*New York State Club Association v. City of New York*, 487 U.S. 1 (1988) .....................8

*New York v. Ferber*, 458 U.S. 747 (1982) ................................................8, 10, 12, 13

*Norton v. Ashcroft*, 298 F.3d 547 (6th Cir. 2002).......................................................19

ACTIVEUS 92968098v12

*Papachristou v. Jacksonville*, 405 U.S. 156 (1972)..........................................................17

*Terry v. Reno*, 101 F.3d 1412 (D.C. Cir. 1996) ...............................................................19

*United States v. Bader*, 698 F.2d 553 (1st Cir. 1983) .......................................................9

*United States v. Bird*, 124 F.3d 667 (5th Cir. 1997) ..................................................10, 15

*United States v. Buddenberg*, No. CR-09-00263,
    2009 WL 3485937 (N.D. Cal. Oct. 28, 2009)..................................9, 15, 18, 19, 20

*United States v. Dinwiddie*, 76 F.3d 913 (8th Cir. 1996) ................................................19

*United States v. Doremus*, 888 F.2d 630 (9th  Cir. 1989)................................................14

*United States v. Fullmer*, 584 F.3d 132 (3d Cir. 2009) ............................................5, 6, 17

*United States v. Fulmer*, 108 F.3d 1486 (1st Cir. 1997)....................................................9

*United States v. Gwyther*, 431 F.2d 1142 (9th Cir. 1970) ...............................................15

*United States v. Salerno*, 481 U.S. 739 (1987) ...............................................................18

*United States v. Shrader*,
    No. 1:09-0270, 2010 WL 2179572 (S.D. W. Va. Apr. 7, 2010) ...........................16

*United States v. Soderna*, 82 F.3d 1370 (7th Cir. 1996).............................................18, 19

*United States v. Weslin*, 156 F.3d 292 (2d Cir. 1998) .....................................................19

*United States v. Williams*, 553 U.S. 285 (2008) .....................................................8, 13, 14

*URI Student Senate v. Town of Narragansett*, 631 F.3d 1 (1st Cir. 2011) ...............14, 16

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982)............................................................................................10, 17

*Virginia v. Black*, 538 U.S. 343 (2003).......................................................................9, 12

*Virginia v. Hicks*, 539 U.S. 113 (2003).............................................................................8

*Wilson v. Johnson*, 247 F. App'x 620 (6th Cir. 2007) ....................................................14

ACTIVEUS 92968098v12

# STATUTES

18 U.S.C. § 32(a)(1), (3) ..............................................................................................14

18 U.S.C. § 43(a)(1) .....................................................................................................16

18 U.S.C. § 43(a)(2)(A) ..........................................................................................2, 9, 15

18 U.S.C. § 43(a)(2)(B) ..........................................................................................9, 15, 16

18 U.S.C. § 43(d)(2) ................................................................................................15, 16

18 U.S.C. § 43(d)(3)(B) ................................................................................................15

18 U.S.C. § 43(e)(1) ........................................................................................1, 2, 7, 9, 10

18 U.S.C. § 248 ...........................................................................................................18

18 U.S.C. § 831(a)(1) ....................................................................................................14

18 U.S.C. § 956(b) .......................................................................................................14

18 U.S.C. § 2266(a)(2) .................................................................................................15

36 C.F.R. § 261.1(b) ....................................................................................................14

U.S.S.G. § 1B1.3(a)(2) .................................................................................................16

# LEGISLATIVE MATERIALS

152 Cong. Rec. H8590-H8594 (daily ed., Nov. 13, 2006) .........................................6, 7

152 Cong. Rec. S10793 (daily ed., Sept. 29, 2006) ........................................................7

152 Cong. Rec. S9254-S9255 (daily ed., Sept. 8, 2006) .................................................7

Report on the Activities of the Committee on the Judiciary, H.R. Rep. No. 109-749,
    109th Cong. 2d Sess. (2006) .................................................................................6, 7

*Animal Enterprise Terrorism Act: Hearing on H.R. 4239 Before the Subcomm. on Crime,
    Terrorism, and Homeland Security of the H. Comm. on the Judiciary,* 109th
    Cong. (2006) .............................................................................................................7

ACTIVEUS 92968098v12

*Amici curiae* respectfully urge that the Court grant the government's motion and dismiss the complaint with prejudice because it fails to state a claim on which relief may be granted.[1]

## INTRODUCTION

Animal research has played an essential role in virtually every major medical advance of the last century, including advances in antibiotics, blood transfusions, dialysis, organ transplantation, vaccinations, chemotherapy, bypass surgery, and control of disease, pain, and suffering, to the benefit of both human and animal health.  Today, researchers are required to minimize any pain or distress research animals may experience and to develop and employ alternatives to the use of live animals wherever possible.  Additionally, many researchers and organizations voluntarily request accreditation and assessment of their practices from the Association for Assessment and Accreditation of Laboratory Animal Care International.  Nonetheless, laboratories, researchers, and researchers' families, have faced threats, harassment, and violent criminal behavior as a result of their ethical pursuit of advancing human and animal health.

The Animal Enterprise Terrorism Act, 18 U.S.C. § 43 (AETA), provides the necessary authority to apprehend, prosecute, and convict individuals who threaten or engage in violence directed against animal enterprises or people connected with them.  The AETA was not designed to prohibit, and does not prohibit, constitutionally-protected speech on any subject.  Rather, it was a reasonable response to violent and threatening *conduct* directed against universities, veterinary colleges, businesses, and individual researchers and their families.  Far from encroaching on First Amendment rights, Congress expressly provided that the AETA shall *not* be construed to prohibit "any expressive conduct (including peaceful picketing or other peaceful

---

[1] A statement identifying the *amici* and their interest in this case is set forth in the motion for leave to file this brief.

demonstration) protected from legal prohibition by the First Amendment to the Constitution." *Id.* § 43(e)(1). Rather, the AETA prohibits, in relevant part, conduct undertaken with the *purpose* of "damaging or interfering with" an animal enterprise's operations and that *intentionally* damages or causes loss of real or personal property. *Id.* § 43(a)(2)(A).

