# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SARAHJANE BLUM; RYAN SHAPIRO; LANA LEHR; LAUREN GAZZOLA; and IVAR ROBERT JOHNSON III, | ) ) ) ) **Civil Action No. 1:11-cv-12229** |
| Plaintiffs | ) ) |
| v. | ) (Leave to File Granted on April 3, 2012) ) |
| ERIC HOLDER, in his official capacity as Attorney General of the United States of America, | ) (Leave to File Excess Pages Granted ) on April 3, 2012) ) ) |
| Defendant | ) ) ) |

**BRIEF OF *AMICI CURIAE*, DR. EDYTHE D. LONDON, DR. J. DAVID JENTSCH, DR. PETER WHYBROW, DR. GORAN LACAN, DR. LYNN FAIRBANKS, DR. JOHN SCHLAG, DR. MADELEINE SCHLAG-REY, DR. DARIO RINGACH, DR. LINDA J. PORRINO, DR. NANCY A. ATOR, DR. P. MICHAEL CONN, DR. MICHELE A. BASSO, DR. STEPHEN J. BERGMAN, DR. MARILYN E. CARROLL, DR. BERTHA MADRAS, DR. JONATHAN C. HORTON, AND DR. PAUL FINKELMAN IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

# AMICI*

Dr. Edythe D. London
Thomas Pike Professor of Addiction Studies
David Geffen School of Medicine
UNIVERSITY OF CALIFORNIA AT
  LOS ANGELES
Los Angeles, California

Dr. Peter Whybrow
Professor and Chair, Dept. of Psychiatry
Director, Semel Institute of Neuroscience
David Geffen School of Medicine
UNIVERSITY OF CALIFORNIA AT
  LOS ANGELES
Los Angeles, California

Dr. Lynn Fairbanks
Professor of Psychiatry
Director, Center for Primate Neuroethology
David Geffen School of Medicine
UNIVERSITY OF CALIFORNIA AT
  LOS ANGELES
Los Angeles, California

Dr. Madeleine Schlag-Rey
Emeritus Neurobiologist
Department of Neurobiology
David Geffen School of Medicine
UNIVERSITY OF CALIFORNIA AT
  LOS ANGELES
Los Angeles, California

Dr. Linda J. Porrino
Professor of Physiology and Pharmacology
Chair, Department of Physiology
  and Pharmacology
WAKE FOREST SCHOOL OF MEDICINE
Winston-Salem, North Carolina

Dr. J. David Jentsch
Professor of Behavioral Neurosciences
David Geffen School of Medicine
UNIVERSITY OF CALIFORNIA AT
  LOS ANGELES
Los Angeles, California

Dr. Goran Lacan
Dept. of Molecular and Medical
  Pharmacology
David Geffen School of Medicine
UNIVERSITY OF CALIFORNIA AT
  LOS ANGELES
Los Angeles, California

Dr. John Schlag
Emeritus Distinguished Professor
Department of Neurobiology
David Geffen School of Medicine
UNIVERSITY OF CALIFORNIA AT
  LOS ANGELES
Los Angeles, California

Dr. Dario Ringach
Professor Neurobiology and Psychology
Jules Stein Eye Institute
David Geffen School of Medicine
UNIVERSITY OF CALIFORNIA AT
  LOS ANGELES
Los Angeles, California

Dr. Nancy A. Ator
Professor of Pharmacology
Director, Division of Behavioral Biology
JOHNS HOPKINS UNIVERSITY SCHOOL OF
  MEDICINE
Baltimore, Maryland

*Affiliations of *Amici* are listed for identification purposes only, and do not reflect the views of their respective institutions.

Dr. P. Michael Conn
Professor of Physiology and Pharmacology
Director, Office of Research Advocacy
OREGON HEALTH & SCIENCE UNIVERSITY
Portland, Oregon

Dr. Stephen J. Bergman
Clinical Instructor in Psychiatry
HARVARD MEDICAL SCHOOL
Cambridge, Massachusetts

Dr. Bertha Madras
Professor of Psycobiology
Chair, Division of Neurochemistry
HARVARD MEDICAL SCHOOL
Cambridge, Massachusetts

Dr. Paul Finkelman
William McKinley Distinguished Professor
   of Law and Public Policy and Senior Fellow
   in the Government Law Center
ALBANY LAW SCHOOL
Albany, New York

Dr. Michele A. Basso
Associate Professor
Department of Neuroscience
UNIVERSITY OF WISCONSIN MADISON
Madison, Wisconsin

Dr. Marilyn E. Carroll
Professor of Psychiatry
Department of Neuroscience
UNIVERSITY OF MINNESOTA
Minneapolis, Minnesota

Dr. Jonathan C. Horton
William Hoyt Professor of Ophthalmology
Beckman Vision Center
UNIVERSITY OF CALIFORNIA AT
   SAN FRANCISCO
San Francisco, California

# TABLE OF CONTENTS

STATEMENT OF INTEREST OF *AMICI CURIAE* ..............................................................1

SUMMARY OF ARGUMENT ........................................................................................2

INTRODUCTION .........................................................................................................4

ARGUMENT ................................................................................................................5

    I.      Congress Enacted The AETA And Its Predecessor In Response To
           Increasing Acts of Terrorism Targeted At Scientists And Medical
           Researchers Such As The *Amici* ....................................................................5

    II.     Freedom Of Speech Has Never Been Unbridled And Has Never
           Protected Acts Of Terrorism .........................................................................19

    III.    The AETA Is Constitutional Because It Prosecutes Terrorism And The
           Plaintiffs Have Means Of Advocacy At Their Disposal That Are Both
           Effective And Lawful ...................................................................................22

CONCLUSION..............................................................................................................26

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Amnesty v. Blair,*
    No. 09-4112 (2nd Cir. 2011)............................................................................22

*Brandenburg v. Ohio,*
    395 U.S. 444 (1969).......................................................................................21

*Debs v. United States,*
    249 U.S. 211 (1919)..................................................................................20, 21

*Dennis v. United States,*
    341 U.S. 494 (1951).......................................................................................20

*Gitlow v. New York,*
    268 U.S. 652 (1925)..................................................................................20, 21

*In Re: National Security Agency Telecommunications Records Litigation,*
    No. M:06-cv-1791 (Central District, California 2006)......................................22

*New York Times v. Sullivan,*
    376 U.S. 254 (1964)..................................................................................19, 20

*Schenck v. United States,*
    249 U.S. 47 (1919)....................................................................................20, 22

*United States v. Bellrichard,*
    994 F.2d 1318 (8th Cir. 1993) ........................................................................21

*United States v. Buddenberg,*
    2010 U.S. Dist. LEXIS 78201 (N.D. Ca. July 12, 2010)..................................23
    2009 WL 3485937 (N.D. Cal. Oct. 28, 2009) ................................................24

*United States v. Fullmer,*
    584 F.3d 132 (3d Cir. 2009)...........................................................6, 8, 10, 21

*United States v. Viefhaus,*
    168 F.3d 392 (10th Cir. 1999) ........................................................................21

*Virginia v. Black,*
    538 U.S. 343 (2003)..................................................................................20, 21

*Virginia v. Hicks,*
    539 U.S. 113 (2003).......................................................................................20

*Wisconsin v. Mitchell*,
    508 U.S. 476 (1993) ...........................................................................................20

## FEDERAL STATUTES

18 U.S.C. §43 (Animal Enterprise Terrorism Act of 2006) (AETA) ...............................*passim*

18 U.S.C. §43 (Animal Enterprise Protection of 1992) (AEPA).......................................*passim*

18 U.S.C. §§2331, 2333-2339 (USA PATRIOT Act of 2001).................................................22

## STATE STATUTES

M.G.L. c. 226 § 127 (Wanton Destruction of Real or Personal Property)…..………………..23

