# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SARAHJANE BLUM, RYAN SHAPIRO, LANA LEHR, LAUREN GAZZOLA, and IVER ROBERT JOHNSON III, Plaintiffs, | ) ) ) ) ) ) | |
| v. | ) ) | Civil Action No. 1:11-cv-12229-JLT |
| ERIC HOLDER, in his official capacity as Attorney General of the United States, Defendant. | ) ) ) ) | |

## BRIEF OF *AMICUS CURIAE* AMERICAN CIVIL LIBERTIES UNION OF MASSACHUSETTS IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......................................................................... ii

STATEMENT OF INTEREST OF *AMICUS CURIAE* ............................... 1

INTRODUCTION ..................................................................................... 2

BACKGROUND ........................................................................................ 3

ARGUMENT ............................................................................................. 6

   I.   The AETA Fails to Specify What Conduct it Prohibits. .................................... 6

      A.   The AETA Lacks an *Actus Reus* Provision. .................................... 7

      B.   The AETA's First Amendment Rule of Construction Worsens its
           Vagueness Problem. ................................................................. 8

      C.   The AETA Contains Additional Unclear Terms. ....................... 12

          1.   *"Interfering"* .............................................................. 13

          2.   *"Personal Property"*. ................................................. 14

          3.   *Conspires"* ................................................................ 15

  II.   The AETA is Susceptible to Arbitrary and Discriminatory Enforcement.... 17

      A.   A Statute is Void for Vagueness if it is Susceptible to Discriminatory
           Enforcement. ............................................................................. 17

      B.   The AETA is Susceptible to Arbitrary Enforcement because it Applies to
           Numerous Economic and Property Crimes. ............................... 18

CONCLUSION. ........................................................................................ 21

# TABLE OF AUTHORITIES

## CASES

*Alderwood Assoc. v. Washington Environmental Council,*
635 P.2d 108 (Wash. 1981) ....................................................................................... 11

*Badway v. United States,*
367 F.2d 22 (1st Cir. 1966) ....................................................................................... 14

*Barr v. Galvin,*
626 F.3d 99 (1st Cir. 2010) ......................................................................................... 1

*Bock v. Westminster Mall Co.,*
819 P.2d 55 (Colo. 1991) ........................................................................................... 12

*Cameron v. Johnson,*
390 U.S. 611 (1968) ................................................................................................... 13

*CEASE v. Faneuil Hall Marketplace,*
745 F. Supp. 65 (D. Mass. 1990) ............................................................................... 15

*Cf. Epton v. New York,*
390 U.S. 29 (1968) ..................................................................................................... 16

*CISPES (Committee in Solidarity with People of El Salvador) v. F.B.I.,*
770 F.2d 468 (5th Cir. 1985) ..................................................................................... 10

*City of Houston v. Hill,*
482 U.S. 451 (1987) ............................................................................... 17, 18, 20

*Commonwealth v. Tate,*
432 A.2d 1382 (Pa. 1981) .......................................................................................... 12

*Cramp v. Board of Public Instruction,*
368 U.S. 278 (1961) ................................................................................................... 10

*Dean v. Byerley,*
354 F.3d 540 (6th Cir. 2004) ..................................................................................... 11

*Delaware v. New York,*
507 U.S. 490 (1993) ................................................................................................... 14

*Estate of Charania v. Shulman,*
608 F.3d 67 (1st Cir. 2010) ........................................................................................ 14

*Frisby v. Schultz,*
    487 U.S. 474 (1988) ........................................................................ 11

*Glik* v. *Cunniffe,*
    655 F.3d 78 (1st Cir. 2011)........................................................... 1

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ........................................................... 9, 10, 17

*Herndon v. Lowry,*
    301 U.S. 242 (1937) ..................................................................... 16, 17

*House v. Napolitano,*
    2012 WL 1038816 (D. Mass. Mar. 28, 2012) ........................... 1

*Hudgens v. NLRB,*
    424 U.S. 507 (1976) ...................................................................... 12

*Hutchins v. District of Columbia,*
    188 F.3d 531 (D.C. Cir. 1999) ................................................. 10

*Kolender v. Lawson,*
    461 U.S. 352 (1983) ..................................................... 6, 8, 17

*Lanzetta v. New Jersey,*
    306 U.S. 451 (1939) ...................................................................... 6

*Long v. State,*
    931 S.W.2d 285 (Tex. Ct. Crim. App. 1996) ....................... 8, 9

*Mangual v. Rotger-Sabat,*
    317 F.3d 45 (1st Cir. 2003)......................................................... 10

*NAACP v. Button,*
    371 U.S. 415 (1963) ....................................................................... 6

*NAACP v. Claiborne Hardware,*
    458 U.S. 886 (1982) ........................................... 6, 13, 15, 16

*NLRB v. Retail Store Employees Union Local 1001 (Safeco),*
    447 U.S. 607 (1980) ..................................................................... 11

*Organization for a Better Austin v. Keefe,*
    402 U.S. 415 (1971) ..................................................................... 15

