UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SARAHJANE BLUM; RYAN SHAPIRO; | * | |
| LANA LEHR; LAUREN GAZZOLA; and | * | |
| IVER ROBERT JOHNSON III, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 11-12229-JLT |
| | * | |
| ERIC HOLDER, in his official capacity as | * | |
| Attorney General of the United States of | * | |
| America, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM

March 18, 2013

TAURO, J.

I.      Introduction

Plaintiffs Sarahjane Blum, Ryan Shapiro, Lana Lehr, Lauren Gazzola, and Iver Robert

Johnson III, dedicated animal rights activists, bring this facial and as-applied challenge to the

Animal Enterprise Terrorism Act ("AETA"),[1] a criminal statute that prohibits acts of violence

against animal enterprises and the persons and entities connected with those enterprises. Plaintiffs

argue that the AETA is overly broad and discriminates on the basis of content and viewpoint, in

violation of the First Amendment to the Constitution, and is impermissibly vague, in violation of

the Fifth Amendment. Before the court is Defendant U.S. Attorney General Eric Holder's motion

to dismiss the complaint for lack of standing and failure to state a claim. After carefully

---

[1] 18 U.S.C. § 43 (2006).

considering both sides' oral arguments and written briefs,[2] the court concludes that Plaintiffs lack

Article III standing to bring their challenges. Accordingly, Defendant Holder's Motion to Dismiss

[#11] is ALLOWED.

II.      Factual Background[3]

Each plaintiff has a strong, personal commitment to animal rights advocacy. In total, they

have devoted more than eighty years to animal rights efforts, and some of the plaintiffs have

dedicated their life's work to advancing the humane and ethical treatment of animals. Their efforts

span a wide range of issues and tactics. Plaintiffs have fought to improve conditions for rabbits,

ducks and geese, and dolphins and other cetaceans. They have exposed cruelties in the foie gras

industry, educated the public about slaughter and factory farming, and organized public charities

and anti-fur protests. They have engaged in letter-writing campaigns, public protests, and lawful

picketing, and undertaken non-violent acts of civil disobedience. Because Defendant Holder

challenges Plaintiffs' Article III standing to sue, the court summarizes each plaintiff's prior

activities and future intentions regarding animal rights advocacy in some detail.

a.      Sarahjane Blum

Blum has devoted twenty-three years to animal rights advocacy.[4] After one year of

college, she decided to delay her education to throw herself full-time into her animal rights work.[5]

Her early efforts focused on an anti-fur campaign spearheaded by the New York City Animal

---

[2] The court acknowledges the helpful contributions of amici on both sides of these important constitutional issues.

[3] The facts are presented as alleged in the Complaint [#1] and in the light most favorable to Plaintiffs.

[4] Compl. ¶ 14 [#1].

[5] Compl. ¶ 68.

Defense League ("NYC ADL").[6] She participated in lawful public demonstrations, engaged in

non-violent civil disobedience, and led trainings on non-violence and advocacy.[7]

After three years traveling the country to engage in animal-specific campaigns and public

speaking, Blum shifted her focus to exposing the cruelties of the foie gras industry.[8] She co-

founded GourmetCruelty.com, a grassroots coalition, with Plaintiff Shapiro. The coalition

conducted a nationwide investigation of foie gras farms, and Blum personally visited one farm

many times, both during the day, when the farm was open to the public, and at night.[9] At the end

of their investigation, Blum, Shapiro, and other organizers "rescued and rehabilitated" a number

of animals from the foie gras farm.[10]

Blum's work culminated in the release of a short documentary, *Delicacy of Despair:*

*Behind the Closed Doors of the Foie Gras Industry*. She openly acknowledged her role in both

the undercover investigation and the open rescue operation, which led to her arrest in 2004 for

trespassing.[11]

Although Blum remains committed to her efforts to expose the practices of the foie gras

industry, her willingness to engage in activism has declined significantly in the past several years.

In 2006, seven members of the United States branch of Stop Huntingdon Animal Cruelty[12]

("SHAC") were convicted of violating the Animal Enterprise Protection Act of 1992 ("AEPA"),[13]

---

[6] Compl. ¶ 69.