The AETA is neither overbroad nor vague, nor does it burden speech in any impermissible way. Its target is not expression, but threatening and violent conduct. That Plaintiffs can hypothesize far-fetched prosecutions implicating protected speech does not make the statute facially overbroad, particularly given that such prosecutions would be contrary to the statute's plain language. Nor is the AETA unconstitutionally vague under the Fifth Amendment. The terms it uses are objective and commonly found in criminal statutes; when read in its entirety, the AETA provides a person of ordinary intelligence ample warning of the conduct prohibited. Finally, the AETA is not a content-based regulation of speech. To the extent it regulates speech at all, it regulates only unprotected speech such as threats or intimidation and does so without regard to the speaker's message or viewpoint. Any adverse effect it may incidentally have on a particular message could be addressed in a context in which it actually arises; it does not warrant holding the statute facially unconstitutional.

## BACKGROUND

Plaintiffs would have this Court believe that the AETA's "specific target" consists of "activists whose demonstrations have caused large businesses to lose profits." Compl. ¶ 6. That is not the case. Congress responded to a marked increase not in "demonstrations," but in threats, bombings, arson, and vandalism—and not just against "businesses," but also against universities, other educational institutions, and any organization or individual with even an indirect or tangential relationship to animal research, including individual researchers and their families.

In 2001, according to an FBI press release, the Animal Liberation Front (ALF) and the Earth Liberation Front (ELF) embarked on an "arson spree," committing 17 arsons that inflicted tens of millions of dollars of damage. FBI, *Fugitive Who Built Firebombs Linked to 2001 Arson of UW Center for Urban Horticulture Arrested Following Expulsion from China* (July 6, 2011).[2] This included a three-alarm fire at the University of Washington's Center for Urban Horticulture that destroyed samples of rare and endangered plants as well as important research data in connection with the protection of endangered plant species. *Id.*

In 2003, an animal rights group called the Revolutionary Cells took responsibility for two bombings in the San Francisco area. The group first announced that it had left "two pipe bombs filled with an ammonium nitrate slurry with redundant timers" at the offices of Chiron Corporation. Finz & Tansey, *Animal rights group tied to bombs*, S.F. Chron., Aug. 30, 2003.[3] Approximately a month later, the Revolutionary Cells claimed responsibility for a 10-pound ammonium nitrate bomb "strapped with nails" that exploded at the offices of Shaklee Inc. Finz, *Militants say they planted Shaklee bomb*, S.F. Chron., Oct. 1, 2003.[4] Revolutionary Cells stated that "[a]ll customers and their families are considered legitimate targets" and, in comments directed to Chiron, threatened: "How are you sleeping? … You never know when your house, your car even, might go boom. Who knows, that new car in the parking lot may be packed with explosives. Or maybe it will be a shot in the dark." *Id.* In 2009, a suspect in these two bombings

---

[2] Available at http://www.fbi.gov/seattle/press-releases/2011/fugitive-who-built-firebombs-linked-to-2001-arson-of-uw-center-for-urban-horticulture-arrested-following-expulsion-from-china

[3] Available at http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2003/08/30/CHIRON.TMP

[4] Available at http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2003/10/01/BA252071.DTL

ACTIVEUS 92968098v12

became the first domestic fugitive to be added to the FBI's Most Wanted Terrorists list. FBI, *New Most Wanted Terrorist – First Domestic Fugitive Added to List* (Apr. 21, 2009).[5]

Also in 2003, the ALF claimed responsibility for vandalizing a laboratory at Louisiana State University's School of Veterinary Medicine, where computers and research equipment were destroyed, with damage estimated between $200,000 and $300,000. ALF's message specifically identified a researcher at the laboratory, stating that his "time is up." Nolen, *LSU Laboratory Vandalized; Animal Extremist Group Claims Responsibility*, J. Am. Veterinary Med. Ass'n, Nov. 1, 2003.[6] The ALF also claimed responsibility for a 2004 break-in at the University of Iowa, where intruders smashed and overturned equipment and poured acid and other chemicals on equipment and papers. Senate Committee on Environment & Public Works, *Oversight on Eco-terrorism specifically examining the Earth Liberation Front ("ELF") and the Animal Liberation Front ("ALF")* (May 18, 2005) (statement of David Skorton, President of the University of Iowa).[7]

In subsequent years, the ALF continued its violence, boasting that it "carries out direct action against animal abuse in the form of rescuing animals and causing financial loss to animal exploiters, usually through the damage and destruction of property." Lehman, *Vandals Trash Bucks Nursery, Bash Monkey Business Bid*, Morning Call (Lehigh Valley, Pa.), May 28, 2005 (quoting ALF website).[8] In 2005, the ALF claimed responsibility for an attack on a Pennsylvania facility that was considering housing research animals, causing tens of thousands of dollars in damage. *Id.* And in 2006, the ALF "took credit" for placing a Molotov cocktail on

---

[5] Available at http://www.fbi.gov/news/stories/2009/april/wanted_042109
[6] Available at http://www.avma.org/onlnews/javma/nov03/031101a.asp
[7] Available at http://epw.senate.gov/hearing_statements.cfm?id=237830
[8] Available at http://articles.mcall.com/2005-05-28/news/3603592_1_animal-abuse-animal-rights-group-research-monkeys

the porch of a home of a UCLA psychiatry professor.  *Molotov Cocktail Incident Probed*, L.A.