## ADDITIONAL AUTHORITIES

Letter from American Civil Liberties Union (ACLU) to Hon. James Sensenbrenner,
    Chairman, House Judiciary Committee and Hon. John Conyers, Ranking Member,
    House Judiciary Committee, *Re: ACLU Urges Needed Minor Changes to AETA
    But Does Not Oppose Bill (S. 3880, the "Animal Enterprise Terrorism Act,")*
    October 30, 2006.................................................................................................................23

*Animal Extremists Get Personal*, 118 SCIENCE 1856 (21 December 2007) ............................12

THE FEDERALIST NO. 84 (Alexander Hamilton) (Clinton Rossiter ed. 1961) ..........................18

Paul Finkelman, *James Madison and the Bill of Rights: A Reluctant Paternity*, 1990
    SUPREME COURT REVIEW 301-47 (1991), *reprinted in* INTERNATIONAL LIBRARY OF
    ESSAYS IN THE HISTORY OF SOCIAL AND POLITICAL THOUGHT SERIES:
    JAMES MADISON (Terence Ball, ed.) (2008): 363-409……………………………………18

James Madison, Report on the Virginia Resolutions, January 1800, 6 THE WRITINGS OF
    JAMES MADISON 385-401 (Gaillard Hunt, ed.) (1900-1910)……………………..……… 18

Abraham Wagner, *Presidential Power in an Age of Terror*, SALTZMAN WORKING PAPER
    No. 14, Arnold A. Saltzman Institute of War and Peace Studies,
    Columbia University (June 2010).....................................................................................20

Abraham Wagner, "Terrorism and The Internet: Uses and Abuses" in M. Kandel and
    A. Last (eds.), *Cyberterrorism*. (New York: World Scientific, 2005)...............................20

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici curiae* are scientists and medical researchers who have been subjected to increasing criminal violence and continued harassment from animal rights extremists for more than two decades.  Since 1987 *Amici* and their colleagues have had their homes and cars firebombed, their research stolen and destroyed, their lives and the lives of their family members threatened.  The objective of these extremists is to force the *Amici* to abandon their professional activities in medical research.  The *Amici* have devoted their professional lives to medical and scientific research, which often requires the use of laboratory animals. They seek to advance the science of medicine, providing the nation with better and more cost-effective health care.

The Animal Enterprise Terrorism Act of 2006 (AETA) provides an important tool for federal law enforcement authorities to prosecute extremists and their underground support networks when they individually or collectively target and attack Animal Enterprises. Extremists have moved well beyond lawfully protected speech to unprotected acts of criminal violence, such as firebombing cars, flooding homes, stalking, and threatening.  The AETA proscribes this form of conduct and therefore does not unconstitutionally violate the First Amendment rights of the Plaintiffs.

If the Plaintiffs are successful, substantial harm could easily result to medication and treatment development in the United States.  *Amici* here seek to express their views as victims of such domestic terrorist acts, or as concerned colleagues who see such violence as jeopardizing the enterprise of medical research.  The *Amici* also provide an analysis of the historical context of the Constitutional guarantee of freedom of speech and various limitations imposed on this guarantee over time by Congress and the Courts because of the importance of the issue before this Court.  They urge this Court to consider the Framers' intent and also urge the Plaintiffs to pursue the lawful means of advocacy available to them that is not proscribed by the AETA.

## SUMMARY OF ARGUMENT

The AETA does not unconstitutionally violate the First Amendment because it targets unprotected terrorist conduct like the destruction of property and true threats of violence. AETA's purpose is to combat acts of terrorism targeted at individuals, including researchers like the *amici*, who dedicate their lives to the advancement of science and medicine.  The Framers never intended Freedom of Speech to interfere with such a purpose and neither Congress nor the Supreme Court allow the First Amendment to protect terrorism.   The AETA is not unconstitutional because it prohibits either unprotected conduct or true threats and the Plaintiffs have lawful and more effective means of expressive advocacy at their disposal.

Congress enacted the AETA and its predecessor, the AEPA, in response to very real and increasing acts of domestic terrorism often targeted at researchers like the *Amici* here.  The purpose of the legislation was to provide a federal enforcement tool against the reoccurring threats and violent activity perpetrated by terrorists and often targeted against certain individuals and organizations.  These perpetrators are fairly dubbed "terrorists" in part because of their underground nature and loosely-affiliated structure, but primarily because their *modus operandi* instills mass fear in the lives of innocent civilians. They employ a broad spectrum of tactics to instill fear, ranging from mailing HIV-Infected razor blades to faculty at Harvard Medical School to firebombing homes of neuroscientists at the University of California at Los Angeles.  Targets, including the *Amici* here, are medical and scientific researchers that engage in animal studies because it is required by federal law for medical research.  In pursuit of these ends, they have weathered a storm of threats and violence that has swept the globe for over two decades and resulted in millions of dollars of damages to individuals, both public and private universities, as well as non-profit organizations.

2

While drawing the line between protected free speech necessary to a democratic society and unprotected illegal conduct has presented a challenge to our Nation from its very beginning, the First Amendment has never been a shield for terrorism.  The Founding Fathers drew this line in such a way as to provide broad protection for individual liberty in order to promote a marketplace of ideas necessary for a democracy.  During difficult times in our Nation's history, the Supreme Court tightened this protection in the interest of national security and allowed more "speech" to fall into the category of unprotected, illegal conduct.  Contemporary American law is more aligned with the vision of the Framers and yet it rightfully denies protection for violence, destructing real or personal property, advocating imminent unlawful behavior, and imposing true threats.  Regardless of the precise location of this line, the First Amendment does not and must not protect terrorism.

The AETA on its face and as applied unquestionably targets domestic terrorism by prohibiting unlawful conduct and intimidation.  The wording of the AETA consists primarily of two provisions, which target the unprotected categories of property destruction and intimidation that places individuals in a reasonable fear of death or serious bodily injury, respectively.  The Government has sparingly enforced the AETA by limiting its application to factual scenarios involving these two unprotected categories.  Since the AETA primarily targets unlawful conduct and secondarily targets "true threats," a decision striking it down would allow Freedom of Speech to shield terrorism.  Such a decision must not stand lest it remove a barricade necessary for researchers like the *Amici* here to continue their tireless work advancing medical science.  The better approach is to allow the AETA to stand rightfully on constitutional grounds and encourage activists like the Plaintiffs to pursue the presently available means of advocacy that are both lawful and effective.

## **INTRODUCTION**

The AETA is not unconstitutional because it targets unprotected terrorist conduct. The purpose of the AETA is to combat acts of terrorism targeted at individuals, including medical researchers like the *Amici*, who dedicate their lives to the advancement of science and medicine. Freedom of Speech was never intended to interfere with such a purpose and does not protect terrorism, whether in the form of violence, the destruction of real or personal property, or threats and intimidation. The AETA is not unconstitutional because it prohibits these unprotected categories and the Plaintiffs can continue to pursue the lawful and potentially effective means of advocacy at their disposal.

Indeed, the experience across the nation since the enactment of the AETA and its predecessor act, the AEPA, has been one of radically increasing levels of speech and expressive activity by animal rights extremists – most often vulgar, obscene and obnoxious – and have been conducted without prosecution under these federal acts. The real "chill" that these Plaintiffs feel, and rightfully so, is that when their expressive activities cross from speech to criminal conduct they become subject to prosecution. As discussed *infra*, the experience of the *Amici* has been that such conduct is not merely hypothetical or speculative, but has involved repeated acts of arson, attempted murder, destruction of property, and other serious criminal acts by these animal rights terrorists.

## ARGUMENT

The Plaintiffs claim the AETA unconstitutionally violates their First Amendment rights.  The Plaintiffs are wrong because the First Amendment does not protect terrorism or terrorist acts conducted under the guise of free speech.