*Papachristou v. City of Jacksonville,*
  405 U.S. 156 (1972) ........................................................................ 17, 20

*Princeton University v. Schmid,*
  455 U.S. 100 (1982) .............................................................................. 11

*Ridley v. Massachusetts Bay Transp. Authority,*
  390 F.3d 65 (1st Cir. 2004) ..................................................................... 1

*Robins v. PruneYard Shopping Center,*
  592 P.2d 341 (Cal. 1979) ...................................................................... 11

*Schleifer v. City of Charlottesville,*
  159 F.3d 843 (4th Cir. 1998) ................................................................. 10

*State v. Schmid,*
  423 A.2d 615 (N.J. 1980) ...................................................................... 11

*United States v. Buddenberg,*
  2009 WL 3485937 (N.D. Cal. 2009) ...................................................... 19

*United States v. L. Cohen Grocery,*
  255 U.S. 81 (1921) ................................................................................... 7

*United States v. Monsanto,*
  491 U.S. 600 (1989) .............................................................................. 14

*United States v. Reese,*
  92 U.S. 214 (1876) ................................................................................ 17

*PruneYard Shopping Center v. Robins,*
  447 U.S. 74 (1980) ................................................................................ 11

*Westfield High School L.I.F.E. Club v. City of Westfield,*
  249 F. Supp. 2d 98 (D. Mass. 2003). ....................................................... 1

## STATUTES AND REGULATIONS

7 U.S.C. § 2131 .......................................................................................... 16

18 U.S.C. § 43 (2002) .......................................................................... passim

18 U.S.C. § 43 (2006) .......................................................................... passim

18 U.S.C. § 248 .............................................................................. 13, 14, 21

18 U.S.C. § 2331 ................................................................................................ 7

22 U.S.C. § 2656 ................................................................................................ 7

28 C.F.R. § 0.85 ................................................................................................. 7

Texas Penal Code § 42.07 ................................................................................. 9

## ADDITIONAL AUTHORITIES

Brian Stelter, *Limbaugh Advertisers Flee Show Amid Storm*, N.Y. TIMES,
      (Mar. 5, 2012), ......................................................................................... 11

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

The American Civil Liberties Union of Massachusetts (ACLUM), a nonprofit membership organization with over 20,000 members and supporters, is a state affiliate of the American Civil Liberties Union (ACLU). ACLUM is dedicated to the principles of liberty, due process, and freedom of expression embodied in the constitutions and laws of the Commonwealth and of the United States. ACLUM often participates in cases implicating those principles, both through direct representation and as *amicus curiae. See, e.g.*, *Glik* v. *Cunniffe*, 655 F.3d 78 (1st Cir. 2011); *Barr v. Galvin*, 626 F.3d 99 (1st Cir. 2010); *Ridley v. Massachusetts Bay Transp. Authority*, 390 F.3d 65 (1st Cir. 2004); *House v. Napolitano*, 2012 WL 1038816 (D. Mass. Mar. 28, 2012); *Westfield High School L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98 (D. Mass. 2003).

The Animal Enterprise Terrorism Act (AETA), 18 U.S.C. § 43 (2006), directly implicates those principles. For the reasons explained below, the AETA is impermissibly vague, in violation of the Fifth Amendment's due process guarantee. ACLUM is concerned that, due to its vague yet sweeping prohibitions, the AETA is undoubtedly chilling—and, if upheld, will continue to chill—speech that is protected by the First Amendment.

ACLUM is also interested in this case because one of the *amicus curiae* briefs submitted in support of the government invokes an October 2006 letter on the AETA written by the national ACLU's legislative office. Br. of *Amici Curiae* Doctors at 23 n.29. That *amicus* brief states that the national ACLU had only minor

disagreements with the bill that was eventually enacted as the AETA. Given the use made of that letter to argue that the statute is constitutional, ACLUM has an interest in expressing its view that the letter has been misused; statements by an affiliated organization in the context of the legislative process are motivated by a wide variety of considerations and do not bar ACLUM's position that the AETA is unconstitutional and should be struck down.

## **INTRODUCTION**

The AETA is impermissibly vague, in violation of the Due Process Clause of the Fifth Amendment. Its vagueness arises from two overarching statutory flaws.

First, the AETA does not enumerate what conduct (or speech) it prohibits. Rather, it omits an *actus reus* provision and offers, in its stead, a vague "rule of construction" that can be understood, at best, only by First Amendment scholars. Second, and perhaps more important, it is susceptible to arbitrary and discriminatory enforcement. As shown below, the AETA could be applied to literally thousands of crimes affecting United States businesses. Yet, in practice, the AETA has been applied only against animal rights activists. That discriminatory enforcement confirms that the AETA is unconstitutionally vague.