[7] Compl. ¶¶ 69-70.

[8] Compl. ¶ 75.

[9] Compl. ¶¶ 77-78.

[10] Compl. ¶ 79.

[11] Compl. ¶¶ 79, 81.

[12] Although Plaintiffs refer to the organization as "Stop Huntington Animal Cruelty," the court notes that the correct spelling is "Huntingdon." See United States v. Fullmer, 584 F.3d 132, 137 (3d Cir. 2009).

[13] 18 U.S.C. § 43 (1992).

the predecessor statute to the AETA, and sentenced to between one and six years in prison. Blum had worked closely and developed friendships with several of the defendants, and she was shocked and devastated by their prosecution and imprisonment as terrorists.[14] She became even more concerned when Congress passed the AETA in 2006. Blum had knowingly violated the law through acts of civil disobedience in the past, but she did not want to risk prosecution and sentencing as a terrorist under the AETA.[15] For a combination of reasons, including depression caused by her friends' imprisonment, fear of prosecution, and increased responsibilities as her mother's caretaker, Blum withdrew from advocacy.[16]

Recently, Blum has decided to reengage in animal rights activism. The Minneapolis Animal Rights Collective has approached her, hoping to learn from her expertise in raising public awareness of the foie gras industry and pushing for a ban on foie gras production.[17] To assist its efforts, Blum would like to lawfully investigate conditions at the Au Bon Canard foie gras farm in Minnesota by obtaining permission to enter the farm and document conditions, entering the farm during the day while it is open to tours, and documenting conditions visible from public property. She would like to publicize the results of her investigation online and at local and national events and organize letter-writing and protest campaigns to raise public awareness and pressure local restaurants to stop serving foie gras.[18] But Blum has refrained from undertaking any of these actions for fear of prosecution under the AETA.

---

[14] Compl. ¶ 82.
[15] Compl. ¶ 83.
[16] Compl. ¶ 84.
[17] Compl. ¶ 86.
[18] Compl. ¶ 87.

Blum would also like to resume her work as a public speaker. In 2010, she received an invitation to speak at an animal rights conference in Seattle. She wanted to show *Delicacy of Despair*, but she refrained from doing so, as she has refrained on other occasions, for fear that if she successfully convinces people to stop buying foie gras, the farms will lose profits and she will be vulnerable to prosecution under the AETA for causing a loss of personal property.[19] Blum would like to speak openly and specifically about her belief that undercover investigation and open rescue are effective advocacy tools, even if sometimes illegal.[20] But she feels chilled from doing so for fear of prosecution. In short, passage of the AETA has chilled Blum's speech and left her feeling inadequate as an animal rights activist.[21]

b.     Ryan Shapiro

Shapiro has spent twenty years furthering animal rights causes.[22] He began as a member of his high school's Animal Rights Club, where he focused on vegetarian outreach and anti-factory farming issues.[23] Shapiro subsequently earned a film degree from New York University's Tisch School of the Arts, where he coordinated an anti-fur campaign in 1995 and co-founded the NYC ADL. He also co-founded an NYU organization, Students for Education and Animal Liberation ("SEAL"), which remains active under a different name.[24] Through these groups, Shapiro organized non-violent civil disobedience and lawful protests at fur stores, circuses, laboratories,

---

[19] Compl. ¶ 91.
[20] Compl. ¶ 88.
[21] Compl. ¶ 94.
[22] Compl. ¶ 15.
[23] Compl. ¶ 100.
[24] Compl. ¶ 101.

and universities. He participated in outreach efforts, led civil disobedience trainings, and spoke at grassroots animal conferences across the country.[25]

In 2001, Shapiro moved to Washington, D.C., where his advocacy focused on investigation and public education relating to the foie gras industry. He joined forces with Plaintiff Blum to spearhead a bi-coastal movement to ban foie gras.[26] Like Blum, Shapiro was arrested in 2004 for his involvement in open rescue, pleaded guilty to misdemeanor trespass, and was sentenced to perform community service.[27] He has been arrested many times in relation to his animal rights work.[28]