Times, July 13, 2006.[9]  The device was apparently planted not at the professor's home, but at a

neighboring house occupied by a 70-year-old woman and her tenant.  Though the device was lit,

fortunately it failed to explode.  *Id.*

      These violent actions and threats were clearly intended to instill fear in the research

community and intimidate companies, universities, and scientists into ending life-saving

research.  This was underscored in a 2005 Senate hearing, when a representative of an extremist

animal rights organization reaffirmed a statement he had made before: "I don't think you'd have

to kill, assassinate too many [scientists].  I think for 5 lives, 10 lives, 15 human lives, we could

save 1 million, 2 million, or 10 million non-human lives."  Senate Committee on Environment &

Public Works, *Eco-Terrorism Specifically Examining Stop Huntingdon Animal Cruelty*

*("SHAC")* (Oct. 26, 2005) (statement of Jerry Vlasak).[10]  Individuals and their families were

identified as particularly vulnerable.  Extremists vandalized the homes of targeted individuals,

broke home and car windows, made threatening and obscene phone calls at all hours of the day

and night, and even targeted one individual's 90-year-old mother by placing her assisted living

address on the Internet with instructions to "have an undertaker arrive to pick up her dead body."

*Id.* (statements of Skip Boruchin & Mark L. Bibi).[11]

      One targeted individual testified that "her family began receiving phone calls, often

'angry and belligerent,' day and night," "awoke to find that pictures of mutilated animals had

been glued to the sidewalk in front of her home, as well as the exterior side wall of her home,"

---

[9] Available at http://articles.latimes.com/2006/jul/13/local/me-belair13

[10] Available at http://frwebgate.access.gpo.gov/cgi-
bin/getdoc.cgi?dbname=109_senate_hearings&docid=f:39521.pdf

[11] Available at http://frwebgate.access.gpo.gov/cgi-
bin/getdoc.cgi?dbname=109_senate_hearings&docid=f:39521.pdf

ACTIVEUS 92968098v12

and received an email asking "how she would feel 'if they cut open my son ... and filled him with poison the way that [Huntingdon] was doing to animals.'" *United States v. Fullmer*, 584 F.3d 132, 144 (3d Cir. 2009).  In 2006, a UCLA researcher announced that, after years of threats, harassment, and intimidation, including masked protestors banging on his windows at night, he would give up his research if the ALF would leave him and his family alone.  Miller, *Fostering a Civil Conversation About Animals in Research*, Science, March 11, 2010.[12]

It was incidents like these—and hundreds of others for which the ALF and similar organizations claimed responsibility—that prompted Congress to enact the AETA in November 2006.  The AETA's proponents made clear that the goal was prevention and punishment of violence and intimidation.  *See* H.R. Rep. No. 109-749, at 167 (2006) ("In recent years, there has been an increase in the number and severity of crimes of violence and intimidation animal rights activists groups have been employing[.]"); 152 Cong. Rec. H8590, H8591 (daily ed. Nov. 13, 2006) (Rep. Sensenbrenner) ("[T]he last several years have seen an increase in the number and the severity of criminal acts and intimidation against those engaged in animal enterprises. … Some of the more violent acts by these groups include arson, pouring acid on cars, mailing razor blades, and defacing victims' homes."); *id.* at H8591-92 (Rep. Scott) ("[W]e have found that employees, board members and family members of businesses and nonprofits affiliated with or doing business with [animal] enterprises are complaining that they are now being stalked, harassed, intimidated or threatened, with some individuals even being physically assaulted, and had their homes, businesses or cars vandalized."); *id.* at H8592 (Rep. Petri) ("Between January of 1990 and June of 2004, extremist movements such as the [ALF], Stop Huntington Animal Cruelty, and the [ELF] committed more than 1,100 acts of terrorism, causing more than $120

---

[12] Available at: http://news.sciencemag.org/sciencenow/2010/03/ringach.html

million in damage.  Animal rights extremists advance their cause through direct action, which includes death threats, vandalism, animal releases and bombings.").

Congress was also conscious of the concerns of legitimate advocacy groups that the AETA steer well clear of prohibiting "lawful protests, boycotts, and other activities," and the House Judiciary Committee clarified that the legislation "was not intended to infringe on these rights in any way."  H.R. Rep. No. 109-749, at 167.  The bill was amended to include a "rule of construction" clarifying that "nothing in the bill shall be construed to prohibit any expressive conduct protected by the First Amendment."  *Id.*; *see* 18 U.S.C. § 43(e)(1).  The AETA as enacted thus "specifically prohibits a prosecution" for legitimate advocacy by someone who, for example, "wishes to peacefully protest research on animals."  152 Cong. Rec. H8594 (daily ed. Nov. 13, 2006) (Rep. Sensenbrenner); *see also* 159 Cong. Rec. S10793 (daily ed. Sept. 29, 2006) (Sen. Leahy) ("These changes will ensure that legitimate, peaceful conduct is not chilled by the threat of Federal prosecution, and that prosecution is reserved for the worst offenders."); 152 Cong. Rec. S9254, S9255 (daily ed. Sept. 8, 2006) (Sen. Feinstein) ("This law effectively protects the actions of the law-abiding protestor while carefully distinguishing the criminal activity of extremists.").  The Department of Justice also made clear that it "does not prosecute and does not wish to prosecute those who lawfully seek to persuade others."  *Animal Enterprise Terrorism Act: Hearing on H.R. 4239 Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary,* 109th Cong. 6 (2006) (statement of Deputy Assistant Attorney General Brent McIntosh).[13]

---

[13] Available at
http://commdocs.house.gov/committees/judiciary/hju27742.000/hju27742_0f.htm.