**I.   Congress Enacted The AETA And Its Predecessor In Response To Increasing Acts of Terrorism Targeted At Scientists And Medical Researchers Such As The *Amici***

Congress enacted the AETA and its predecessor, the AEPA, in response to very real and increasing acts of domestic terrorism often targeted at researchers like the *Amici* here.  A primary purpose of the legislation was to provide a federal enforcement tool against the reoccurring threats and violent activity perpetrated by several "animal rights" organizations and affiliated individuals against animal enterprises and individuals working for them.  The perpetrators of these acts are fairly dubbed "terrorists" in part because of their underground nature and loosely-affiliated structure, but primarily because their *modus operandi* instills mass fear in the lives of innocent civilians.  Many of these civilians, like the *Amici*, are researchers engaged in studies utilizing laboratory animals because it is required by law and necessary for the development of new medications and treatments.  Consequently, they have weathered a storm of threats and violence and have incurred large personal economic losses.

A primary purpose of the legislation was and is to provide a federal enforcement tool against the reoccurring threats and violent activity perpetrated against individuals and organizations working with animals.  *See, e.g.,* 152 Cong. Rec. H8590, H8591-92 (daily ed. Nov. 13, 2006) (Rep. Scott) (Amendments to the legislation are in response to the rising incidents of violence and threats against individuals like the *Amici* here and the entities that employ them.); *Id.* (The legislation addresses over 1,000 incidents of violent attacks, threats, intimidation, and other illegal acts occurring in the past 15 years.).  Among the perpetrators are individuals, who

are members of or are otherwise associated with organizations like the Animal Liberation Front ("ALF"), Stop Huntington Animal Cruelty ("SHAC"), Band of Mercy ("BoM"), The Justice Department ("TJD"), the Environmental Liberation Front ("ELF"), and others.[1]  *Id.*

These groups are fairly labeled "terrorists" in part because of their loosely-affiliated structure and underground nature.  *See* FBI, TERRORISM IN THE UNITED STATES 1999 17 (1999) [hereinafter "FBI, TERROR REPORT 1999"][2] (noting loosely affiliated extremists, whether domestic or international in nature, pose most urgent terrorist threat in U.S.); *Id.* at 30 (discussing rising concern of loosely affiliated animal rights and environmental extremists); *Id.* at 23 (describing loose affiliations as primary category of international terrorism).  There is even overlap between the environmental and animal rights extremists.  *See, e.g.*, FBI - TERRORISM 2002-2005 3 (2d ed. 2005) [hereinafter "FBI, TERROR REPORT 2002-2005"][3] (ELF and ALF jointly claim responsibility for arson attack and mink release).  Also like international terrorists, they operate underground.  *See, e.g.*, *United States v. Fullmer*, 584 F.3d 132, 139-141 (3d Cir. 2009).  (SHAC website posts anonymous illegal attacks and disclaims any engagement in illegal conduct); FBI, TERROR REPORT 1987-1999, at 3 (ALF website posts laboratory break-in and theft in great detail without claiming credit for the attacks."[4]

---

[1] Not to be confused with the U.S. Department of Justice.

[2] http://www.fbi.gov/stats-services/publications/terror_99.pdf

[3] http://www.fbi.gov/stats-services/publications/terrorism-2002-2005/terror02_05.pdf

[4] Various Internet web sites maintained by these organizations and their supporters post announcements of arson, fire bombings, laboratory break-in, animal theft and other criminal acts in great detail, often with photos, on same day as the attacks, without claiming credit, as "anonymous postings."  Most active here have been the web sites of the North American Animal Liberation Press Office (NAALPO), the Justice Department, and the BoM.

Yet they are fairly labeled "terrorists" primarily because they employ a broad spectrum of methods to instill fear in their targets that ranges from the mailing of HIV-infected razor blades to researchers at Harvard Medical School to the firebombing of the homes and cars of UCLA scientists. *See* Harvard University, *Eight Faculty Members Receive Mail Threats*, HARVARD UNIVERSITY GAZETTE, Oct. 28, 1999[5] [hereinafter "*Harvard Article*"] (Razor blades were inserted into the inside back panels of white business-sized envelopes in order to inflict harm upon opening and mailed to Harvard faculty at Harvard Medical School and Beth Israel Hospital.); ADL, *Animal Rights Extremists Target the University of California*[6] *[hereinafter "ADL Article 2011"];* Andrew Blankstein and Greg Kirkorian, *Fire Set at UCLA Scientist's House*, LOS ANGELES TIMES, Feb. 6, 2008, at B4. A number of these attacks were directed at the *Amici* here.

For example, the ALF claimed responsibility for firebombing the home of Dr. Edythe London in February 2008 and for flooding it just three months earlier. *Id*. In May 2011, animal rights extremists claimed to have sent letters containing a "dangerous present" to both Drs. London and Jentsch. *See ADL Article 2011*; *see also* Michael Martinez, *Activist Group Claims to Send AIDS-Tainted Razors to Animal Researcher*, CNN, Nov. 24, 2010. Jentsch is no foreigner to these threats and attacks as animal rights extremists took credit for blowing up his car in 2009. *See ADL Article 2011.*

---

[5]http://news.harvard.edu/gazette/1999/10.28/threat.html

[6]http://www.adl.org/NR/exeres/FE4F2992-54B2-4E4E-84C5-4C6A9596A7DE,DB7611A2-02CD-43AF-8147-649E26813571,frameless.htm (last visited March 8, 2012)

The effects of these attacks reaches beyond the *Amici* as animal right extremists intending to target *Amici* often mistakenly attack unaffiliated bystanders.  In August of 2006, for example, extremists firebombed the home of a 70 year-old woman when they thought it belonged to *Amicus* Dr. Lynn Fairbanks.  *See* Rebecca Trounson and Joe Mozingo, *UCLA to Protect Animal Research*, LOS ANGELES TIMES, Aug. 26, 2006.[7]  Similarly, these extremists botched an attempt to target *Amicus* Dr. Goran Lacan by firebombing a car at the wrong home.  *See* Andrew Blankstein, *Arson Aimed at UCLA Scientist*, LOS ANGELES TIMES, Nov. 29, 2008.[8]  The attack caused damage to three vehicles, as well as the home of the unaffiliated bystanders.  *See Id.*[9]

The *Amici* here similarly seek to better health care with their research.  For example, much of Dr. London's research focuses on treatments for individuals in overcoming drug and alcohol addiction as well as adolescents overcoming tobacco addiction.  *See, e.g.*, E.D. London et. al., *Neural correlates of affect processing and aggression in methamphetamine dependence*, 68 ARCH. GEN. PSYCHIATRY 271-282 (2011); E.D. London et. al., *Effect of modafinil on learning and task-related brain activity in methamphetamine-dependent and healthy individuals*. 36 NEUROPSYCHOPHARMACOLOGY 950-959 (2011); E.D. London et. al., *Dysregulation of D2-mediated dopamine transmission in monkeys after chronic escalating methamphetamine exposure*. J. NEUROSCIENCE (in press 2012).

---

[7] http://articles.latimes.com/2006/aug/26/local/me-ucla26

[8] http://articles.latimes.com/2008/nov/29/local/me-animal-arson29

[9] Not unlike some of their attacks, these extremists are more often than not entirely misinformed regarding the information upon which they justify their conduct.  *See, e.g.*, 6-7 MICHAEL P. CONN AND JAMES V. PARKER, THE ANIMAL RESEARCH WAR (2008) (One *Amicus* describes how an extremist accused him of torturing Marmosets when he had never even seen a Marmoset).