Though the AETA's vagueness violates the Fifth Amendment, it threatens to chill speech and conduct protected by the First Amendment. Strident and even coercive speech, including speech that causes losses to businesses, has long been a protected form of expression with a storied history. It has been used, for example, by the civil rights protestors, organized labor, and anti-apartheid advocates. But the

AETA, due to its vagueness, forces an ordinary person to guess whether her speech or expressive conduct about animal rights will result in a criminal prosecution labeling her an animal enterprise "terrorist." Indeed, AETA's unconstitutionally vague terms authorize arbitrary and discriminatory enforcement in an area where the constitution requires the government to regulate with precision.

Perhaps recognizing its vagueness and breadth, Congress sought to insulate the AETA from constitutional challenge by engrafting it with a First Amendment "rule of construction." That rule purports to exclude from the AETA's sweep "any expressive conduct . . . protected from legal prohibition by the First Amendment."

But the rule actually renders the AETA even vaguer. Criminal statutes must be understandable by all ordinary people, but the AETA's rule of construction ensures that the law can be understood, if at all, only by First Amendment experts. Yet even those experts will likely be chilled by the AETA from engaging in certain protected speech and conduct. After all, they cannot be sure that every police officer and prosecutor will share their understanding of the First Amendment.

For these reasons, and those stated below, the AETA is void for vagueness.

## BACKGROUND

The Animal Enterprise Terrorism Act was passed by Congress and signed into law by President George W. Bush on November 27, 2006. The AETA replaced the Animal Enterprise Protection Act (AEPA), which had become law in 1992.

Generally speaking, the AEPA made it a crime to "intentionally damage[] or cause[] the loss of any property (including animals or records) used by the animal

enterprise," if the defendant had "the purpose of causing physical disruption to the functioning of an animal enterprise." 18 U.S.C. § 43(a) (2002). Under the AEPA, an "animal enterprise" included any business where animals are on display—such as a fair, zoo, or rodeo—and any "commercial or academic enterprise that uses animals for food or fiber production, agriculture, research, or testing." *Id.*

The AETA substantially broadened the law's scope. Whereas the AEPA required a showing that the defendant intentionally damaged or caused the loss of "any property . . . used by the animal enterprise," the AETA can be satisfied by any one of three showings: (1) intentional damage to or loss of "any real or personal property . . . used by a animal enterprise"; (2) intentional damage to or loss of "any real or personal property of a person or entity" associated with an animal enterprise; or (3) intentional placement of someone in fear of death or serious injury through a specified "course of conduct. 18 U.S.C. § 43(a)(2) (2006). Similarly, whereas the AEPA required a showing that the defendant's purpose was to cause "physical disruption," under the AETA the government need only show that the defendant's purpose was to "damag[e] or interfer[e] with the operations of an animal enterprise." *Id.* § 43(a)(1).

Neither the AEPA nor the AETA purports to define a particular act, or set of acts, constituting animal enterprise terrorism. Consequently, the portion of the statute defining an "offense" now reads:

> (a) Offense.— Whoever travels in interstate or foreign commerce, or uses or causes to be used the mail or any facility of interstate or foreign commerce—

(1) for the purpose of damaging or interfering with the operations of an animal enterprise; and

(2) in connection with such purpose—

(A) intentionally damages or causes the loss of any real or personal property (including animals or records) used by an animal enterprise, or any real or personal property of a person or entity having a connection to, relationship with, or transactions with an animal enterprise;

(B) intentionally places a person in reasonable fear of the death of, or serious bodily injury to that person, a member of the immediate family (as defined in section 115) of that person, or a spouse or intimate partner of that person by a course of conduct involving threats, acts of vandalism, property damage, criminal trespass, harassment, or intimidation; or

(C) conspires or attempts to do so;

*Id.* § 43(a).

The AETA also drastically expanded the definition of an "animal enterprise." Under the AEPA all "animal enterprises" actually used live animals. But, under the AETA, the term "animal enterprise" includes "a commercial or academic enterprise that uses *or sells* animals *or animal products*" for almost any purpose, including "profit." 18 U.S.C. § 43(d)(1) (2006) (emphasis added). Thus, under the AETA, numerous crimes affect "animal enterprises."

Seeking to provide a boundary for this newly-expanded law, Congress in 2006 gave the AETA a First Amendment "rule of construction." Under that rule, the AETA "shall not be construed . . . to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the Constitution." 18 U.S.C. § 43(e)(1) (2006).

# ARGUMENT

## The AETA is Unconstitutionally Vague.

A criminal statute is void for vagueness unless it "define[s] the criminal offense with sufficient definiteness that [(1)] ordinary people can understand what conduct is prohibited and [(2)] in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357-358 (1983) (citations omitted). The AETA fails both prongs of this test.

## I.    The AETA Fails to Specify What Conduct it Prohibits.

A penal statute like AETA violates due process if it requires ordinary people, "at peril of life, liberty or property[,] to speculate as to [its] meaning." *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939). The prohibition against vagueness is particularly important when a criminal statute threatens to prohibit speech, conduct, or association protected by the First Amendment. Indeed, even when "violence or threats of violence . . . occurs in the context of constitutionally protected activity . . . 'precision of regulation is demanded.'" *NAACP v. Claiborne Hardware*, 458 U.S. 886, 916-917 (1982) (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)). The AETA falls far short of that standard for three principal reasons: (1) it does not affirmatively define a prohibited act; (2) it relies on a rule of instruction that cannot be interpreted by ordinary people; and (3) it relies on vague terms that risk chilling expression protected by the First Amendment.