During the anti-foie gras campaign, Shapiro became convinced that animal rights activists should focus on issues of factory farming. He concluded that exposing the actual conditions on these farms through video documentation was the most effective way to garner change, more effective than either the civil disobedience or public protest he had undertaken in the past. Because of his background in film and experience with the anti-foie gras campaign, Shapiro felt particularly qualified for this work.[29] But the arrest and prosecution of SHAC members stunned him as well. He had lived and worked with several of the defendants, and he worried that peaceful protest and civil disobedience had become too risky. In particular, he worried that he may have been charged as a terrorist for his 2004 open rescue, had it occurred just years later.[30]

Shapiro's concerns led him to withdraw significantly from animal rights advocacy. Instead, he pursued a Ph.D., focusing on national security conflicts over animal protection and the

---

[25] Compl. ¶ 102.
[26] Compl. ¶ 104.
[27] Compl. ¶ 105.
[28] Compl. ¶ 102.
[29] Compl. ¶ 106.
[30] Compl. ¶¶ 107-08.

marginalization of animal protectionists as security threats.[31] He still engages in leafleting, public

speaking, and campaign work, but he worries that these methods are less effective than exposing

the underlying industry cruelties.[32] He would like to lawfully document animal rights abuses, but

he has refrained from doing so out of fear of prosecution under the AETA.[33] The AETA has

chilled him from participating in lawful protest and investigation of animal cruelty.[34]

      c.      <u>Lana Lehr</u>

Lehr has approximately fifteen years of experience as an animal rights activist.[35] She is the

founder and managing director of RabbitWise, an all-volunteer, public charity committed to the

proper care and treatment of companion rabbits. RabbitWise focuses on improving rabbit

retention rates, educating owners on best practices, and advocating for general rabbit welfare.[36]

Lehr had worked with Friends of Rabbits, a non-profit organization focused on rescue and care,

but her desire to focus on a wider range of issues, including experimentation and use of rabbit fur,

led her to found RabbitWise.[37]

RabbitWise has provided Lehr with numerous advocacy opportunities. In 2005, the

organization convinced a hotel to cancel an Easter "rabbit raffle" when Lehr learned that the hotel

did not have a permit to raffle live animals. When another hotel planned a "bunny brunch," using

live rabbits as decorations, Lehr convinced it to allow RabbitWise members to attend the brunch

with information on rabbit care. The hotel later informed Lehr that it would not feature live

---

[31] Compl. ¶ 110.
[32] Compl. ¶ 111.
[33] Compl. ¶ 111.
[34] Compl. ¶ 115.
[35] Compl. ¶ 116.
[36] Compl. ¶ 117.
[37] Compl. ¶ 120.

animals at future events. These successes encouraged Lehr to organize a letter-writing campaign to hotel chains explaining the repercussions of rabbit giveaways. Her efforts resulted in a local county ordinance prohibiting distribution of live animal prizes on county property.[38]

Lehr has also participated in anti-fur campaigns. She organized monthly protests in front of a store that sells fur and sometimes brought rabbits with her to facilitate meaningful interaction and education. All of the protests that Lehr attended were completely lawful and properly permitted.[39] She has never engaged in civil disobedience or been arrested.[40] Indeed, she pays particular attention to the legality of the events she attends because, as a licensed psychotherapist, she worries that an arrest would cause her to lose her license and livelihood. She must renew her license annually and is routinely asked whether she has been arrested.[41]

The AETA has chilled Lehr's participation in advocacy efforts. She has stopped attending anti-fur protests for fear of prosecution. She no longer brings rabbits with her to restaurants that serve rabbit meat. Although Lehr would like to continue attending lawful, peaceful protests, she has not attended any anti-fur or animal rights protest since 2009. She has stopped passing out literature at events attended by rabbit breeders and limits her advocacy to letter-writing campaigns, petitions, and conferences.[42]

d.      Lauren Gazzola

Gazzola has devoted at least fifteen years to animal rights activism.[43] While attending NYU, she worked with Plaintiff Shapiro in the NYC ADL and SEAL. She focused primarily on