**ARGUMENT**

Plaintiffs challenge the AETA as overbroad and impermissibly discriminatory under the First Amendment and vague under the Fifth Amendment.  Each challenge lacks merit.

## I. THE AETA IS NOT OVERBROAD

"The overbreadth doctrine is strong medicine that is used sparingly and only as a last resort." *N.Y. State Club Ass'n v. City of N.Y.*, 487 U.S. 1, 14 (1988) (internal quotation marks and citation omitted).  Yet Plaintiffs use it as their *first* resort, claiming that the AETA is "so broad as to criminalize a substantial amount of First-Amendment-protected activity, like protesting, picketing, dissemination of information and other advocacy intended to affect a business that uses or sells animals."  Compl. ¶ 10.  Plaintiffs are wrong; in fact, the AETA does not prohibit *any* constitutionally-protected expression or conduct, let alone the "substantial" amount required to invalidate a statute as overbroad on its face.

Because AETA does not "by [its] terms, seek to regulate only spoken words," but rather turns on "conduct and not merely speech," Plaintiffs must show that any overbreadth is "not only … real, but *substantial* as well, *judged in relation to the statute's plainly legitimate sweep*." *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 615 (1973) (internal quotation marks omitted; emphasis added).  The Supreme Court and the First Circuit have recognized that a facial overbreadth challenge will "[r]arely, if ever, … succeed against a law … that is not specifically addressed to speech or to conduct necessarily associated with speech." *Virginia v. Hicks*, 539 U.S. 113, 124 (2003); *see also New York v. Ferber*, 458 U.S. 747, 773 (1982) (rejecting overbreadth challenge where "arguably impermissible applications of the statute" were no more than "a tiny fraction of the materials within the statute's reach"); *McCullen v. Coakley*, 571 F.3d 167, 182 (1st Cir. 2009) ("Courts must 'vigorously enforce' this substantiality requirement." (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008))).

Plaintiffs do not deny the constitutionality of the AETA's prohibition on "intentionally plac[ing] a person in reasonable fear of … death … or serious bodily injury … by a course of conduct involving threats, acts of vandalism, property damage, criminal trespass, harassment, or intimidation" (18 U.S.C. § 43(a)(2)(B))—nor could they, as "[t]he First Amendment does not protect violence." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982); *see also Virginia v. Black*, 538 U.S. 343, 359 (2003) (First Amendment permits a ban on "true threats," by which "the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals"); *United States v. Fulmer*, 108 F.3d 1486, 1491 (1st Cir. 1997) (holding that the test for "true threats" is "whether [the speaker] should have reasonably foreseen that the statement he uttered would be taken as a threat by those to whom it is made").  Plaintiffs also do not claim the right to destroy or steal physical property; indeed, they acknowledge that taking animals, even when referred to as "direct action" or "rescue," is illegal.  Compl. ¶ 79.  Consequently, the AETA "by its terms applies to so many situations in which speech is *not* involved that the number of times it will be applied to restrict speech would seem comparatively small."  *United States v. Bader*, 698 F.2d 553, 556 (1st Cir. 1983) (Breyer, J.); *see also United States v. Buddenberg*, No. 09-00263, 2009 WL 3485937, at *4 (N.D. Cal. Oct. 28, 2009) (upholding the AETA against an overbreadth challenge).

Plaintiffs contend that the AETA reaches "a substantial amount of First-Amendment-protected activity" through its prohibition on "intentionally damag[ing] or caus[ing] the loss of any real or personal property (including animals or records) used by an animal enterprise, or having a connection to, relationship with, or transactions with an animal enterprise." Compl. ¶ 34; 18 U.S.C. § 43(a)(2)(A).  That contention is baseless.  Subsection (A), like all of the AETA, is limited by the statute's "rule of construction": "[n]othing in [the AETA] shall be

construed to prohibit any expressive conduct (*including peaceful picketing or other peaceful demonstration*) protected from legal prohibition by the First Amendment." 18 U.S.C. § 43(e)(1) (emphasis added). The Act thus cannot reach constitutionally-protected expression, because it expressly states that it does *not* do so. There is no reason to ignore this limiting provision, particularly given the Supreme Court's admonition that courts faced with overbreadth challenges "should, of course, construe the statute to avoid constitutional problems." *Ferber*, 458 U.S. at 769 n.24; *United States v. Bird*, 124 F.3d 667, 683 & n.17 (5th Cir. 1997) (rejecting overbreadth challenge in part because statute contained savings clause worded identically to the AETA's).

Plaintiffs argue that the savings clause is "effectively meaningless because no federal statute could prohibit any expressive conduct ... protected by the First Amendment." Compl. ¶ 52. That is a curious argument, since an overbreadth challenge *requires* a showing that the statute "prohibits constitutionally protected conduct." *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1982). Indeed, the "court's first task is to determine whether the enactment *reaches a substantial amount of constitutionally protected conduct.* If it does not, then the overbreadth challenge must fail." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982) (emphasis added). Due to its "rule of construction," the AETA avoids overbreadth for the simple reason that it is *defined* not to reach protected conduct.[14]

Plaintiffs also complain that the reach of First Amendment protection is "hardly obvious to the legal profession, much less to the public" and that they "should not be forced to test the

---

[14] Plaintiffs' assertion that no federal statute could constitutionally regulate protected speech (Compl. ¶ 52) is also manifestly erroneous. Courts have rejected challenges to statutes that regulate plainly protected speech. *See, e.g.*, *Burson v. Freeman*, 504 U.S. 191 (1992) (upholding law prohibiting the solicitation of votes and the display or distribution of campaign materials within 100 feet of the entrance to a polling place); *Frisby v. Schultz,* 487 U.S. 474 (1988) (upholding ordinance prohibiting picketing "before or about" a residence); *McCullen v. Coakley*, 571 F.3d 167 (1st Cir. 2009) (affirming this Court's rejection of facial challenge to law prohibiting protected activity within a buffer zone surrounding reproductive health clinics).