The extremists target the *Amici* because they are members of medical and scientific communities engaging in laboratory research utilizing animals as required by law.  Laws in the U.S. as well as other nations often require the testing of new pharmaceuticals, treatments, and medical devices and for safety and efficacy on animals in the preclinical trial phase prior to any clinical trial involving human beings. *See, e.g.*, *Fullmer* (noting the laws and regulations of the United States and Europe require animal testing to ensure safety and efficacy of pharmaceuticals, veterinary products, and medical implants).   Many Nobel Prize-winning breakthroughs in science and medicine involved animal testing, including, *inter alia*, the discovery of penicillin, insulin, and the human papilloma virus.  *See generally* Michael P. Conn AND James V. Parker, THE ANIMAL RESEARCH WAR (2008); *see also* Carl Cohen and Tom Regan, 119-123 THE ANIMAL RIGHTS DEBATE (2001).   Treatments for cancer, the human immunodeficiency virus (HIV), and a host of other disorders and diseases have also benefitted from research with laboratory animals.  *See Id.*

As another example, Dr. Jed Rose, then on the UCLA Medical School faculty, was pivotal in pioneering the well-known "nicotine patch," which enabled millions of smokers to break their habit and saved countless lives in recent years. *See, e.g.*, Jed E. Rose et. al., *Precessation Treatment With Nicotine Patch Significantly Increases Abstinence Rates Relative To Conventional Treatment*, 11 NICOTINE & TOBACCO RESEARCH 1021, 1067-1075 (2009).  The *Amici* remain committed to their goal of bettering humanity.

Yet this commitment has not been without a significant cost. What began as a movement in the United Kingdom 20 years ago has become a campaign of intimidation and violence by animal rights extremists in the United States. *See Fullmer*, at 138 (discussing quick rise of England SHAC movement in the early 1990's and the assault of the Huntingdon COO by three masked individuals in front of his London home); FBI, TERROR REPORT 1987-1999, at 30 (first recorded U.S. attack was a 1987 ALF arson in Davis, California). Plaintiff Gazzola was convicted for her role in incidents, including coordinating and participating in a Seattle bombing and making specific threats of violence at a Huntingdon worker's home. *Fullmer*, at 146-49.[10] Similar incidents have occurred across the nation over the past two decades and have caused more than $175 million in damage with single incidents totaling hundreds of thousands of dollars. *See ADL Article 2011*. They have been marked by acts of harassment, death threats, vandalism, and bombings deliberately targeting individuals, including the *Amici* here, their students, colleagues, families, friends, and loved ones. *Id.*[11]

---

[10]Plaintiff Gazzola was videotaped threatening to burn down the individual's home and warning that the police could not protect him or his family. *Id.* at 148. She also stated: "Where were the police when [one individual's] car got flipped over in his driveway? Where were the police when [another individual] had all his windows smashed in and his house covered in red paint in Chicago? And where were the police when your house was covered in red paint a few weeks ago? They can't protect you. "Your injunctions can't stop us. *We'll always find a way around whatever they throw at us.*" *Id.* at 146 (emphasis added). The Seattle smoke bombings were at the offices of Guy Carpenter and resulted in the building evacuation of over 700 people. *Id.* at 149. Guy Carpenter is a Marsh subsidiary, Huntingdon's former insurer. *Id.* at 148. Other SHAC threats included e-mailing a Marsh employee *to ask her how she would feel if they cut up her son and filled him full of poison*. *Id.* at 144. Plaintiffs in this action continue to portray Ms. Gazzola's actions in the prior criminal case as merely protected free speech, for which she was wrongly convicted – a notion that was rejected by the trial court, the Third Circuit, and the U.S. Supreme Court.

[11] While the brief for the Government and the institutional *amici* touch upon these acts, the *amici* here, consisting of the individuals whose very lives have been traumatized by these events, feel it is necessary to address the breadth and depth of these attacks in order to voice their perspective adequately. As such, a more expansive description of select attacks is presented *infra*.

*The Campaign Against the University of California:*  Beginning in 2006, these extremist groups have operated increasingly against University of California (UC) scientists and researchers in the medical areas utilizing animals for laboratory research.  UC scientists involved in animal research and targeted by these extremists include individuals from UCLA, UC Berkeley, UC Davis, UC Irvine, UC San Francisco, UC San Diego, and UC Santa Cruz.  They have been the targets of a widespread campaign of intimidation and violence by animal rights extremists.  In addition to having their homes and cars vandalized and firebombed, they and their families have been harassed and received death threats.[12]  Incidents targeting the *Amici* and others associated with the UC system include the following:

- On May 3, 2011, two animal rights extremist cells claimed that letters, each containing "a dangerous present," had been sent the previous week to *Amici* Drs. Edythe London and J. David Jentsch, UCLA scientists.  *ADL Article 2011.*  The claim was jointly made by the "Justice Department" and the Animal Liberation Brigade (ALB).  *Id.*  The "Justice Department" is a group that has mailed contaminated razor blades to animal researchers at other U.S. universities and injured several people using letter-bombs since the 1990s.  *Id.* The ALB claimed responsibility for explosives at the offices of two companies tied to animal testing in 2003.  *Id.*  Both are offshoots of the Animal Liberation Front (ALF).  *Id.*

- On November 22, 2010, the "Justice Department" claimed responsibility for sending tainted razor blades to *Amicus* Jentsch, warning him, *"STOP YOUR SICK EXPERIMENTS*

---

[12] The campaign against the University of California began several months after an animal rights conference held in Los Angeles – "Animal Rights 2005 National Conference" that featured representatives of the Primate Freedom Project (PFP) and Stop Huntingdon Animal Cruelty (SHAC), a radical animal rights group known for posting on its Web site the names, addresses, phone numbers and other personal information of people who work at companies doing business with its primary target, Huntingdon Life Sciences.

*OR HELL AWAITS YOU*." *Id.*; *see also* Michael Martinez, *Activist Group Claims To Send AIDS-Tainted Razors To Animal Researcher*, CNN, Nov. 24, 2010 (generally discussing the attack). The group claimed that the razor blades were AIDS-tainted. *Id.* They also sent "rusty razor blades tainted with AIDS-infected blood" to Stephanie Groman, a UCLA graduate student working with Jentsch. *ADL Article 2011.* They then issued a second communiqué that week warning animal researchers more broadly, "*Mark our words, we will destroy all who fall into our focus." Id.*

- March and July of 2009 were marked by an additional attack against *Amicus* Jentsch, as well as one against Dr. Michael Selsted, respectively. The ALB took credit for using a homemade explosive device to blow up the car of *Amicus* Jentsch outside his home on March 7, 2009. *Id.*[13] On July 10, 2009, UC Irvine pathologist Dr. Michael Selsted had his home and three vehicles vandalized with paint and paint stripper and the word "killer" spray-painted on his garage door. *Id.* The ALF claimed responsibility and stated in its communiqué: "We can only hope that one day someone will make you suffer as much as the animals in the laboratories you work in." *Id.*

- Extremists made two attacks against *Amici* in November of 2008, including a misplaced car-bomb intended for Dr. Goran Lacan, a UCLA medical researcher. This car bomb destroyed two vehicles outside a woman's home on November 20th and also damaged this woman's property *Id.* Students and Workers for the Liberation of UCLA Primates claimed

---

[13] The statement included a message to the FBI, ostensibly in response to recent attempts by law enforcement agencies to crack down on animal rights extremists' criminal activity. *Id.* "The more legit activists you [expletive] with the more it inspires us since wer're [*sic*] the people whom you least suspect and when we hit we hit hard." *Id.*

responsibility for the attack in a communiqué. *Id.*[14]  The ALF claimed responsibility for an

attack on November 27th at a UCLA clinic that was vandalized with red paint and had its

locks glued shut.  The communiqué described the facility as an "outpost of the murderous

UCLA medical department." *Id.*

- Several firebombs occurred in the summer of 2008.  One of them exploded at night at the

  home of UC Santa Cruz (UCSC) molecular biologist Dr. David Feldheim and forced him

  and his family, who had been sleeping inside, to escape down a fire ladder. *Id.*  Authorities

  described the bomb as a "Molotov cocktail on steroids." *Id.*  Feldheim was one of 13