### A.    The AETA Lacks an *Actus Reus* Provision.

The AETA does not regulate with precision. In fact, its description of an "offense"—in subsection (a)—fails to define a predicate *actus reus* constituting animal enterprise terrorism. Unlike other federal "terrorism" provisions, the AETA does not require a predicate "violent act[] or act[] dangerous to human life."[1] And unlike its predecessor—the Animal Enterprise Protection Act—the AETA does not even require an intended "physical disruption." 18 U.S.C. § 43(a)(1) (2002).

Instead, animal enterprise terrorism under the AETA means *any* act—or any attempt or conspiracy to do any act—that has a nexus with interstate commerce, is done for a specified but broadly-defined *purpose*, and has one of two broadly-defined *effects*. The requisite purpose is "damaging or interfering with the operations of an animal enterprise." 18 U.S.C. § 43(a)(1). The requisite effects are (1) "intentionally damag[ing] or caus[ing] the loss of any real or personal property" associated with an animal enterprise, or (2) "intentionally plac[ing] a person in reasonable fear" of her safety. *Id.* § 43(a)(2). But the terroristic act is never defined.[2]

It is therefore impossible for anyone, even with the help of legal counsel, to know the AETA's boundaries. Even the government acknowledges that the AETA

---

[1] 18 U.S.C. § 2331(1) & (5) (defining "international terrorism" and "domestic terrorism"); *see* 22 U.S.C. § 2656f(d)(2) ("'terrorism' means premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents"); 28 C.F.R. § 0.85 (defining terrorism to require "the unlawful use of force and violence").

[2] *See United States v. L. Cohen Grocery*, 255 U.S. 81, 89 (1921) ("Observe that the section forbids no specific or definite act. . . . It leaves open, therefore, the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against.").

sweeps up numerous (sometimes minor) activities, from trespass to property crimes. U.S. Op. Memo at 8, 17.[3] But the government does not purport to supply a comprehensive description of acts that violate the AETA, and that is because the absence of an *actus reus* provision makes such a description impossible.

### B.   The AETA's First Amendment Rule of Construction Worsens its Vagueness Problem.

Because the AETA's definition of an "offense" could be satisfied by almost any conduct—including expressive conduct—any attempt to square the AETA with the First Amendment hinges on the AETA's first "Rule[] of Construction." 18 U.S.C. § 43(e). That rule provides that the AETA does not "prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the Constitution." *Id.* § 43(e)(1). But, no matter whether that rule can forestall plaintiffs' *First Amendment* challenge, it enhances their *due process* challenge by exacerbating the AETA's vagueness.

For starters, the rule of construction makes First Amendment doctrine— rather than everyday words known by "ordinary people"—the touchstone for AETA liability. *Kolender*, 461 U.S. at 357-358. Yet it is hard to find two legal scholars, let alone every single person of "ordinary" intelligence, who agree on the First Amendment's boundaries.

Accordingly, as Texas's highest criminal court has observed, a First Amendment rule of construction "creat[es] [a] vagueness problem." *Long v. State*, 931 S.W.2d 285, 295 (Tex. Ct. Crim. App. 1996) (en banc). In *Long*, the court struck

---

[3] The government's opening memorandum in support of its motion to dismiss is cited as "U.S. Op. Memo." Its reply memorandum is cited as "U.S. Reply Memo."

down, as unconstitutionally vague, the "stalking" provision of a harassment statute. Although the statute contained a rule purporting to protect "activity in support of constitutionally or statutorily protected rights," Texas Penal Code § 42.07(e), applying that rule "on a case-by-case basis would require people of ordinary intelligence—and law enforcement officials—to be First Amendment scholars." *Long*, 931 S.W.2d at 295. The court rejected that requirement:

> Because First Amendment doctrines are often intricate and/or amorphous, people should not be charged with notice of First Amendment jurisprudence, and a First Amendment defense cannot by itself provide adequate guidelines for law enforcement. Moreover, an attempt to charge people with notice of First Amendment caselaw would undoubtedly serve to chill free expression.