---

[38] Compl. ¶ 121.
[39] Compl. ¶ 124.
[40] Compl. ¶ 125.
[41] Compl. ¶ 128.
[42] Compl. ¶¶ 126-28, 130-31, 133.
[43] Compl. ¶ 135.

fur use and vivisection, and she has participated in both lawful protests and non-violent acts of

civil disobedience. She has been arrested on several occasions.[44]

During her last year of college, Gazzola interned with In Defense of Animals, a national

animal rights organization. She secured a full-time position with the organization after college and

worked there for approximately six months.[45] She then moved on to SHAC, where from 2001 to

2004 she organized protests, drafted educational materials and press releases, gave interviews,

conducted Internet research on Huntingdon and affiliated companies, and collaborated with other

organizers to steer the direction of the SHAC campaign.[46] Gazzola was arrested and convicted

under the AEPA in 2004 for her involvement with SHAC, including for making true threats

against individuals and for planning and executing SHAC's illegal activities.[47] She was sentenced

to fifty-two months in prison and is currently on probation.[48]

Having served her sentence, Gazzola would like reimmerse herself in lawful animal rights

campaigns protected by the First Amendment. She understands that the First Amendment protects

theoretical advocacy of illegal action and expressions of support for violations of the law. She also

understands that the First Amendment protects lawful residential protests, as long as they comply

with municipal and state ordinances.[49] But the AETA, and her previous arrest, have chilled her

from engaging in advocacy that involves both of these tactics. For example, in 2011 she received

an invitation to speak at a law school about her AEPA criminal conviction. She said that, "I'd do

---

[44] Compl. ¶¶ 135-36.
[45] Compl. ¶¶ 137-38.
[46] Compl. ¶ 138.
[47] Compl. ¶¶ 139-41; see United States v. Fullmer, 584 F.3d 132, 157 (3d Cir. 2009).
[48] Compl. ¶ ¶ 134, 139.
[49] Compl. ¶ 142.

it again. It was all worth it."[50] She wanted to conclude by adding, "So go do it," but she refrained

for fear that this statement could serve as evidence of a conspiracy to violate the AETA.[51] The

AETA has chilled her from participating in provocative advocacy that seems to her obviously

protected by the First Amendment.

     e.       <u>Iver Robert Johnson III</u>

Johnson first came to animal rights advocacy about ten years ago, when he was in middle

and high school.[52] He organized and attended weekly, lawful anti-fur protests at a department

store and participated in some acts of peaceful civil disobedience. He attended protests at

circuses, rodeos, and fur farms.[53]

After graduating from high school in 2001, Johnson worked part time as a delivery driver

for a vegan restaurant and devoted most of his energy to the emerging SHAC campaign. A native

of Chicago, Johnson became a leader in the SHAC Chicago movement. He organized weekly

protests of businesses associated with Huntingdon Life Sciences, which usually drew between ten

and twenty protestors.[54] He also organized several regional SHAC demonstrations each year.

These attracted between one and two hundred people.[55] Johnson's SHAC advocacy focused

primarily on lawful and peaceful picketing, public education, and outreach.[56] He has been arrested

many times for disorderly conduct and similar offenses.[57]

---

[50] Compl. ¶ 146.
[51] Compl. ¶ 147.
[52] Compl. ¶ 18.
[53] Compl. ¶¶150-51.
[54] Compl. ¶¶ 152-53.
[55] Compl. ¶ 154.
[56] Compl. ¶ 155.
[57] Compl. ¶ 157.

Since the 2006 convictions of the SHAC members, Johnson has faced significant obstacles to his advocacy efforts. He attended a 2007 protest in Chicago when Huntingdon Life Sciences sought to be re-listed on the New York Stock Exchange. Upon arrival, Johnson encountered more than forty police officers in riot gear and not a single other protestor.[58] Johnson spent approximately six months organizing protests attended by only four or five people. The activists that he reached out to said they were too afraid of terrorism charges to protest.[59] In response, Johnson shifted his focus from lawful protest to public education and support for imprisoned animal rights activists.[60]