- 10 -

breadth ... of the First Amendment."  Compl. ¶¶ 51-52.  But Plaintiffs themselves are able to

identify several forms of advocacy that the AETA clearly does not prohibit.  *E.g.*, Compl. ¶¶ 111

(acknowledging that "leafleting, public speaking and campaign work … do[] not risk

prosecution"), 133 (acknowledging as "safe tactics" "letter writing campaigns, petitions, [and]

attending conferences"); 142 (stating an "understand[ing] that theoretical advocacy of illegal

action, along with expressions of support for those who violate the law, is protected by the First

Amendment" and that "it is lawful to protest in front of an individual's home, consistent with

municipal and state ordinances limiting such activity, as long as one does not make threatening

statements").  Plaintiffs also identify various activities—including past actions by "animal rights

activists"—that are "illegal" and not constitutionally protected.  Compl. ¶¶ 55 ("personal threats

and property destruction"), 79 (acknowledging Plaintiff Blum's "illegal rescue" of ducks).

While close questions may arise, they are merely hypothetical at this point and can be addressed

"through case-by-case analysis of the fact situations to which [the Act's] sanctions, assertedly,

may not be applied."  *Broadrick*, 413 U.S. at 615-616.

Plaintiffs take issue with the fact that the AETA's prohibition on activity that causes an

animal enterprise to lose "personal property" extends to prohibited activity that causes loss of

profits or increased security costs.  Compl. ¶¶ 5, 16, 36, 38.  But that is irrelevant, because

protected speech—such as a lawful "labor picket," "investigation," "protest," "boycott," or "mail

campaign" (Compl. ¶¶ 38-39)—is expressly exempted from prohibition under 18 U.S.C. §

43(e)(1).  Accordingly, it does not matter whether constitutionally-protected activity causes lost

profits or any kind of "damage[]" or "loss"; if it is constitutionally protected, the AETA does not

prohibit it.  While *unprotected* speech (such as threats or incitement to imminent lawless action)

is punishable if the remaining requirements of the AETA are met, it is not constitutionally

problematic to limit the prohibition to situations involving loss of property, including lost profits

or increased security costs.  Indeed, such unprotected speech could be banned entirely.  *See*

*Black*, 538 U.S. at 359; *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942).[15]

   Plaintiffs' claims of "chill," when closely examined, turn not on fear that the AETA

*prohibits*, or allows them to be *convicted* for, any constitutionally-protected speech, but rather on

an asserted fear of arrest or prosecution under color of the AETA—even though constitutionally

protected speech is not prohibited under the AETA.  *E.g.*, Compl. ¶¶ 14, 17 ("fear of

prosecution"), 16 ("possibility of prosecution"), 128 ("possibility of facing charges").[16]  But the

overbreadth doctrine turns on "whether *the prohibitory terms* of a particular statute extend to

protected conduct … [and] whether individuals who engage in protected conduct can be

*convicted* under a statute, not whether they might be subject to arrest and prosecution."  *Black*,

538 U.S. at 371 (Scalia, J., concurring in part, concurring in the judgment in part, and dissenting

in part) (citing cases); *see also Ferber*, 458 U.S. at 768 (overbreadth doctrine is based on "fear of

*criminal* sanctions by a statute susceptible of *application* to protected expression" (emphasis

added; internal quotation marks omitted)).

   Moreover, plaintiffs' assertion that they have been personally chilled because they

perceive a risk of arrest or prosecution due to protected activity—a prosecution the AETA would

---

[15] For the same reason, Plaintiffs' objection to the breadth of the term "animal enterprise" (Compl. ¶ 47) adds nothing to their overbreadth argument.  Section 43(e)(1) exempts protected conduct and speech from the AETA's prohibition, regardless of the kind of "enterprise" to which any "loss" may be caused.  To the extent Plaintiffs contend that the definition of "animal enterprise" covers more than just research facilities and other institutions that were targeted in the attacks that prompted the AETA, "[t]he fact that the coverage of the statute is broader than the specific concern that led to its enactment is of no constitutional significance."  *Hill v. Colorado*, 530 U.S. 703, 730-731 (2000).  Rather, "[w]hat is important is that all [covered entities] share the interests served by the statute"—which is plainly the case here.  *Id*. at 731.

[16] Plaintiff Johnson apparently does not even fear arrest or prosecution; he complains only that he has been "unable to convince others to work with him" and "has not found a community to connect with."  Compl. ¶¶ 159, 161.

not authorize—is hypothetical at best.  A constitutionally-drafted statute does not become overbroad simply because a rogue police officer or prosecutor might enforce it beyond its terms. Were that to occur, the remedy is "not to invalidate the law *in toto*, but rather to reverse the particular conviction."  *Ferber*, 458 U.S. at 773.  In extreme cases, a remedy may lie against the officer.  *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 390-397 (1971).  But the Department of Justice has specifically indicated that it has no desire to prosecute, or even chill, protected speech.  *See supra* p. 7; Def. Br. 13-14 n.4.  And while the FBI has "endorsed prosecution" of what Plaintiffs euphemistically call "undercover investigation and open rescue," the actual activities the FBI discusses are clearly not constitutionally protected, namely "illegal entry" and "taking animals."  Compl. ¶ 98; Compl. Ex. A at 2.  Accordingly, whatever "chill" Plaintiffs assert is not "the kind and degree of chill that is judicially cognizable."  *Ferber*, 458 U.S. at 772 n.27 (internal quotation marks omitted).