  UCSC faculty targeted in a pamphlet listing their home addresses and photos with the

  warning: "Animal abusers everywhere beware; we know where you live; we know where

  you work; we will never back down until you end your abuse."[15] *Id.*  Another firebombing

  was of a UCLA commuter van on June 3rd with the ALF claiming responsibility. *Id.*[16]

- February of 2008 also included a firebombing at the home of an *Amicus*, as well as other

  attacks against UCSC faculty.  On February 3, 2008, a firebomb exploded and damaged the

  home of *Amicus* Dr. Edythe London. *Id.; see also* Andrew Blankstein and Greg Kirkorian,

  *Fire Set at UCLA Scientist's House*, LOS ANGELES TIMES, Feb. 6, 2008, at B4.  The ALF

  claimed responsibility for the act in a communiqué and also took credit for flooding

---

[14] This group claimed responsibility for other acts in 2008, including vandalizing three cars in the Santa Monica driveway of a UCLA scientist and stealing three UCLA vans. *Id.*  The Primate Freedom Project (PFP), a group with chapters around the U.S. that describes itself as "dedicated to ending the use of nonhuman primates in biomedical and harmful behavioral experimentation," has also had a key role in the campaign against the University of California. *Id.*

[15] A second firebomb destroyed a vehicle owned by another UCSC animal researcher and a third received a threatening phone message at home the day of the firebombings. *See Id.*

[16] Since then, several other vans have been vandalized and stolen by the ALF and similar groups targeting UCLA. *Id.*

London's home three months earlier.  *ADL Article 2011; see also* Andy Guess, *Going on the Offensive Against Animal 'Liberationists,* INSIDE HIGHER ED., Feb. 21, 2008.[17]   On February 24, 2008, six masked extremists attempted to enter the home of a UCSC scientist during her daughter's birthday party.  *ADL Article 2011.*   One of the intruders hit her husband with an unidentified object before running off with the rest of the group.  *Id.*[18]

- On June 24, 2007, a bomb was left under the car of the late Dr. Arthur Rosenbaum, then chief of pediatric ophthalmology at UCLA's Jules Stein Eye Institute.[19]  *See* Greg Miller, *Animal Extremists Get Personal*, 1829 SCIENCE 1856-58 (2007).   The ALB claimed responsibility for the attempted firebombing in a communiqué which included the doctor's home address and warned: "you need to watch your back because next time you are in the operating room or walking to your office you just might be facing injections into your eyes like the primates, you sick twisted [expletive]."   Patrick Range McDonald, *Monkey*

---

[17]http://www.insidehighered.com/news/2008/02/21/ucla. In its communiqué at that time the ALF threatened to return: "It would have been just as easy to burn your house down Edythe.  As you slosh around your flooded house consider yourself fortunate this time."  *Id.*  The ALF has also threatened London and her family and claimed responsibility for sending "blood and rat poisoned covered razor blades" to her home and planted a fake bomb in the law offices of her husband, which required the daylong evacuation of an office building where over 600 people were affected and suffer economic loses while the Los Angeles Police Department bomb squad located the fake bomb.  *See Id.* (discussing, *inter alia,* the razor blade mailing attack on Dr. London).

[18] In March 2009 four individuals were arrested in connection to the incident, and these suspects are also accused of harassing and intimidating UC Berkeley researchers during demonstrations in front of their homes in October 2007 and January 2008.  *Id.*

[19] Prior to his passing Dr. Rosenbaum is credited with performing over 5,000 surgical procedures to restore the vision in infants and children, and in many cases utilizing procedures developed in research employing laboratory animals.

*Madness at UCLA: Violent Radicals Aim To Kill Jules Stein Eye Institute Researchers Who Test On Animals*, LA WEEKLY, Aug. 09, 2007.[20]

- On June 30, 2006, a bomb intended for *Amicus* Dr. Lynn Fairbanks, was mistakenly left outside a neighbor's home.  *See Id.*  The ALF claimed responsibility for the attempted attack in a communiqué, stating that they had placed a "Molotov cocktail" on Fairbanks' doorstep because of her involvement in animal experimentation.  *Id.*  A Primate Freedom Project (PFP) spokesperson said that Dr. Fairbanks "is riding a gravy train to personal gain, nothing else, and I hope the ALF stops her in her tracks."  *Id.*  In addition to posting Fairbanks' address and photo on its Web site prior to the incident, the PFP site had featured a flyer intended for "distribution in her neighborhood."  *Id.*

-  Animal rights terrorism in the Los Angeles area in recent years extends beyond UCLA.  *Id.*  For example, the ALF claimed responsibility for acts of harassment and vandalism aimed at Los Angeles Mayor Antonio Villaraigosa and Deputy Mayor Jimmy Blackman, as well as their families.  *Id.*  They claimed responsibility for vandalizing the home of Deborah Villar, the sister of Mayor Villaraigosa.  *Id.*  The ALF communiqué issued on the attack listed Los Angeles Animal Services as the target, citing the mayor's refusal "to hire a new manager to stop the carnage of animals in our city."  *Id.*  It warned the Mayor and his family: "next time we throw bottles, they'll be filled with gasoline."  *Id.*  The ALF also claimed responsibility for vandalizing Villar's home, as well as the homes of Blackman and his parents.  *Id.*

---

[20] The communiqué also warned that activists know that "just demonstrating won't stop this kind of evil."  *ADL Article 2011.*  Later, Rosenbaum's wife received a letter with razor blades stating, "If your husband can't stop himself from his obsession to torture monkeys maybe you can.  If not then tell him that we will do exactly what he does to monkeys to you."  *Id.*

***Other Attacks Across the United States:***   The deliberate targeting of university scientists involved in animal research is not a new phenomenon, nor is it limited to California.  *Id.*  For example, a group calling itself Tucson H.A.A.N.D. ("Hooligans Attack at Night, Duh") vandalized the home of Dr. Katalin Gothard, a scientist at the University of Arizona's College of Medicine, on February 20, 2009.  *Id.*  Similarly, researchers at Wake Forest University in North Carolina, *Amici* herein, were also targeted in February 2009.  *Id.*[21]   A sampling of other campuses targeted by animal rights extremists, who have carried out acts of vandalism, animal release, arson and other types of property destruction, includes:

- Johns Hopkins University (JHU), December 2008:  The ALB claimed responsibility for "special letter bombs" sent to researchers.  They accused JHU of being one of the "top violators of the Animal Welfare Act" and promised that "[a]ll responsible for the torture and oppression of innocent beings will soon receive the same treatment."  *See Id.*; *see also* William E. Dyson, Terrorism: An Investigator's Handbook, 467 (4th ed. 2012).

- Oregon Health & Science University (OHSU), December 2007:  The ALF claimed responsibility for vandalizing a researcher's cars outside his home for his primate reproductive work, warning "blatant disregard for the earth, animals and it's [*sic*] resources shall not go unseen by the ever-watching eyes of the ALF."  *ADL Article 2011*.