*Id.*

A First Amendment rule of construction is particularly likely to chill free expression because, even when a potential defendant believes that *she* understands First Amendment caselaw, she cannot be sure that all prosecutors and police officers will share her understanding. As the Supreme Court has explained, "where a vague statute 'abut(s) upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of (those) freedoms.'" *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (footnotes omitted). The AETA "abuts" First Amendment freedoms because, under its rule of construction, the AETA's boundary *is* the First Amendment. Faced with such an uncertain and dangerous boundary between protected conduct and criminal conduct, members of the public will of course "'steer

far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked.'" *Id.*[4]

What is more, the AETA's First Amendment rule of construction would itself be vague even to someone who *had* studied First Amendment caselaw. For example, because the rule carves out only "expressive conduct" protected by the First Amendment, rather than *everything* protected by the First Amendment, it is unclear whether it also protects pure speech or conduct reflecting the rights of assembly, association, and the free exercise of religion. Although the government seems to have concluded that subsection (e)(1) protects all of that conduct, its analysis relies on cases interpreting statutory language that is not identical to the AETA. *See* U.S. Reply Memo at 5.[5]

It is also unclear how legal scholars, let alone ordinary people, would interpret the phrase "protected from legal prohibition." That phrase might mean that AETA liability arises from conduct that is not *actually* prohibited in the state or town where it occurred, so long as the conduct is *capable* of prohibition under the First Amendment. For example, certain targeted residential pickets and secondary

---

[4] This substantial chilling effect supports the plaintiffs' claim that they have standing to challenge the AETA. *See Cramp v. Board of Public Instruction*, 368 U.S. 278, 283 (1961) ("The vices inherent in an unconstitutionally vague statute [include] the risk of unfair prosecution and the potential deterrence of constitutionally protected conduct . . . ."); *Mangual v. Rotger-Sabat*, 317 F.3d 45, 59 (1st Cir. 2003) (the threat of prosecution was sufficient to confer standing, "even if it were not likely that the reporter would be convicted" under the challenged statute).

[5] *See Hutchins v. District of Columbia*, 188 F.3d 531, 546 & n.9 (D.C. Cir. 1999) (excluding "religion, freedom of speech, and the right of assembly"); *Schleifer v. City of Charlottesville*, 159 F.3d 843, 853 (4th Cir. 1998) (same); *CISPES (Committee in Solidarity with People of El Salvador) v. F.B.I.*, 770 F.2d 468, 473-474 (5th Cir. 1985) ("rights guaranteed under the First Amendment").

boycotts are *capable* of prohibition. *See Frisby v. Schultz*, 487 U.S. 474, 483 (1988) (upholding an ordinance that prohibited picketing directly in front of a targeted residence); *NLRB v. Retail Store Employees Union Local 1001 (Safeco)*, 447 U.S. 607, 616 (1980) (upholding a prohibition on secondary boycotts in the National Labor Relations Act). Thus, where targeted residential pickets are legal, an activist will have no idea whether engaging in them violates the AETA. *See, e.g.*, *Dean v. Byerley*, 354 F.3d 540, 546 (6th Cir. 2004) (noting that "there is no applicable Michigan statute that bans all targeted residential picketing").

Similarly, sponsors of Rush Limbaugh's radio show were targeted by a secondary boycott after Limbaugh remarked on a law student's sex life. When the boycotters successfully targeted ProFlowers—a former Limbaugh sponsor that sells chocolates presumably made from cow's milk—did they all violate the AETA?[6]

The same uncertainty will arise when state constitutional protections for "expressive conduct" are broader than the protections afforded by the First Amendment. For example, state constitutional law in California, New Jersey, Washington, Colorado, and Pennsylvania would protect an activist who hands out flyers inside a shopping mall asking people to divest their retirement portfolios of the stocks of companies that have been guilty of animal cruelty.[7] But the First

---

[6] *See* Brian Stelter, *Limbaugh Advertisers Flee Show Amid Storm*, N.Y. TIMES, Mar. 5, 2012, at B1.

[7] *Robins v. PruneYard Shopping Center*, 592 P.2d 341 (Cal. 1979), s.c. *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980); *State v. Schmid*, 423 A.2d 615 (N.J. 1980), appeal dismissed *sub nom. Princeton University v. Schmid*, 455 U.S. 100 (1982); *Alderwood Assoc. v. Washington Environmental Council*, 635 P.2d 108

Amendment does not apply in privately-owned shopping malls. *Hudgens v. NLRB*, 424 U.S. 507 (1976). Accordingly, an ordinary person may now have to ask whether such advocacy, though a constitutional right in her state, may nonetheless violate the AETA. Thus, subsection (e)(1) renders the AETA's vagueness problem worse, rather than better.[8]

### C.      The AETA Contains Additional Unclear Terms.

Although the absence of a true *actus reus* requirement and the presence of an unhelpful rule of construction are reason enough to hold that the AETA is void for vagueness, the statute also contains other vague terms. The government argues that this Court can make sense of those provisions by adopting limiting constructions "with an eye toward Congress' intent." U.S. Op. Memo at 26. But, again, the test for vagueness is not whether skilled government lawyers can make sense of a law. It is instead whether law is understandable by ordinary people. With respect to at least three other statutory terms, the AETA is impermissibly vague.

---

(Wash. 1981); *Bock v. Westminster Mall Co.*, 819 P.2d 55 (Colo. 1991); *Commonwealth v. Tate*, 432 A.2d 1382 (Pa. 1981).