Johnson moved to New York City in 2011 to attend the New School.[61] He had hoped to recommit himself to animal rights activism. Unfortunately, Johnson has not found an active animal rights community in which to participate. Local activists are chilled from engaging in protests out of fear of prosecution under the AETA. Johnson has attended individual protests, but he has not found sustained and carefully planned campaigns. After delaying his education and devoting more than a decade to animal rights, Johnson feels dismayed at the effect the AEPA and AETA have had on his community.[62]

III.    Analysis[63]

---

[58] Compl. ¶ 158.
[59] Compl. ¶ 158.
[60] Compl. ¶ 159.
[61] Compl. ¶ 160.
[62] Compl. ¶ 161.
[63] "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Warth v. Seldin, 422 U.S. 490, 501-02 (1975); see Benjamin v. Aroostook Med. Ctr., Inc., 57 F.3d 101, 104 (1st Cir. 1995) (explaining that the appropriate standard of review "differs little from that used to review motions to dismiss under Fed. R. Civ. P. 12(b)(6)").

Defendant Holder moves to dismiss Plaintiffs' complaint under Rule 12(b)(1) for lack of subject matter jurisdiction. He argues that Plaintiffs lack Article III standing to sue because they have not alleged any specific, actual harm suffered. He also asserts that their claims are not ripe for review because they have not alleged any concrete plan to engage in proscribed activity.

Every plaintiff bringing suit in federal court must establish Article III standing. Standing consists of both constitutional and prudential dimensions. To satisfy the constitutional aspect, a plaintiff must establish three elements.

> "First, the plaintiff must have suffered an 'injury in fact'–an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical." ' Second, there must be a causal connection between the injury and the conduct complained of–the injury has to be 'fairly trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' "[64]

Over this constitutional framework, the Supreme Court has laid several prudential limitations on standing. These include " 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.' "[65]

A plaintiff always must establish the constitutional elements of standing.[66] In certain situations, however, courts relax the prudential requirements. Most relevant here, the Supreme Court has relaxed the prohibition on raising the rights of others in the context of pre-enforcement

---

[64] Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 46 (1st Cir. 2011) (quoting Ariz. Christian Sch. Tuition Org. v. Winn, 131 S. Ct. 1436, 1442 (2011)).

[65] Osediacz v. City of Cranston, 414 F.3d 136, 139 (1st Cir. 2005) (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)); see Nat'l Org. for Marriage, 649 F.3d at 46.

[66] Osediacz, 414 F.3d at 141.

facial challenges.[67] Because a facial challenge necessarily implicates the rights of others, relaxing

this prudential requirement allows important First Amendment cases to proceed.[68] Nevertheless,

"the constitutional requirements apply with equal force in every case."[69]

Thus, every plaintiff bringing a pre-enforcement facial challenge to a criminal statute must

establish an injury-in-fact. This presents a challenge for Plaintiffs because "[b]y definition, . . . the

government has not yet applied the allegedly unconstitutional law to the plaintiff, and thus there is

no tangible injury."[70] Plaintiffs therefore have two options. First, they may allege "an intention to

engage in a course of conduct arguably affected with a constitutional interest, but proscribed by

[the] statute," where "there exists a credible threat of prosecution."[71] Second, they may allege that

they are "chilled from exercising [their] right to free expression or forgoe[ ] expression in order to

avoid enforcement consequences."[72]

In each case, the issue turns on whether there is a credible threat of enforcement.[73] In

other words, "fear of prosecution must be 'objectively reasonable.' "[74] "Determining objective

reasonableness demands a frank consideration of the totality of the circumstances, including the

nature of the conduct that a particular statute proscribes."[75] Although a court "will assume a

---

[67] Id. at 140-41.

[68] Id.

[69] Nat'l Org. for Marriage, 649 F.3d at 46.

[70] Id. at 47.

[71] Mangual v. Rotger-Sabat, 317 F.3d 45, 56-57 (1st Cir. 2003) (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)).

[72] Id. at 57 (quoting N.H. Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 13 (1st Cir. 1996)).

[73] N.H. Right to Life, 99 F.3d at 14.