In sum, this is not even a case where Plaintiffs can "conceive of some impermissible applications of a statute"—though even that "is not sufficient to render it susceptible to an overbreadth challenge."  *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984).  Rather, Plaintiffs are asking the Court to invalidate an act of Congress on speculation that it will be misapplied contrary to its own terms, namely without regard for its "rule of construction" that constitutionally-protected activity is not prohibited.  Plaintiffs' assertion amounts at best to a "fanciful hypothetical[]" (*Williams*, 553 U.S. at 301-303); it is certainly not a "sufficiently sprawling" application of the AETA that could support a finding of overbreadth, much less substantial overbreadth.  *McCullen*, 571 F.3d at 182.  Because the AETA's "legitimate reach dwarfs [any] arguably impermissible applications," it is not overbroad.  *Ferber*, 458 U.S. at 773.

ACTIVEUS 92968098v12

## II.     THE AETA IS NOT UNCONSTITUTIONALLY VAGUE

Plaintiffs' facial vagueness attack fails because the AETA "is surely valid in the vast majority of its intended applications."  *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (internal quotation marks and citation omitted).  It is not enough that a statute "requires some interpretation."  *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 13-14 (1st Cir. 2011) (internal quotation marks omitted).  After all, "[c]lose cases can be imagined under virtually any statute.  The problem that poses is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt."  *Williams*, 553 U.S. at 306.  Accordingly, Plaintiffs must show that the AETA "fail[s] to give persons of ordinary intelligence a reasonable opportunity to know what conduct is proscribed and what is not" or that it "delegate[s] basic policy matters to adjudicators for resolution on an ad hoc or largely subjective basis, thus threatening arbitrary and discriminatory application."  *McCullen*, 571 F.3d at 183.

None of the terms Plaintiffs challenge makes it impossible to know what is prohibited.  Indeed, courts have rejected vagueness challenges to most of the very terms Plaintiffs identify.

***"Damaging"; "damages"; "loss."***  The term "damage" commonly appears in statutes.  *See, e.g.*, 18 U.S.C. § 32(a)(1), (3) (punishing anyone who willfully "damages" aircraft or an air navigation facility); 18 U.S.C. § 831(a)(1) (prohibiting transactions involving nuclear materials that cause or are likely to cause "substantial damage to property or to the environment"); 18 U.S.C. § 956(b) (prohibiting conspiracy to "damage" property in a foreign country).  Courts have rejected vagueness challenges to "damage" or its variants.  *E.g.*, *United States v. Doremus*, 888 F.2d 630, 635-36 (9th Cir. 1989) (rejecting as-applied challenge to 36 C.F.R. § 261.1(b), which provides a civil penalty for "damaging" federal property); *Wilson v. Johnson*, 247 F. App'x 620, 626 (6th Cir. 2007) (rejecting vagueness challenge to university disciplinary policy prohibiting "knowingly caus[ing] damage to ... any real or personal property of another" (internal

ACTIVEUS 92968098v12

quotation marks omitted)).  "Loss" is also a term well-known to the law; Plaintiffs themselves refer to its "common use" and cite cases interpreting it.  Compl. ¶ 36 & n.1.  Ultimately, Plaintiffs are themselves able to interpret these terms broadly to include "the loss of profit and increased security costs."  Compl. ¶ 36.  While Plaintiffs contend that these terms are overbroad—a contention that fails—their ability to interpret the words makes plain that they cannot be so *vague* as to violate the Fifth Amendment.[17]

*"Interfering."*  Courts have similarly found that laws containing the term "interfering" are constitutional.  *See Buddenberg*, 2009 WL 3485937, at *8 (AETA); *see also Cameron v. Johnson*, 390 U.S. 611, 616 (1968) (statute prohibiting "obstruct[ing] and "interfer[ing]" with ingress or egress to and from a courthouse "clearly and precisely delineates its reach in words of common understanding" and "plainly require[s] no 'guess(ing) at (their) meaning'" (alterations in original)); *Bird*, 124 F.3d at 683-84 (federal statute prohibiting "injur[ing], intimidat[ing] or interfer[ing]" with a person seeking reproductive health services was not unconstitutionally vague); *see also United States v. Gwyther*, 431 F.2d 1142, 1144 n.2 (9th Cir. 1970) (stating, in the context of a challenge to an indictment, that "'interfere' has such a clear, specific and well-known meaning as not to require more than use of the word[] [itself] in a criminal statute").

*"Course of conduct."*  The AETA prohibits intentionally placing a person in fear of death or serious bodily injury by a "course of conduct involving threats, acts of harassment, acts of vandalism, property damage, criminal trespass, harassment, or intimidation," and further defines "course of conduct" as "a pattern of conduct composed of 2 or more acts, evidencing a

---

[17] Plaintiffs also claim that the term "economic damages" is vague, although they acknowledge that the term is defined in the statute.  Compl. ¶¶ 167, 35.  Their argument appears to be that the limiting definition of "economic damages" in 18 U.S.C. § 43(d)(3)(B) does not narrow or clarify the terms "damage" or "loss" in the offense section of the statute.  But no clarification is necessary, because those terms are not vague to begin with.

continuity of purpose." 18 U.S.C. § 43(a)(2)(B), (d)(2). "Course of conduct" appears in other federal statutes. *E.g.*, *id.* § 2266(a)(2) (defining "course of conduct" in the interstate stalking statute identically to the AETA); *United States v. Shrader*, No. 1:09-0270, 2010 WL 2179572, at *4-5 (S.D. W. Va. Apr. 7, 2010) (rejecting vagueness challenge to the interstate stalking statute, because the statute "is sufficiently specific to put a person of reasonable intelligence on notice of the proscribed conduct"); *see also* U.S.S.G. § 1B1.3(a)(2) (instructing sentencing courts to consider acts and omissions that were part of the same "course of conduct").