- University of Utah, April 2007:  The ALF claimed responsibility for vandalizing a neurobiology professor's home in Riverton, causing thousands of dollars in damage by breaking windows, gluing locks shut, and destroying his lawn.  *Id.*  They targeted this scientist on other occasions, including in January 2007 when they vandalized his house and

---

[21]  In a communiqué the "Justice Department" claimed responsibility for mailing razor blades covered in rat poison to two scientists there and warned, "This is only the start – end the experiments on the primate captives or it only gets worse." *Id*

used acid to destroy windows.  The ALF communiqué warned "we will be back repeatedly to destroy your property until animals no longer die for your blood money.  *Id.*  Until you leave the torture business we'll continue to turn your life upside down."  *Id.*

- Louisiana State University (LSU), April 2005:  The ALF claimed responsibility for breaking into a biology lab.  They released caged mice, glued locks shut, broke windows and aquarium glass, and spray-painted ALF slogans on walls.  *Id.*  They also claimed responsibility for a September 2003 break-in at LSU's School of Veterinary Medicine, which resulted in hundreds of thousands of dollars in damage.  *Id.*

- University of Iowa, November 2004:  The ALF took credit for pouring acid on documents, destroying computers, and removing over 400 animals.  *Id.*  They described it as "a methodical effort to cripple the UI psychology department's animal research."  *Id.*

- Brigham Young University (BYU), July 2004:  Fires burned two tractors and more than 3,000 pounds of cardboard at a building on the campus in Provo, Utah.  *See* FBI, TERROR REPORT 2002-2005, at 16.  The incident accompanied vandalism that included spray painting campus buildings with "ALF," "war is on," "you guys are the terrorists," and "this will never end."  *Id.*  Damage estimates were $75, 000.  *Id.*  The incident followed prior vandalism in May.  *Id.*  Harrison Burrows and Joshua Demmitt confessed to these incidents and were sentenced on January 15, 2005.  *Id.*  In March of 2005**,** Jason Hall was charged with a misdemeanor for his alleged role in the fires.  The *For The Record: Public Safety News From Tribune Staff And Wire Reports*, SALT LAKE TRIBUNE, Mar. 26, 2005.[22]

- University of Minnesota, April 1999:  Twelve research laboratories were broken into and vandalized and research animals were stolen, resulting in monetary damages of over $2

---

[22] http://www.sltrib.com/utah/ci_2623089.

million.   FBI, TERROR REPORT 1987-1999, at 3.   On the same day the ALF web page specified the break-ins in exact detail, including the number and species of animals stolen, the buildings and floors of the laboratories, and the vandalism.   *Id.*

- Harvard University, October 1999:  Eight faculty members of Harvard University received threatening letters with razor blades at their places of work, including Harvard Medical School and Beth Israel Hospital.   *See Harvard Article*.   The razor blades were inserted into the inside back panels of white business-sized envelopes in order to inflict harm to anyone opening them by hand.   *Id.*   One such letter read, "You have until autumn 2000 to release all your primate captives and get out of the vivisection industry.   *ADL Article 2011*.   If you do not heed our warning, your violence will be turned back upon you."   *Id.*   The "Justice Department" claimed responsibility for the mailing, which was part of an intended act of violence in which 80 researchers at different universities received threatening letters booby-trapped with razor blades.   *Id.*; *see also Harvard Article.*

- Cornell University, October 1997: Members of the BoM, an earlier incarnation of ALF, destroyed files, ruined blood samples, confiscated paperwork and released cows at the Animal Teaching and Research Unit.   *ADL Article 2011.*

- Michigan State University (MSU), 1992: A firebombing of an animal research laboratory at MSU destroyed years of research and caused $2.5 million in damages.   *ADL Article 2011.* An animal rights spokesperson who was also involved in the incident served over three years in prison for aiding and abetting arson.   *Id.*

- University of Arizona, April 1989:   The ALF claimed responsibility for breaking into university research labs, where they set two fires and released more than 1,100 laboratory animals, causing an estimated $100,000 in damage.   *Id.*

## II.    Freedom Of Speech Has Never Been Unbridled And Has Never Protected Acts Of Terrorism

While drawing the line between protected free speech necessary to a democratic society and unprotected illegal conduct has challenged our Nation since its inception, the First Amendment has never been a shield for terrorism.  Many of the Founding Fathers drew this line in such a way as to provide broader protection for an individual's liberty.  At times, the Supreme Court tightened this protection in the interest of national security by allowing more "speech" to fall into the category of illegal conduct.  Contemporary American law is more in line with the Framer's intent and yet it rightfully continues to deny protection for advocating unlawful behavior and for imposing true threats.  Irrespective of the precise location of this line, the First Amendment does not and must not protect terrorism.

Many of the Founding Fathers envisioned broad protection for free speech in order to generate the marketplace of ideas necessary for democracy; yet even then Freedom of Speech did not protect violence, threats or property damage.  Free speech pre-dates the Constitution and was arguably born in the colony of New York with the 1735 trial of John Peter Zenger.[23]  At the time of its drafting, neither Alexander Hamilton nor James Madison envisioned a need for the first Amendment because they were of the opinion that the Constitution did not delegate governmental power to infringe upon these individual liberties.  *See* JAMES MADISON, 6 THE WRITINGS OF JAMES MADISON 385-401 (Gaillard Hunt ed. 1900-1910); Alexander Hamilton,

---

[23]Zenger was arrested and tried on criminal charges for seditious libel and found not guilty, establishing the beginning of public opposition to trials of seditious libel.  *See generally* PAUL FINKELMAN, A BRIEF NARRATIVE OF THE CASE AND TRYAL OF JOHN PETER ZENGER (2010). Nevertheless, the Supreme Court never ruled on the Constitutionality of the Sedition Act before its speech provisions expired in 1801, only commenting on it retrospectively in *dicta*.  *See New York Times Co. v. Sullivan*, 376 U.S. 254, 276 (1964) ("Although the Sedition Act was never tested in this Court, the attack upon its validity has carried the day in the court of history.").  The repatriations paid for convictions under the Act therefore brought the importance of the First Amendment to light.  *Id.*

*Federalist No. 84*, *reprinted in* 4 THE PAPERS OF ALEXANDER HAMILTON 706 (Harold Syrett ed. 1962); Paul Finkelman, *James Madison and the Bill of Rights:  A Reluctant Paternity*, 1990 SUPREME COURT REVIEW 301-47 (1990) (generally discussing Madison's ambivalence to the bill of rights).[24]   While the Sedition Act was ultimately viewed in poor light, the speech it punished was verbal and written, not "symbolic," and did not involve violent conduct or true threats to personal safety.  *New York Times Co.* at 276.

At times, the Supreme Court narrowed this protection by allowing more speech to fall into the category of illegal conduct.  The Court implemented the "clear and present danger" requirement, *see Schenck v. United States*, 249 U.S. 47, 50-51 (1919) (upholding conviction under the Espionage Act of 1917 for passing out pamphlets on draft opposition), and expanded it to allow governmental restraints on speech that had a "natural tendency and probable effect" to generate illegal conduct.  *See Debs v. United States*, 249 U.S. 211, 216 (1919) (upholding Espionage Act conviction of presidential candidate speech opposing WW-I).  The Court further tightened protection by upholding a criminal statute proscribing speech advocating government overthrow.  *See Gitlow v. New York*, 268 U.S. 652, 669 (1925) (reasoning these utterances ". . .present a sufficient danger of substantive evil to bring their punishment within the range of legislative discretion."); *see also Dennis v. United States*, 341 U.S. 494, 510 (1951) ("In each case [courts] must ask whether the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as necessary to avoid the danger.").  The Court did not protect speech with an attenuated connection to unlawful behavior even without a true threat of violence.

---

[24]Post-ratification, however, Madison pushed for the Bill of Rights and was willing to concede "that in a certain form and to a certain extent, such a provision was neither improper nor altogether useless."  1 Annals of Congress, 1st Cong., 1st Sess., 453; *see also* Finkelman, *James Madison and the Bill of Rights*, at 340-42.

Contemporary American law is more in line with the Framer's intent, but Freedom of Speech is not unbridled and certain unprotected categories remain. Freedom of Speech does not cover criminal acts including arson, assault, destruction of property, and trespass. *See, e.g., Virginia v. Hicks*, 539 U.S. 113 (2003) (no First Amendment protection for trespass); *Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993) (excluding physical attacks from "expressive speech" and noting such attacks are not protected by the First Amendment); *Virginia v. Black*, 538 U.S. 343, 394 (2003) (Thomas, J., dissenting) ("[O]ne cannot burn down someone's house to make a political point and then seek refuge in the First Amendment . . . .").