[8] The AETA's two other rules of construction—subsections (e)(2) and (e)(3)—also fail to cure its vagueness problem. Although the government claims that subsection (e)(2) provides that "the Act shall not be construed to interfere with activities protected as free speech," U.S. Reply Memo at 5, subsection (e)(2) merely states that the AETA does not "create new remedies" for violations of expression protected by the First Amendment. Similarly, subsection (e)(3) merely states that the AETA does not provide exclusive penalties and does not preempt state or local law.

1.      *"Interfering"*

The AETA applies to conduct done with the purpose of "damaging or interfering" with the operations of an animal enterprise. 18 U.S.C. § 43 (a)(1). For two reasons, it is unclear what Congress meant by "interfering."

First, the term "interfering" is presented in the disjunctive with "damaging," which suggests that the requisite interference need not cause any damage. Second, Congress in 2006 deleted the requirement that the defendant intend some "physical disruption," which suggests that the requisite interference need not involve a physical act. In that context, the term "interfering" is vague enough to suggest that it could be satisfied simply by urging someone to end a business relationship with an animal enterprise. *Claiborne*, 458 U.S. at 891, 894 (theory of liability against organizers of boycott was common-law malicious interference with business).

The government and its *amici* argue that the term "interfere" has survived vagueness challenges involving other statutes. But when the term "interfere" has been approved, it has been part of time, place, and manner regulation that "clearly and precisely delineated" the *kind* of interference at issue. *Cameron v. Johnson*, 390 U.S. 611, 616 (1968) (discussing the picketing of a courthouse in a manner that "unreasonably interfere[d]" with "ingress or egress"). For example, the Freedom of Access to Clinic Entrances Act, while prohibiting "interference" with people obtaining or providing reproductive health services, precisely defines interference as "restrict[ing] a person's freedom of movement." 18 U.S.C. § 248(a)(1), (e)(2). Further,

13

unlawful "interfere[nce]" under the FACE Act requires "force," "threat of force," or "physical obstruction." *Id.* § 248(a)(1). The AETA has no such limitation.

  2.    *"Personal Property"*

The parties skirmish over whether the AETA's "personal property" clause—which prohibits intentionally damaging or causing the loss of "personal property"—proscribes damage of and losses to profits. *See* 18 U.S.C. § 43 (a)(2)(A). While ACLUM agrees with plaintiffs' interpretation, it writes to address another problem with the phrase "personal property." Specifically, even if the government is right that "personal property" excludes lost profits, it remains unclear whether "personal property" includes *other* intangible property.

The Supreme Court has noted that personal property can include intangible personal property such as "dividends, interest, and other securities distributions," *Delaware v. New York*, 507 U.S. 490, 495 (1993), as well as "rights, privileges, . . . [and] claims." *United States v. Monsanto*, 491 U.S. 600, 607 (1989) (quoting 21 U.S.C. § 853(b)). The First Circuit has similarly observed that personal property can include interests in stocks and promissory notes. *Estate of Charania v. Shulman*, 608 F.3d 67, 71 (1st Cir. 2010) (stocks); *Badway v. United States*, 367 F.2d 22, 24 (1st Cir. 1966) (promissory notes). Thus, personal property is often intangible.

Accordingly, the phrase "personal property" in the AETA is impermissibly vague because political campaigns often seek to damage or cause the loss of intangible property. That is precisely the point of boycott and divestment

campaigns.[9] *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) (intent to damage business of "blockbusting" real estate agent); *Claiborne*, 458 U.S. at 911-912 (intent to damage business of white-owned businesses). Even where such activities seek to coerce, that "does not remove them from the reach of the First Amendment." *Keefe*, 402 U.S. at 419. But under the AETA, a person of ordinary intelligence must speculate whether a proposed boycott or divestment campaign will result in their imprisonment.

Although the government correctly observes that the AETA defines "personal property" to "include[e] animals or records," that list hardly excludes intangible property. U.S. Op. Memo at 24. The term "records," after all, could mean records of intangible property. For example, if an activist were to "interfere" with an animal enterprise's distribution of a stock dividend, it is unclear whether the government would be quick to agree that the interference did not affect a "record" within the meaning of the AETA.

3.     *"Conspires"*

Finally, the AETA's conspiracy provision exponentially increases its vagueness and threatens to stifle protected speech, association, and assembly. In *Claiborne*, the Supreme Court noted that the First Amendment forbids attaching civil liability to "'rhetorical' threats of violence by boycott leaders" and "failure to act" against "boycott 'enforcers' [who] caused fear of injury to persons and property."

---

[9] Legitimate protesting and leafleting can be recharacterized as trespassing that harms a business's property. *See CEASE v. Faneuil Hall Marketplace*, 745 F. Supp. 65, 67-68, 74 & n.22 (D. Mass. 1990) (noting the defendant's argument that a protest against cruelty to veal calves harmed restaurants) (Tauro, J.).

458 U.S. at 897 & n.20. Yet the AETA's conspiracy provision could be interpreted to attach criminal liability to speech that is far less incendiary.