[74] Mangual, 317 F.3d at 57 (quoting R.I. Ass'n of Realtors, Inc. v. Whitehouse, 199 F.3d 26, 31 (1st Cir. 1999)).

[75] R.I. Ass'n of Realtors, Inc., 199 F.3d at 31.

credible threat of prosecution in the absence of compelling contrary evidence,"[76] a plaintiff must

allege an intention to engage in activity "that could reasonably be construed to fall within the

confines" of the act.[77] A subjective chill does not suffice.[78] Rather, the plaintiff "must establish

with specificity that [he or] she is 'within the class of persons potentially chilled.' "[79] Thus, to

determine whether Plaintiffs have alleged an objectively reasonable chill, this court must make an

initial determination of whether a reasonable reading of the AETA would proscribe their proposed

conduct.[80]

After carefully considering Plaintiffs' allegations, this court concludes that they have failed

to allege an objectively reasonable chill and, therefore, failed to establish an injury-in-fact. The

court does not doubt Plaintiffs' deeply held commitment to animal welfare or the sincerity of their

personal fear of prosecution under the AETA. Nevertheless, Plaintiffs have not alleged an

intention to engage in any activity "that could reasonably be construed" to fall within the statute.[81]

In reaching this conclusion, the court focuses primarily on two of the AETA's five

subsections. First, the AETA defines the offense as follows:

> Whoever travels in interstate or foreign commerce, or uses or causes to be used
> the mail or any facility of interstate or foreign commerce–
>
> > (1) for the purpose of damaging or interfering with the operations of an
> > animal enterprise; and

---

[76] N.H. Right to Life, 99 F.3d at 15; see Mangual, 317 F.3d at 57.

[77] Ramirez v. Sanchez Ramos, 438 F.3d 92, 99 (1st Cir. 2006); see Osediacz v. City of Cranston, 414 F.3d 136, 141 (1st Cir. 2005).

[78] Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1152 (2013); Laird v. Tatum, 408 U.S. 1, 13-14 (1972); Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 47 (1st Cir. 2011).

[79] Nat'l Org. for Marriage, 649 F.3d at 47 (quoting Osediacz, 414 F.3d at 142).

[80] See Ramirez, 438 F.3d at 99; R.I. Med. Soc'y v. Whitehouse, 66 F. Supp. 2d 288, 302 (D.R.I. 1999), aff'd, 239 F.3d 104 (1st Cir. 2001).

[81] Ramirez, 438 F.3d at 99.

(2) in connection with such purpose–

(A) intentionally damages or causes the loss of any real or personal property (including animals or records) used by an animal enterprise, or any real or personal property of a person or entity having a connection to, relationship with, or transactions with an animal enterprise;

(B) intentionally places a person in reasonable fear of the death of, or serious bodily injury to that person, a member of the immediate family (as defined in section 115) of that person, or a spouse or intimate partner of that person by a course of conduct involving threats, acts of vandalism, property damage, criminal trespass, harassment, or intimidation; or

(C) conspires or attempts to do so;

shall be punished as provided for in subsection (b).[82]

After establishing penalties, restitution, and statutory definitions, the AETA concludes with rules

of construction.

Nothing in this section shall be construed–

(1) to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the Constitution;

(2) to create new remedies for interference with activities protected by the free speech or free exercise clauses of the First Amendment to the Constitution, regardless of the point of view expressed, or to limit any existing legal remedies for such interference; or

(3) to provide exclusive criminal penalties or civil remedies with respect to the conduct prohibited by this action, or to preempt State or local laws that may provide such penalties or remedies.[83]

---

[82] 18 U.S.C. § 43(a) (2006).
[83] 18 U.S.C. § 43(e) (2006).

15

Read straightforwardly, the AETA criminalizes: 1) intentionally damaging or causing the loss of real or personal property; 2) intentionally placing a person in reasonable fear of death or serious bodily injury; and 3) conspiring or attempting to commit either of these two acts.