Plaintiffs assert that the AETA's definition of "course of conduct" is vague because it is not clear whether the required "continuity of purpose" could be satisfied by a general "political purpose," and it is not clear how one counts "2 or more acts." Compl. ¶¶ 40-41. But these are not the kind of claims that win a facial vagueness challenge; "words are rough-hewn tools, not surgically precise instruments. Consequently, some degree of inexactitude is acceptable in statutory language." *URI Student Senate*, 631 F.3d at 14. Moreover, the AETA "contains additional terms that supply concrete guidance as to the behavior that it prohibits." *Id.* The AETA makes clear that a "course of conduct" must involve "threats, acts of vandalism, property damage, criminal trespass, harassment, or intimidation," with the *intended* effect of "placing a person in reasonable fear of" death or serious bodily injury. 18 U.S.C. § 43(a)(2)(B). Accordingly, the "2 or more acts" that can make up a "course of conduct" under subsection (B) are the "acts" identified in subsection (B) itself: threats or "acts" of vandalism, property damage, criminal trespass, harassment, or intimidation. And the continuity of "purpose" refers to the purpose identified in the AETA: "the purpose of damaging or interfering with the operations of an animal enterprise." *Id.* § 43(a)(1). The fact that there is no "time frame specified " for such a "course of conduct" (Compl. ¶ 41) is not surprising; criminal organizations like ALF—like many

ACTIVEUS 92968098v12

terrorists who target defenseless civilians—have proven themselves willing and able to lie in wait and spread their attacks over years.  *See supra* pp. 3-6.  A person who *intentionally* plots to place another in reasonable fear of death or serious bodily injury by engaging in "disparate acts across years" (Compl. ¶ 41) cannot plausibly complain that he is not engaged in the same planned, deliberate "course of conduct."  Lack of a time limitation on such a "course of conduct" certainly does not make the statute *vague*.[18]

Of course, Plaintiffs do not contend that they wish to put anyone in fear of death or serious injury, much less do so intentionally.  The intent requirement, which is an essential element of the AETA's prohibitions, alleviates any vagueness concern, because it removes any possibility that anyone will unwittingly run afoul of the law.  *See Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2720 (2010); *Hill*, 530 U.S. at 732; *Hoffman Estates*, 455 U.S. at 499; *United States v. Fullmer*, 584 F.3d 132, 153 (3d Cir. 2009) (upholding AETA's predecessor act).  "The theoretical possibility" that someone in Plaintiffs' position might be prosecuted under the AETA "is of no due process significance unless the possibility ripens into a prosecution."  *Hoffman Estates*, 455 U.S. at 503 n.21.

---

[18] The terms that Plaintiffs challenge have nothing in common with the open-ended, subjective terms that have been held vague.  The term "vagrants"—defined to include "rogues and vagabonds," "habitual loafers," and "common night walkers"—gave the police "unfettered discretion" and made "even-handed administration of the law" impossible.  *Papachristou v. Jacksonville*, 405 U.S. 156, n.1, 168, 171 (1972).  Prohibiting three or more people from congregating in a manner that is "annoying" imposes "an unascertainable standard" enforced at the whim of the arresting officer.  *Coates v. Cincinnati*, 402 U.S. 611, 613-14 (1971).  The same is true of a provision allowing withholding of a license for activity that would "significantly harm[] the legitimate protectable interests of the affected citizens," which allows "purely subjective evaluations of wholly unrestricted factors, and thus vests the denial of a license in the essentially unbridled discretion of a municipal administrator."  *Fantasy Book Shop v. City of Boston*, 652 F.2d 1115, 1119, 1123 (1st Cir. 1981).  The AETA's terms have nothing in common with these examples.

ACTIVEUS 92968098v12

**III.      THE AETA IS CONTENT-NEUTRAL AND VIEWPOINT-NEUTRAL**

Plaintiffs complain that the AETA unconstitutionally discriminates on the basis of viewpoint and content.  Compl. ¶ 169.  But to succeed in this facial challenge, Plaintiffs must show that "no set of circumstances exists under which the Act would be valid."  *McCullen*, 571 F.3d at 174 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).[19]  Plaintiffs cannot meet that standard; even they admit that the AETA applies to substantial "illegal" conduct that is not constitutionally protected.  *See supra* pp. 9, 11; *see also McCullen*, 571 F.3d at 176 ("[A] law designed to serve purposes unrelated to the content of protected speech is deemed content-neutral even if, incidentally, it has an adverse effect on certain messages.").  And even to the extent that it extends to speech, it applies to unprotected speech—threats and intimidation— regardless of message or viewpoint.

The fact that the statute provides specific protection for "animal enterprises" against property crimes and threats does not mean that it singles out any particular *viewpoint*.  "Whether those who violate [the AETA] are doing so because of their commitment to animal rights, or worker's pay, or a particular animal enterprise's conduct overseas is irrelevant to establishing a violation."  *Buddenberg*, 2009 WL 3485937, at *12.  Thus, if a chef eliminated foie gras from her menu out of concern for animal cruelty, and an angry farmer responded by repeatedly threatening the chef or by burning down the restaurant, the AETA could apply (assuming the remaining elements were satisfied).  In this respect, as Defendant points out (Def. Br. 28), the AETA resembles the Freedom of Access to Clinics Entrances Act ("FACE"), 18 U.S.C. § 248, which prohibits injuring, intimidating, or interfering with a person seeking reproductive health services.  Like the FACE, the AETA applies to conduct that can have an expressive element but

---

[19] Although the Complaint formulaically incants that the AETA is unconstitutional "on its face, and as applied to Plaintiffs" (*e.g.*, Compl. ¶¶ 165, 167; Prayer for Relief ¶ 1), they do not allege that AETA has been "applied" to them at all.