Though the Court expanded Freedom of Speech to protect abstract discussions of using unlawful behavior, *contra Schenck, Debs,* and *Gitlow, supra*, the incitement of imminent unlawful conduct remains unprotected. *Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969) (*per curiam*). Threats and intimidation are not protected, regardless of whether they involve political rhetoric. *See Virginia v. Black*, 538 U.S. 343, 360 (2003) (A "true threat" is unprotected and includes intimidation "where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death."); *see also United States v. Fulmer*, 108 F.3d 1486, 1491 (1st Cir. 1997)) (adopting reasonably foreseeable standard to uphold conviction of a true threat); *United States v. Viefhaus*, 168 F.3d 392, 396 (10th Cir. 1999) (bomb threats cross threshold of political rhetoric to criminal threat and "[t]he fact that a specific threat accompanies pure political speech does not shield a defendant from culpability"); *cf. United States v. Bellrichard*, 994 F.2d 1318, 1322 (8th Cir. 1993) (affirming liability for "guilty posters" disclosing names and addresses of abortion doctors and noting one "may not escape prosecution for uttering threatening language merely by combining [it] with issues of public concern").

Many Federal statutes exist for the purposes of combating terrorism.   Following the terrorist attacks of September 11, 2001 ("9/11") Congress acted quickly to provide additional law enforcement tools to keep the nation safe with the Patriot Act.[25]   The Act made significant amendments to over 15 federal statutes and increased the investigative powers of U.S. law enforcement agencies.   While the USA PATRIOT Act has been somewhat controversial, Congress has not passed any of the bills proposed to amend it.[26]

### III.   The AETA Is Constitutional Because It Prosecutes Terrorism And The Plaintiffs Have Means Of Advocacy At Their Disposal That Are Both Effective And Lawful

The statutory wording of the AETA and its enforcement are unquestionably aimed at domestic terrorism.   The AETA is a prosecutorial tool for fighting acts of terrorism and its

---

[25] The Act passed the House (H.R. 2975) as the Provide Appropriate Tools Required to Intercept and Obstruct Terrorism (PATRIOT) Act of 2001 on October 12, 2001, and by the Senate as the Uniting and Strengthening America (USA) Act (S. 1510 ) on October 11, 2001.  On October 17, 2001 the Financial Anti-Terrorism Act passed the House of Representatives.  The USA Act and the Financial Anti-Terrorism Act were combined to become the USA PATRIOT Act and signed into law by President Bush on October 26, 2001. In actuality, this Act updated a number of statutes already in effect.   18 U.S.C. §§ 2331 and 2333-2338 were enacted in 1990 as the Antiterrorism Act of 1990, Pub. L. No. 101-519, § 132, 104 Stat. 2240, 2250, but were repealed and subsequently re-enacted as part of the Federal Courts Administration Act of 1992, Pub. L. No. 102-572, 106 Stat. 4506 (1992).  18 U.S.C. § 2339B was enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, § 303(a), 110 Stat. 1214, 1250, and was amended by, *inter alia*, the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), Pub. L. 108-458, § 6603, 118 Stat. 3638, 3762-3764.  18 U.S.C. § 2339C was enacted in 2002 as part of an act to implement the international Anti-Terrorist Conventions, including the International Convention of the Suppression of the Financing of Terrorism, Pub. L. 107-197, § 202(a), 116 Stat. 721, 724. *See*, Abraham Wagner, *Presidential Power in an Age of Terror*, SALTZMAN WORKING PAPER No. 14, Arnold A. Saltzman Institute of War and Peace Studies, Columbia University (June 2010).   The most significant of the amended provisions relating to electronic surveillance are presently before the Ninth Circuit where a number of cases have been consolidated.   *See In Re: National Security Agency Telecommunications Records Litigation*, No. M:06-cv-1791 (C.D. CA 2006); *Amnesty v. Blair,* No. 09-4112 (2d Cir. 2011).

[26]These bills include the Protecting the Rights of Individuals Act, the Benjamin Franklin True Patriot Act, and the Security and Freedom Ensured Act (SAFE), none of which were passed by Congress.   Federal court challenges to various provisions of the Act have been brought on constitutional grounds but as yet none have reached the Supreme Court.

wording targets the unprotected categories of criminal property damage and intimidation.  The Government has sparingly enforced the AETA by limiting its application to unprotected categories.  Since the AETA primarily targets conduct and secondarily targets unprotected "true threats," a decision striking it down would allow Freedom of Speech to shield terrorism.

The AETA fights terrorism and it effectively contains two provisions that respectively proscribe unprotected illegal conduct and threats.  The first provision proscribes intentionally damaging or causing the loss of the real or personal property of an animal enterprise or connected persons or entities.  18 USC § 43(a)(2)(A).  Such a provision cannot receive First Amendment protection because intentionally damaging the real or personal property of another is, by its very nature, illegal conduct and not speech.  *See, e.g.*, M.G.L. c. 226 § 127 (Massachusetts makes the malicious or wanton destruction of real or personal property a felony).

The second prong proscribes intentionally threatening certain individuals by placing them in "reasonable fear of death" or "serious bodily harm."  18 USC § 43(a)(2)(B).  This wording almost identically tracks the wording in *Virginia v. Black*, which declines to protect speech intentionally made to instill "fear of bodily harm or death." At 1548-49.  If anything, the statute proscribes conduct that is even less likely to receive protection because it requires the "bodily harm" to be "serious."   § 43(a)(2)(B).  It also makes room for the reasonableness standard adopted in this Circuit for unprotected "true threats." *Fulmer*, at 1491.[27]  Such fear "reasonably" results from death threats associated with firebombs directed at their recipients.

---

[27]Since the *Amici* here feel the briefs for the Government and for the institutional *Amici* (Docket No. 27) substantially cover the defenses to Plaintiffs' over-breadth and vagueness arguments, they do not repeat them here in order to avoid redundancy.  *See* Def. Br. pp. 16-26; Inst. *Amici* Br. pp. 8-18.  They would, however, like to add one simple point from the perspective of the victims: Whatever the "breadth" or "vagueness" of the wording simply matches the breadth and amorphous nature of the attacks and threats, which range from fire bombs to floods and from death threats in person to e-mails threatening to cut up and poison children.  *See* Part I, *supra*.  If

The AETA is enforced sparingly and only involves fact patterns that include unprotected illegal conduct and true threats.  While Plaintiff's Complaint discusses the dismissal of *United States v. Buddenberg*, *see* Compl. ¶¶ 59-62 (citing 2010 U.S. Dist. LEXIS 78201 (N.D. Ca. July 12, 2010), it neglects to mention that the dismissal was for a lack of specificity in the indictment, which merely recited the elements of the statute, and that any discussion of "breadth" that the court entertained related only to this lack of factual allegations.  *Buddenberg* at 24-25.  Plaintiffs' Complaint further neglects to mention that the same judge had previously denied the criminal defendants' motion to dismiss, which argued the constitutional theories identical to those that the Plaintiffs raise here, s*ee* 2009 WL 3485937 (N.D. Cal. Oct. 28, 2009), and that the FBI investigation leading to the charges were based on unprotected criminal conduct including, forced entry, assault, destruction of property, and death threats.  FBI, *Press Statement: Four Extremists Arrested For Threats and Violence Against UC Researchers* (Feb. 20, 2009) (describing the allegations leading to the arrests).[28]

A number of lawful means of advocacy have proven themselves to be effective and have a less detrimental impact on the fields of medical and scientific research.  For example, Congress has passed and frequently amended the Animal Welfare Protection Act, which sets standards for

---

Congress had specifically enumerated the types of attacks, these extremists could simply evade prosecution by generating new and innovative ways to damage property and instill fear into the lives of the *Amici*.  These extremists have already demonstrated their capability for ingenuity in the field of terror.