Given the AETA's conspiracy provision, activists must now ask whether *any and all* political agitation will risk criminal exposure. It is particularly unclear what overt acts would trigger AETA liability for activists engaged in a divestment campaign.[10] In the context of a call for divestment, could an activist incur AETA liability by posting to the Internet records of an animal enterprise's egregious violations of the Animal Welfare Act? *See* 7 U.S.C. § 2131 *et seq.* The variations on this theme are many, and they confirm that the AETA is that it is unclear in an area that must be regulated with precision.

The AETA is therefore similar to the "attempted insurrection" statute struck down in *Herndon v. Lowry*, 301 U.S. 242 (1937). The statute at issue there proscribed "[a]ny attempt, by persuasion or otherwise, to induce others to join in any combined resistance to the lawful authority of the State." *Id.* at 246 n.2. Though the statute purported to prohibit instigating unlawful conduct, it "amount[ed] merely to a dragnet which may [have] enmesh[ed] any one who agitate[d] for a change of government if a jury can be persuaded that he ought to have foreseen his words would have some effect in the future conduct of others." *Id.* at 263-64. Because it had "no reasonably ascertainable standard of guilt," the statute was too "vague and indeterminate" to survive scrutiny. *Id.*

---

[10] *Cf. Epton v. New York*, 390 U.S. 29, 32 (1968) ("the use of constitutionally protected activities to provide the overt acts for conspiracy convictions might well stifle dissent and cool the fervor of those with whom society does not agree at the moment") (Douglas, J., dissenting from denial of certiorari).

A law against conspiring to cause the loss of personal property is just as incomprehensible as a law against attempted insurrection. Thus, like the law in *Herndon*, the AETA is too vague to withstand constitutional scrutiny.

## II.   The AETA is Susceptible to Arbitrary and Discriminatory Enforcement.

The AETA is also impermissibly vague for a second reason: its susceptibility to, and track record of, arbitrary and discriminatory enforcement.

### A.   A Statute is Void for Vagueness if it is Susceptible to Discriminatory Enforcement.

A statute can be impermissibly vague not only for confusing the public, but also for exposing the public to oppression. "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory applications." *Grayned*, 408 U.S. at 108-09. Laws must therefore provide explicit standards that do not "allow[] policemen, prosecutors, and juries to pursue their personal predilections." *Kolender*, 461 U.S. at 357-358 (citations omitted).

The Supreme Court applied this principle in *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972), and *City of Houston v. Hill*, 482 U.S. 451 (1987), In *Papachristou*, the Court struck down a vagrancy ordinance that essentially allowed the police to prosecute as vagrants people whose guilt of more serious crimes they suspected but could not prove. The Court explained that a legislature cannot "set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." 405 U.S. at 165 (quoting *United States v. Reese*, 92 U.S. 214, 221

(1876)). In *Hill*, the Court struck down Houston's interrupting-an-officer ordinance, which allowed virtually unfettered discretion to arrest people for annoying officers.

The AETA is similarly flawed, for reasons demonstrated by the government's defense of the statute. In response to the plaintiffs' argument that the AETA is not neutral as to content and viewpoint, the government has argued that the AETA prohibits multiple, huge categories of conduct without regard to whether the defendant sought to advance any political message. U.S. Op. Memo at 27-29; U.S. Reply Memo at 19-23. For *precisely* that reason—its sweeping breadth—the AETA is unduly susceptible to discriminatory enforcement.

### B.   The AETA is Susceptible to Arbitrary Enforcement because it Applies to Numerous Economic and Property Crimes.

The AETA may be the broadest criminal statute in the United States Code. Even if the government is correct that the AETA exempts speech—due to its First Amendment rule of construction—it still sweeps up "vandalism, property damage, trespass, harassment or intimidation." U.S. Reply Memo at 17. In fact, it may apply to an astonishing portion of crimes against United States businesses.

To begin, "animal enterprise" under the AETA's 2006 amendments now includes essentially any business that "uses or sells animals or animal products." 18 U.S.C. § 43 (d)(1)(a). That definition includes nearly every supermarket, convenience store, restaurant, coffee shop, and pharmacy in the United States. It also includes every retail establishment or Internet merchant that sells leather goods, including shoe stores, department stores, and book stores. The AETA also

defines "animal enterprise" to include zoos, pet stores, and fairs. Crimes against *any* of those businesses can violate the AETA.

Although the AETA has other requirements, they are easily met by most economic crimes against animal enterprises, and by most acts of violence against animal enterprise employees or associates. A defendant violates the AETA if, for the purpose of damaging or interfering with the operations of an animal enterprise, she intentionally damages or causes loss to an animal enterprise—or any person or entity associated with an animal enterprise—or places in fear someone associated with the animal enterprise. 18 U.S.C. § 43 (a)(2). Although the government has suggested that animal rights activists disproportionately engage in such conduct, *see* U.S. Op. Memo at 27-29, that is not so.