And this is how both the AETA and its predecessor AEPA have been enforced. For example, the Third Circuit affirmed SHAC members' convictions under the AEPA of conduct including campaigns of intimidation and harassment, unlawful electronic civil disobedience, and true threats, such as threatening to burn someone's house down.[84] As another example, two defendants pleaded guilty to violating the AETA by allegedly trespassing on a mink farm, releasing 500 animals, and vandalizing the property.[85] Plaintiffs have not directed this court to any case charging as an AETA violation the type of conduct in which they seek to engage.[86]

Plaintiffs have not alleged an intention to engage in any activity prohibited by the AETA.[87] The conduct they seek to participate in - lawful and peaceful advocacy -  is very different: documenting factory conditions with permission, organizing lawful public protests and letter-writing campaigns, speaking at public events, and disseminating literature and other educational materials. None of Plaintiffs' proposed activities fall within the statutory purview of intentionally damaging or causing loss of real or personal property or intentionally placing a person in reasonable fear of death or serious injury.

Plaintiffs' main argument to the contrary, that "personal property" must be read to include loss of profits, is unavailing. First, the court must read the term "personal property" in light of the

---

[84] See United States v. Fullmer, 584 F.3d 132 (3d Cir. 2009).

[85] See United States v. Viehl, No. 2:09-CR-119, 2010 WL 148398, at *1 (D. Utah Jan. 12, 2010).

[86] See Compl. ¶¶ 53-66.

[87] See Osediacz v. City of Cranston, 414 F.3d 136, 141 (1st Cir. 2005) ("It is, therefore, not surprising that . . . the party mounting a facial challenge at the very least desired or intended to undertake activity within the compass of the challenged statute.").

words around it, specifically "animals or records" and "real property."[88] In this context, personal property cannot reasonably be read to include an intangible such as lost profits. Second, the definitions section of the statute specifically defines the term "economic damage" to include "loss of profits."[89] The court cannot reasonably read these two distinct terms - "personal property" and "economic damage" - to have the same meaning.

The AETA's rules of construction dispel any remaining doubt about the plain meaning of the statutory offense. Rather than exempting otherwise prohibited conduct, as Plaintiffs propose, the rules provide that any ambiguities be resolved in favor of granting full First Amendment rights. But Plaintiffs do not present an ambiguous case. Indeed, the rules of construction explicitly confirm the plain meaning of the offense: it does not prohibit "peaceful picketing" and "other peaceful demonstration."[90] Because by their own allegations Plaintiffs seek to engage only in lawful conduct protected by the First Amendment, they have failed to allege an objectively reasonable chill.[91]

## III.    Conclusion[92]

This court recognizes the significance of Plaintiffs' challenges to the AETA's constitutionality. An allegation that a statute chills fundamental First Amendment rights is very serious, and the court accords their challenge careful scrutiny and attention. The court also appreciates that, in pre-enforcement challenges, issues of standing may appear to blur into

---

[88] See 18 U.S.C. § 43(a)(2)(A) (2006).

[89] See 18 U.S.C. § 43(d)(3) (2006).

[90] See 18 U.S.C. § 43(e)(1) (2006).

[91] The court notes that Plaintiff Johnson does not appear to feel chilled at all. In addition to failing to establish an injury-in-fact, his claims raise concerns about causation and redressability.

[92] Because the court concludes that Plaintiffs lack standing, it need not reach Defendant Holder's ripeness argument or the merits of the case.

determination of the merits.[93] Nevertheless, even in this sensitive context, Plaintiffs must establish

all of the constitutional requirements for Article III standing. Although Plaintiffs personally fear

prosecution under the AETA, they have failed to establish an objectively reasonable chill on their

First Amendment rights. Where Plaintiffs seek to engage in lawful and peaceful investigation,

protest, public-speaking, and letter-writing, the court cannot reasonably conclude that these

actions fall within the purview of a statute requiring intentional damage or loss to property or

creation in an individual of a reasonable fear of death. Because Plaintiffs have therefore failed to

establish Article III standing, Defendant Holder's Motion to Dismiss [#11] is ALLOWED.


AN ORDER HAS ISSUED.

/s/ Joseph L. Tauro
United States District Judge

---

[93] See, e.g., R.I. Med. Soc'y v. Whitehouse, 66 F. Supp. 2d 288, 302 (D.R.I. 1999).