also carries "physical consequences that are independent of symbolic significance." *United States v. Soderna*, 82 F.3d 1370, 1374-1375 (7th Cir. 1996) (Posner, J.). Also like the FACE, the AETA "applies to anyone who violates its terms, regardless of ideology or message." *Norton v. Ashcroft*, 298 F.3d 547, 553 (6th Cir. 2002). Indeed, Judge Posner specifically likened FACE to a hypothetical law prohibiting "bombing of laboratories by persons seeking to impede research on animals," which he opined would be consistent with the First Amendment. *Soderna*, 82 F.3d at 1376.[20]

It does not matter that the AETA may be used against animal rights activists more than other groups. Just because a law disproportionately reaches the speech or conduct of individuals with a certain viewpoint does not render it invalid; "there is no disparate impact theory under the First Amendment." *Norton*, 298 F.3d at 553 (quoting *Soderna*, 82 F.3d at 1376); *see also McCullen*, 571 F.3d at 177 ("[A] disparate impact on particular kinds of speech is insufficient, without more, to ground an inference that the disparity results from a content-based preference." (citation omitted)); *Soderna*, 82 F.3d at 1376 ("[T]he authority of government to criminalize dangerous or destructive conduct is not diminished by the fact that most or even all of the people who engage in the particular conduct sought to be criminalized do so for political reasons."). Nor does it matter that the violence that led to the AETA's enactment was perpetrated by animal rights extremists. *McCullen*, 571 F.3d at 176 ("[I]t is insufficient that a regulation may have been adopted in direct response to the negative impact of a particular form of speech." (quoting *McGuire v. Reilly*, 260 F.3d 36, 45 (1st Cir. 2001))). The AETA was enacted to protect

---

[20] Every Circuit to consider a viewpoint discrimination challenge to FACE has upheld it. *See Norton*, 298 F.3d at 553; *United States v. Weslin*, 156 F.3d 292, 297 (2d Cir. 1998); *Terry v. Reno*, 101 F.3d 1412, 1418-1421 (D.C. Cir. 1996); *United States v. Dinwiddie*, 76 F.3d 913, 921-923 (8th Cir. 1996); *Soderna*, 82 F.3d at 1374-1376; *Cheffer v. Reno*, 55 F.3d 1517, 1521-1522 (11th Cir. 1995); *American Life League, Inc. v. Reno*, 47 F.3d 642, 648-653 (4th Cir. 1995).

- 19 -

individuals and institutions like *amici* and their members from violence, threats, and property

damage, regardless of the motivating viewpoint or message.  *See Buddenberg*, 2009 WL

3485937, at *11.  Plaintiffs cannot show that the AETA violates the First Amendment, and

certainly not in *all* of its applications, as is required for this facial challenge.

## CONCLUSION

Congress passed the AETA as a measured and carefully-crafted response to alarming,

violent attacks by criminals and criminal organizations.  If, as Plaintiffs profess, they seek only

to engage in lawful reporting, commentary, advocacy, and protest protected by the First

Amendment, they have nothing to fear from the AETA.  They cannot, however, overturn

Congress's sound judgment that the criminal law should protect innocent civilians and lawful

enterprises from violent conduct that is *not* protected by the Constitution—whether the conduct

is theft framed as "rescue," trespass framed as "investigation," vandalism framed as "direct

action," or intimidation framed as "protest."

For the foregoing reasons, the Court should grant the government's motion and dismiss

the Complaint with prejudice.

ACTIVEUS 92968098v12

April 6, 2012                              Respectfully submitted,


                                            /s/  Mark C. Fleming_____
                                           Seth P. Waxman (admitted *pro hac vice*)
                                           WILMER CUTLER PICKERING HALE AND
                                           DORR LLP
                                           1875 Pennsylvania Avenue, N.W.
                                           Washington, D.C. 20006
                                           Seth.waxman@wilmerhale.com

                                           Mark C. Fleming (BBO #639358)
                                           WILMER CUTLER PICKERING HALE AND
                                           DORR LLP
                                           60 State Street
                                           Boston, MA 02109
                                           (617) 526-6000
                                           Mark.fleming@wilmerhale.com

                                           *Counsel for* Amici Curiae *National Association for
                                           Biomedical Research, Association of American
                                           Medical Colleges, Association of American
                                           Universities, Association of American Veterinary
                                           Medical Colleges, Association of Public and Land-
                                           grant Universities, Federation of American
                                           Societies for Experimental Biology, Massachusetts
                                           Biotechnology Council, Massachusetts Society for
                                           Medical Research, The General Hospital
                                           Corporation d/b/a Massachusetts General Hospital,
                                           The Brigham & Women's Hospital, Inc., and The
                                           McLean Hospital Corporation*

ACTIVEUS 92968098v12

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing document was served upon the

following persons on the 6th day of April 2012 through the Court's electronic filing system.

Howard Friedman
David Milton
Law Offices of Howard Friedman, P.C.
90 Canal Street
5th Floor
Boston, MA 02114-2022
hfriedman@civil-rights-law.com
dmilton@civil-rights-law.com

Alexander A. Reinert
c/o Benjamin N. Cardozo School of Law
55 Fifth Avenue, Room 938
New York, NY 10003
areinert@yu.edu

Rachel Meeropol
Alexis Agathocleous
Center for Constitutional Rights
666 Broadway
7th Floor
New York, NY 10012
rachelm@ccrjustice.org
aagathocleous@ccrjustice.org

Deanna L. Durrett
United States Department of Justice
Civil Rights Division, Employment Litigation Section
26 Federal Plaza
New York, NY 11201
deanna.l.durrett@usdoj.gov

/s/ Mark C. Fleming
Mark C. Fleming

- 22 -