[28] http://www.state.gov/m/ds/rls/119478.htm.   Plaintiff's Complaint also paints an erroneous description of the prosecution under the AEPA by broad brushing what it describes as a "myriad of legal and *illegal* conduct" and lumping together what the SHAC-7 defendants were and were not charged for in *Fullmer*.  Comp. ¶¶ 54-58; *contra* 584 F.3d at 138-142 (describing, *inter alia*, destruction of property, trespass at individual's homes, cyber attacks causing company system shut-downs totaling $400,000 in damage, death threats, and bombings).  The SHAC-7 case also involved the inter-state stalking statute.  *Id.*  The factual details of this case, including Plaintiff Gazzola's role in a bombing and death threats, are discussed in Part I, *supra*.  Nevertheless, Plaintiff's discussion of the AEPA is moot because it has been superseded by the AETA.

the treatment of animals intended for research and provides enforcement authority to the Animal

and Plant Health Inspection Service.  *See generally* 7 U.S.C. 2131 *et seq.* (enacted in 1960 and

amended typically to broaden coverage in 1970, 1976, 1985, 1990, 2002, and 2008).[29]  The FDA

has also implemented best practices through the Code of Federal Regulations' "Good Laboratory

Practice for Nonclinical Laboratory Studies."  *See* 21 CFR § 54 *et seq*.

Lawful advocacy also promotes personal accountability among researchers and scientists

and, unlike terrorism, does not entail a negative effect on their communities.  Many researchers

and their employing organizations make a good faith effort to minimize the detrimental affect

research has on animals by seeking out accreditation from the Association for Assessment and

Accreditation of Laboratory Animal Care International and implementing their best practices.

*See generally* National Research Council, *Guide for The Care And Use Of Laboratory Animals*

(8th Ed. 2011).[30]  Unlawful advocacy, especially in the form of threats and property destruction

proscribed by the AETA, however, has a detrimental effect on research and could easily cause

some of our Nation's best minds to leave the field. *See* Part I, *supra*.[31]

Plaintiffs seem to be painfully aware that lawful remedies are available to them.  Plaintiff

Lehr, for example, avers that she has successfully lobbied for a municipal code in Montgomery

---

[29]  Activists lawfully lobby Congress to pass additional bills and Congress has favorably responded in recent years by passing the Animal Fighting Prohibition Enforcement Act of 2007, P.L. 110-22 (signed into law May 3, 2007), introducing The Pet Safety and Protection Act of 2009 (H.R. 3907/S. 1834) in the 110th Congress and reintroducing the bill as the Puppy Uniform Protection and Safety Act (H.R. 5434/S. 3424 in the 111th Congress).

[30]  http://grants.nih.gov/grants/olaw/Guide-for-the-care-and-use-of-Laboratory-animals.pdf

[31]  Of additional note is the fact that the ACLU did not oppose the bill introducing the Act, but only suggested minor changes.  American Civil Liberties Union (ACLU) letter to Hon. James Sensenbrenner, Chairman, House Judiciary Committee and Hon. John Conyers, Ranking Member, House Judiciary Committee, *Re: ACLU Urges Needed Minor Changes to AETA, But Does Not Oppose Bill (S. 3880, the "Animal Enterprise Terrorism Act,"* October 30, 2006.  The final version of the bill did not incorporate these minor changes suggested by the ACLU.

County that forbade the giving away of bunnies and also that she currently distributes educational materials on-line. Comp. ¶¶ 121-22. Plaintiff Johnson engages in public education by showing film screenings of videos related to animal rights. ¶ 159. Plaintiff Shapiro engages in animal rights activism, including public speaking and campaign work. ¶ 111. Plaintiffs can (and do) easily engage in a host of lawful forms of advocacy and expressive activities that do not implicate the AETA because they do not constitute terrorism.

Naturally, then, Plaintiffs' Complaint begs a number of questions. Given Plaintiff Johnson's involvement in showing film screenings, ¶ 159, for example, the Complaint begs the question why Plaintiff Shapiro would fear prosecution for the same conduct. ¶ 114. As a whole, the Complaint begs the question as to why the Plaintiffs desire to strike down a statue, which, by its plain meaning, penalizes unlawful conduct and threats, when they are not being prosecuted and only intend to engage in lawful advocacy. Perhaps Plaintiffs' self-professed engagements in other forms of "advocacy" already answer this question. *See, e.g.*, ¶¶ 79, 81, 105, 136, 147, 155.

## CONCLUSION

The AETA is not unconstitutional because it prohibits illegal conduct and true threats or intimidation, while specifically excluding free speech and related expressive activities. To hold otherwise is to remove an important tool from federal law enforcement and shield that barricades extremists from threatening and violently attacking researchers like the *Amici* here, as well as their colleagues, friends, children, and loved ones, and causing very real economic damager to these victims and their respective institutions. Whatever "fear" the plaintiffs purportedly possess regarding possible prosecution under the AETA for engaging in lawful conduct is certainly far less rationale and far outweighed by the fear that the *Amici* have felt at the hands of extremists

and do feel at the prospect of living without the AETA.  The AETA does not "chill" speech in this area, as experience across the nation has amply demonstrated.

What Plaintiffs can and should fear, and several know from their personal experience, is that when they cross from protected speech to criminal activity, like violence and the destruction of property, they can legitimately expect prosecution.  The First Amendment simply does not contain an escape clause for such criminal acts perpetrated in the name of animal rights or anything else.  Plaintiffs and other animal rights activists do have a well-protected right to speak, march, demonstrate and engage in other expressive activities.  Their self-proclaimed mission does not however, grant them immunity from criminal acts against those they oppose.

For the reasons stated herein, the *Amici* respectfully request that this Court grant the Government's motion and dismiss the Complaint with prejudice.

Dated: April 11, 2012

RESPECTFULLY SUBMITTED,

/s/ Abraham R. Wagner
Abraham R. Wagner (*pro hac vice*)
LAW OFFICES OF ABRAHAM WAGNER
1901 Avenue of the Stars, Suite 200
Los Angeles, CA  90067
(310) 461-1485
arw@it.org

/s/ Brian D. Tobin
Brian D. Tobin (BBO # 679313)
TOBIN & GRUNEBAUM
55 William Street
Wellesley Hills, MA 02481
(781) 237-0877
btobin@tobin.pro

*Attorneys for Amici Curiae Dr. Edythe D. London, Dr. J. David Jentsch, Dr. Peter Whybrow, Dr. Goran Lacan, Dr. Lynn Fairbanks, Dr. John Schlag, Dr. Madeleine Schlag-Rey, Dr. Dario Ringach, Dr. Linda J. Porrino, Dr. Nancy A. Ator, Dr. P. Michael Conn, Dr. Michele A. Basso, Dr. Stephen J. Bergman, Dr. Marilyn E. Carroll, Dr. Bertha Madras, Dr. Jonathan C. Horton, and Dr. Paul Finkelman.*

**CERTIFICATE OF SERVICE**

I certify that on this day I caused a true copy of the above document filed through the CM/ECF system to be sent electronically to the registered participants as identified on the NEF and that paper copies will be sent to those indicated as non-registered participants on the date indicated below.

Date: April 11, 2012   /s/ Abraham R. Wagner
                  Abraham R. Wagner

Howard Friedman
David Milton
Law Offices of Howard Friedman, P.C.
90 Canal Street, 5th Floor
Boston, MA 02114-2022
dmilton@civil-rights-law.com

Alexander A. Reinert
c/o Benjamin N. Cardozo School of Law
55 Fifth Avenue, Room 938
New York, NY 10003
areinert@yu.edu

Rachel Meeropol
Alexis Agathocleous
Center for Constitutional Rights
666 Broadway, 7th Fl.
New York, NY 10012
rachelm@ccrjustice.org

Deanna L. Durrett
United States Department of Justice
Civil Division, Federal Programs Branch
26 Federal Plaza, Room 346
New York, NY 10278
deanna.l.durrett@usdoj.gov