In fact, as the government acknowledges, there is no requirement that the defendant target the animal enterprise *because* of its connection to animals. The government correctly notes that the AETA actually "address[es] destructive, violent, threatening conduct, *regardless of whether the conduct is accompanied by a message or not, and regardless of what that message might be.*" U.S. Reply Memo at 23 (emphasis added); *see also United States v. Buddenberg*, 2009 WL 3485937, *8 (N.D. Cal. 2009) ("Defendants are correct that a wide variety of expressive and *non-expressive conduct* might plausibly be undertaken with the purpose of interfering with an animal enterprise") (emphasis added).

On its face, then, the AETA is an omnibus crime statute. It prohibits all manner of intentional "damage" against all manner of businesses. To be sure, the AETA might apply to certain acts by animal rights activists. But it also applies to:

- Every act of graffiti affecting an "animal enterprise";

- Every act of shoplifting from a supermarket;

- Every intentional trespass or disruption at numerous retail establishments;

- Every assault against a convenience store clerk; and

- Every libelous statement on the Internet about an online animal enterprise, from Amazon to Zappos.

Accordingly, a neutral application of the AETA would *not* have a disparate impact on animal rights activists. If the FBI and federal prosecutors were so inclined, they could fill their dockets with AETA prosecutions. That fact means that the AETA is exactly like the statutes invalidated in *Papachristou* and *Houston v. Hill*: "The ordinance's plain language is admittedly violated scores of times daily . . . yet only some individuals -- those chosen by the police in their unguided discretion -- are arrested." *Hill*, 482 U.S. at 466-67.

In exercising their unguided AETA discretion, prosecutors and law enforcement officers are unmistakably discriminating against animal rights advocates. Run-of-the-mill trespassers and vandals are never been prosecuted under the AETA. Nor are shoplifters. Nor are people who lie on the Internet. Instead, as the government concedes, *"only self-identified animal rights activists have been prosecuted under the AETA.*" U.S. Op. Memo at 29.

The AETA is therefore unlike the FACE Act, on which the government relies. U.S. Op. Memo at 28-29. The FACE Act actually prohibits a narrow class of conduct: "force, threat of force, or [] physical obstruction" of reproductive health services providers and patients. 18 U.S.C. § 248. That narrow prohibition is violated only occasionally, and it is typically violated by anti-abortion protestors. So the *neutral* application of the FACE Act can be expected to yield a disparate impact on that group.

That is not the case with the AETA. Though thousands of people have surely violated the AETA, the government has prosecuted *only* animal rights advocates. That is not the neutral application of a law that has a disparate impact, as the government has argued. It is the discriminatory application of a law that gives virtually unbridled discretion to police and prosecutors.

## <u>Conclusion</u>

The AETA does not clearly define "animal enterprise terrorism," and it is so broad that numerous crimes could be prosecuted as "animal enterprise terrorism." Yet the only people being prosecuted under this statute are those who have protested the inhumane treatment of animals. That treatment is a serious and legitimate subject of debate, and it should not be stifled by a vague criminal statute. This Court, therefore, should deny the defendant's motion to dismiss and hold that the AETA is void for vagueness.

Respectfully submitted,
AMERICAN CIVIL LIBERTIES
UNION OF MASSACHUSETTS
By its attorneys,

/s/ Matthew R. Segal                    /s/ David J. Nathanson
Matthew R. Segal                        David J. Nathanson
BBO No. 654489                          BBO No. 633772
Sarah R. Wunsch                         Wood & Nathanson, LLP
BBO No. 548767                          227 Lewis Wharf
John Reinstein                          Boston, MA 02109
BBO No. 416120                          617-248-1806 telephone
ACLU of Massachusetts                   866-807-4618 facsimile
211 Congress St., 3rd Flr.              dnathanson@woodnathanson.com
Boston, MA 02110
617-482-3170 telephone                  Cailen LaBarge
617-451-0009 facsimile                  BBO No. 682572
msegal@aclum.org                        351 Dorchester St, apt 1
                                        Boston, MA 02638
                                        518-330-9539 telephone
                                        cmlabarge@gmail.com

Dated: May  21, 2012

22

<u>Certificate of Service</u>

I hereby certify that this document, which was filed on this date through the ECF system, will be sent electronically on this date to the following registered participants in this matter:

Howard Friedman
David Milton
Law Offices of Howard Friedman, P.C.
90 Canal Street, 5th Floor
Boston, MA 02114-2022
dmilton@civil-rights-law.com

Alexander A. Reinert
c/o Benjamin N. Cardozo School of Law
55 Fifth Avenue, Room 938
New York, NY 10003
areinert@yu.edu

Rachel Meeropol
Alexis Agathocleous
Center for Constitutional Rights
666 Broadway, 7th Fl.
New York, NY 10012
rachelm@ccrjustice.org

Deanna L. Durrett
United States Department of Justice
Civil Division, Federal Programs Branch
26 Federal Plaza, Room 346
New York, NY 10278

<u>/s/ David J. Nathanson</u>
David J. Nathanson

Date: May 21, 2012